801 P.2d 1216
**Gene Francis STUART,
Petitioner-Appellant,**

v.

**STATE of Idaho, Respondent.**

No. 17014.

Supreme Court of Idaho.

Oct. 16, 1990.

Robert E. Kinney, Orofino, for petitioner-appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen. (argued), Boise, for respondent.

## ON DENIAL OF PETITION FOR REHEARING

1990 Opinion No. 35, issued March 12, 1990, is hereby withdrawn and this opinion is substituted therefor.

BAKES, Chief Justice.

The appellant, Gene Francis Stuart, appeals the district court's denial of his petition for post conviction relief. Stuart was convicted of first degree murder by torture of three-year-old Robert Miller, committed on September 19, 1981. He was sentenced to death. His conviction and sentence were affirmed by this Court on direct appeal. *See State v. Stuart*, 110 Idaho 163, 715 P.2d 833 (1985). In June, 1986, Stuart filed a petition for post conviction relief with the district court. The petition claimed twelve separate grounds for relief.

In December of 1986, the district court issued an opinion rejecting the petition and gave Stuart notice that the court intended to dismiss the petition pursuant to I.C. § 19-4906. The opinion rejected the vast bulk of Stuart's grounds for relief because those issues had been decided on direct appeal, no petition for rehearing had been filed, and thus they were *res judicata*. The district court went on to find that three other grounds, while not *res judicata*, did not raise any legal issue or questions of fact which would entitle Stuart to either a hearing or any legal relief.

Stuart filed a reply to the district court's notice of intent to dismiss which included the affidavits of his counsel, a hospital employee David Simmons, Lynn Matteoni and her daughter Katrina. Each of these four affidavits alleged factual matters relating to evidence which had not been previously presented and which Stuart felt was sufficient to warrant an evidentiary hearing.

The affidavit of David Simmons, an acquaintance of Stuart, related that Stuart had sought advice from him concerning the discipline and upbringing of the victim. The trial court concluded that Simmons' lay opinion given to Stuart, whom he knew only casually, did not constitute newly discovered evidence such as would require a hearing.

The other affidavits were related. The affidavits of Ms. Lynn Matteoni and her daughter Katrina purported to contradict testimony given at trial by the State's witnesses which had portrayed Stuart as a person who abused and misused women and children. The Matteonis' affidavits alleged that their experience with Stuart indicated that he was a gentle, loving and caring person. Ms. Matteoni's affidavit declared that in 1975-76, while she was separated from her husband, she spent considerable time with Stuart in an informal relationship. She stated that her two young daughters also spent time with Stuart and that they were extremely fond of Stuart. The affidavit further stated that Stuart cared for both of the children while Ms. Matteoni worked and that he was against spanking children for discipline. She further states that the "allegations of abuse made by Vicki Nelson [against Stuart] have been related to me in part by Gene's attorney. From my experience with Gene Stuart, he showed no signs whatsoever of any type of abusive behavior toward me or my children, very much in contrast to the testimony of Vicki Nelson as the same was related to me." Finally, Ms. Matteoni explains that she was unaware of the charges and trial and was therefore unable to come forward and testify at that time. Ms. Matteoni's daughter Katrina's affidavit stated that she was 5 years of age when Stuart was dating her mother. She stated that he took care of them, did not punish them and that she was willing to testify in greater detail to her recollections of Stuart.

Stuart's attorney filed an affidavit which attempted to set out a foundation as to the circumstances which precluded the Matteonis from testifying during the original proceeding. The affidavit indicated that (1) Stuart was denied sufficient investigative assistance prior to trial, and (2) due to the insufficient assistance he was unable to contact the Matteonis until a considerable time after the trial. The attorney's affidavit described his attempts to contact Lynn Matteoni which were "all to no avail." The affidavit goes on to point out that he finally was put in contact with Ms. Matteoni by her mother in October of 1986 and that he was able to contact Ms. Matteoni in January of 1987. Additionally, Stuart's attorney's affidavit set forth certain background facts regarding Stuart's allegation

that certain plea bargaining negotiations resulted in the sentencing being arbitrary.

After considering Stuart's response to the court's December 23, 1986, order, the district court issued a second opinion in May of 1987. That opinion again reviewed two of Stuart's grounds for post conviction relief covered in the first opinion and additionally dealt with the claim of newly discovered evidence set out in the affidavits. In this second opinion, the district court held (1) that the use of preliminary hearing testimony at the sentencing was lawful and that, therefore, the petitioner's allegation was legally insufficient and required no hearing; (2) that Stuart's sentence was not imposed in an arbitrary manner; and (3) that the allegation that newly discovered evidence was proffered by the affidavits did not meet the standard set in *Drapeau v. State*, 103 Idaho 612, 651 P.2d 546 (Ct. App.1982), in that it failed to raise a substantial question of fact which would probably change the conviction or sentence, thus requiring an evidentiary hearing.

Stuart appealed to this Court, and on March 10, 1989, we issued our opinion affirming the district court's denial of Stuart's petition for post conviction relief. Stuart petitioned for rehearing, which petition was granted on June 12, 1989. After additional briefing and reargument, we conclude that the district court did not err in denying Stuart's petition for post conviction relief, and affirm the district court's judgment dismissing Stuart's petition for post conviction relief. Our March 10, 1989, opinion is withdrawn, and this opinion is substituted therefor.

I

In this appeal from the trial court's dismissal of the petition for post conviction relief, Stuart argues that the trial court erred in summarily dismissing his petition without conducting an evidentiary hearing on the issues. The district court's decision to dismiss Stuart's petition without an evidentiary hearing was based on I.C. § 19–4906(b), which reads:

**19–4906. Pleadings and judgment on pleadings.—** ...

(b) When a court is satisfied, on the basis of the application, the answer or motion, and the record, that the applicant is not entitled to post-conviction relief and no purpose would be served by any further proceedings, it may indicate to the parties its intention to dismiss the application and its reasons for so doing. The applicant shall be given an opportunity to reply within 20 days to the proposed dismissal. In light of the reply, or on default thereof, the court may order the application dismissed or grant leave to file an amended application, or direct that the proceedings otherwise continue. Disposition on the pleadings and record is not proper if there exists a material issue of fact.

This Court has held that it is appropriate to dismiss an application for post conviction relief without affording an evidentiary hearing, under this statute, if the allegations, though uncontroverted, do not entitle the applicant to relief. *Clark v. State*, 92 Idaho 827, 452 P.2d 54 (1969). In this case, the district court's two memorandum decisions are complete and well reasoned. In the first opinion the district court correctly observed that substantially all of Stuart's claims had been raised in the direct appeal, *State v. Stuart*, 110 Idaho 163, 715 P.2d 833 (1985), and thus were res judicata. Of those issues remaining, the trial court found that they were legally insufficient. Specifically regarding the claim of newly discovered evidence, the district court stated that "[c]onsidered as a whole, this new evidence does not raise material questions of fact, especially when viewed against the backdrop of the overwhelming evidence produced at trial. To be sure, this evidence would probably not have affected the conviction or the sentence." We have reviewed the record to determine whether a genuine question of material fact existed and we conclude that the district court did not err in dismissing Stuart's petition for post conviction relief. We review each of Stuart's contentions separately below.

II

Stuart argues that three separate grounds existed for the district court to

grant a hearing on his petition for post conviction relief. Those grounds are (A) the use of preliminary hearing testimony for purposes of sentencing; (B) Stuart's claim that his rights were violated by plea bargaining negotiations; and (C) newly discovered evidence which was raised by the four affidavits submitted to the district court. In the rehearing granted by this Court on June 12, 1989, Stuart raises for the first time the issue of whether or not there was a proper weighing of the mitigating circumstances against *each* of the aggravating circumstances as required in our April 4, 1989, opinion in *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989). We will deal with each of these in turn.

## A.

### *Use of Preliminary Hearing Testimony*

Stuart argues that the trial court erred by considering preliminary hearing testimony at the sentencing hearing. This issue was not raised by Stuart in his direct appeal, *State v. Stuart*, 110 Idaho 163, 715 P.2d 833 (1985). Nonetheless, Stuart alleges that the error is "fundamental" and can be raised at any time.

The trial court in this case considered testimony from the transcript of the preliminary hearing, relying upon our decision in *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), which upheld the use of preliminary hearing testimony in sentencing in a death penalty case. The Court in *Osborn* based its decision on our earlier decision in *State v. Coutts*, 101 Idaho 110, 113, 609 P.2d 642, 645 (1980), which held that "in the absence of an explicit request for the

formal hearing contemplated by I.C. § 19-2516, the court may reach its sentencing decision by receiving the unsworn formal statements presented by both sides, together with the presentence report and arguments of the respective counsel." The district court noted that Stuart did not make any explicit request for a formal hearing contemplated by I.C. § 19-2516, and that Stuart himself "intend[ed] to rely on trial testimony and argument, and was not demanding strict compliance with the live testimony formality of I.C. § 19-2516." We conclude that under *State v. Osborn* and *State v. Coutts*, the use of a preliminary hearing transcript at the sentencing/aggravation/mitigation hearing was not error where no formal sentencing hearing as provided in I.C. § 19-2516 had been requested.[1]

## B.

### *Plea Bargain*

Next, Stuart has contended that the State offered not to recommend the death penalty if Stuart pleaded guilty to first degree murder by torture. Stuart rejected the offer. According to Stuart it follows that, by exercising his right to a jury trial, the death penalty was imposed arbitrarily, and in violation of the appellant's rights under the fifth and fourteenth amendments to the United States Constitution, and art. I, §§ 7 and 13, of the Idaho Constitution. The district court rejected this contention, pointing out that it was petitioner who first offered to plead guilty to manslaughter which was rejected by the State. The State, on the other hand, offered to withdraw the request for a death penalty for a

1. The trial court in its post conviction decision also denied Stuart's claim, specifically pointing out that in Stuart's original direct appeal to this Court, *State v. Stuart*, 110 Idaho 163, 176, 715 P.2d 833, 846 (1985), this Court had held that "[i]t was stipulated at the sentencing hearing that when sentencing the defendant the court would consider evidence presented at the preliminary hearing and trial along with the presentence investigation report." In *Stuart I*, the direct appeal, the validity of Stuart's death sentence was considered by this Court, and no issue regarding the use of the preliminary hearing testimony in the sentencing proceeding was raised. Nor did Stuart file a petition for rehear-

ing from our decision in *Stuart I* contesting our statement that "[i]t was stipulated at the sentencing hearing that when sentencing the defendant the court would consider evidence presented at the preliminary hearing and trial along with the presentence investigation report." *State v. Stuart*, 110 Idaho at 176, 715 P.2d at 846. We need not decide whether it is now too late for Stuart to question the trial court's post conviction finding that it was stipulated at the sentencing hearing that the court could consider evidence presented at the preliminary hearing. Under our prior decisions in *State v. Osborn* and *State v. Coutts*, the trial court did not err in considering the preliminary hearing testimony.

guilty plea to first degree murder, which was rejected by Stuart. Thus, while negotiations were entered into, no arrangement was ever made. The trial court noted the provision in I.C.R. 11(d) which expressly permits the prosecuting attorney and the defendant to "engage in discussions with a view toward reaching an agreement that upon the entering of a plea of guilty to a charged offense ... the prosecuting attorney will ... make a recommendation ... for a particular sentence...." The trial court further noted that I.C.R. 11(d)(2) and (4) make it clear that the sentencing court is not bound to accept any such sentencing arrangement. Thus, the court concluded that there was no merit to the petitioner's contention that, by entering into negotiations, his constitutional right to a jury trial had been violated. We agree with the district court's analysis of I.C.R. 11. Stuart cites no relevant contrary authority.

## C.

### New Evidence

Finally, Stuart argues that newly discovered evidence, not available to him at the time of trial, has created a material issue of fact which would affect the conviction and/or the sentence imposed on him. The new evidence was contained in the four affidavits, summarized above, which were submitted to the district court. In rejecting Stuart's claim the district court relied on *Drapeau v. State*, 103 Idaho 612, 651 P.2d 546 (Ct.App.1982), stating the rule as follows: "In analyzing the evidence produced at trial with this new evidence, this court must determine whether a substantial question of fact exists which would probably change the conviction or sentence, thus, requiring an evidentiary hearing." The district court's opinion goes on to review the evidence produced at trial in detail and holds that "as a whole, this new evidence does not raise material questions of fact ... and would not have ... affected the conviction or sentence." We agree.

■ The petitioner in a post conviction relief proceeding has the burden of proving, by a preponderance of the evidence, the allegations which he contends entitle

him to relief. *Estes v. State*, 111 Idaho 430, 725 P.2d 135 (1986). In analyzing a petition for post conviction relief, to determine whether or not a hearing is required, the standard which a district court must follow was set out in *Cooper v. State*, 96 Idaho 542, 531 P.2d 1187 (1975):

> When the alleged facts, even if true, would not entitle the applicant to relief, the trial court may dismiss the application without holding an evidentiary hearing. ... Allegations contained in the application are insufficient for the granting of relief when [1] *they are clearly disproved by the record of the original proceedings,* or [2] *do not justify relief as a matter of law.*

96 Idaho at 545, 531 P.2d at 1190 (emphasis added). The requirements for obtaining a new trial based upon newly discovered evidence were set out in *State v. Drapeau*, 97 Idaho 685, 551 P.2d 972 (1976), where this Court, quoting from 2 C. Wright, Federal Practice & Procedure: Criminal § 557 (1969), stated:

> Accordingly, rather exacting standards have been developed by the courts for motions of this kind. A motion based on newly discovered evidence must disclose (1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence is material, not merely cumulative or impeaching; (3) that it will probably produce an acquittal; and (4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendant.

97 Idaho at 691, 551 P.2d at 978. Based upon the foregoing standard, the district court did not err in denying Stuart's claim to a hearing based upon his allegations of newly discovered evidence as set out in the affidavits.

### 1. The Simmons affidavit

■ The Simmons affidavit indicated that, before the killing of Robert Miller by Stuart, Simmons knew Stuart on a casual basis, beginning in 1981. They originally met in conjunction with Stuart's body shop business in Orofino, Idaho, and later also visited in a local cafe. Simmons lived in

Orofino, as did Stuart. Simmons was employed at the State Hospital North in Orofino.

Simmons stated in his affidavit that in late August or early September, 1981, less than one month before Stuart killed Robert Miller, and during one of their conversations at the Lumbermen's Cafe, "Mr. Stuart requested my advice concerning discipline and upbringing of Robert Miller, a young child of Mr. Stuart's girlfriend with whom he was residing." Simmons further stated, "Stuart indicated he was having difficulty determining the extent to which he could discipline young Robert Miller without inflicting physical harm." Simmons also indicated that Stuart had told him that he, Stuart, had been raised by an extremely strict and stern father who used alcohol and who inflicted physical abuse on Mr. Stuart and other members of his family.

The trial court did not err in refusing to grant a hearing based upon the Simmons affidavit. The affidavit on its face shows that the evidence contained therein was not newly discovered and that it could have been obtained before trial with reasonable diligence. Stuart himself was a party to these discussions, and presumably was well aware of what Simmons said and could have produced that evidence at trial had he thought it to be beneficial to his case. Simmons lived and worked in the same town, Orofino, as the defendant and his counsel and was easily accessible to them if they had felt his testimony would have been either admissible or beneficial. No showing was made in either the affidavit of Stuart's counsel or in Simmons' affidavit why he was not contacted as a witness. Simmons states in his affidavit that he was aware that Stuart was charged with murder by torture, arising from the death of Robert Miller, and because no one requested his assistance as a witness he did not come forward. Aside from the serious problem of admissibility of the lay opinions and advice given by Simmons to Stuart, all of those conversations were known to Stuart since he personally participated in them, and the witness was at all times available to testify had the defendant and

his counsel thought that the evidence might have been helpful. The trial court did not err in rejecting Stuart's claim that the Simmons affidavit contained either newly discovered evidence or evidence which would probably have changed the conviction or sentence, thus requiring an evidentiary hearing. As this Court stated in *State v. Drapeau*, 97 Idaho 685, 551 P.2d 972 (1976), *quoting from* 2 C. Wright, Federal Practice & Procedure: Criminal § 557 (1969):

> Although defendants are tireless in seeking new trials on the ground of newly discovered evidence, motions on this ground are not favored by the courts and are viewed with great caution. No court wishes a defendant to remain in jail if he has discovered evidence showing that he is not guilty, but after a man has had his day in court, and has been fairly tried, there is a proper reluctance to give him a second trial.

97 Idaho at 691, 551 P.2d at 978. The matters contained in Simmons' affidavit were not "unknown to the defendant at the time of trial," and the trial court found that the evidence probably would not produce an acquittal or change the sentence. Accordingly, those allegations did not meet the test of this Court's decision in *Drapeau*, and the trial court did not err in denying a hearing based upon the affidavit of David Simmons as supported by the affidavit of Stuart's counsel.

### 2. The Matteoni affidavits

The other affidavits from Lynn Matteoni and her teenage daughter Katrina Matteoni, supplemented by the affidavit of Stuart's counsel, were directed toward Stuart's efforts at trial to show the jury that he was not an abuser of women or their children. These affidavits, executed in February of 1987, concerned a relationship between Lynn Matteoni, her daughter Katrina, and Stuart twelve years earlier during the period August, 1975, through December, 1976. Matteoni and Stuart had become acquainted at their common place of employment. At that time Lynn Matteoni and her children were separated from

her husband, and her affidavit states that during 1975 and 1976 she regularly stayed either at Stuart's home, or he stayed at her home. After they commenced living together, Matteoni ceased employment where Stuart was employed and became employed as a bartender which required her to work until late in the evening. Matteoni's affidavit describes how Stuart would pick up her daughters at Matteoni's parents' home, who were taking care of them during the day, and take them home until Lynn Matteoni got off work. The older of the two children at the time was 5 or 6 years of age and the younger approximately 1 year old.[2] The affidavit of Lynn Matteoni stated that she and her children felt a very strong bond toward Stuart, and at no time did he give her any indication whatsoever that he would strike or harm anyone. She further stated that he opposed spanking children and that "he would not allow me to spank the children in his presence, and often indicated that if a parent had to resort to spanking he or she had lost control of the situation." Matteoni stated in her affidavit that in December of 1976 they separated because Stuart wanted to marry her but she refused. She stated that even though she had been abused both physically and mentally by her former husband she was unable to bring herself to commence divorce proceedings against her husband. She also stated that she was fearful that her relationship with Stuart would change if they were to marry. She stated her reticence was not caused by any conduct on the part of Stuart.

In concluding that the Matteoni affidavits did not contain newly discovered evidence that would probably produce an acquittal or change the sentence, the trial court stated:

> Initially, this court takes exception to petitioner's conclusion that conviction resulted almost totally from the testimonial evidence of ex-wives and girlfriends. On the contrary, this court is of the opinion that most of the evidence at trial surrounded the actual tortuous acts committed by petitioner on the victim. A sufficient review of this factual evidence is provided in the Supreme Court's opinion, Stuart, 110 Idaho at 165–167 [715 P.2d 833], and does not merit repetition here. Suffice it to say that the victim, a toddler, was subject to some very depraved, brutal and demoralizing physical and mental abuses. Most of the evidence at trial centered upon the nature of the victim's many injuries and the manner in which they were inflicted. This evidence focused on the main issues of torture and causation.
>
> The testimony of ex-wives and girlfriends was offered on the issue of intent. The new evidence is offered to contradict that testimony. The state correctly points out that the evidence at trial indicated that petitioner's pattern of abuse only began after he had complete control and domination of the woman or children he was with. It is evident that although Matteonis lived with petitioner, it was not under the same conditions of control as testified to at trial. Indeed, evidence was presented to the trial and sentencing court that petitioner had at least one relationship with a woman who he did not abuse. The Matteonis' affidavits even tend to support the state's theory of petitioner's actions.

As the trial court noted in its opinion, not all of the evidence at trial was that petitioner abused every woman with whom he came in contact. There was evidence of others that he did not, and the Matteonis' experience with Stuart would only have been cumulative of this other evidence. As this Court held in State v. Drapeau, 97 Idaho 685, 551 P.2d 972 (1976), evidence,

---

**2.** The typed affidavit of Katrina Matteoni, executed February 21, 1987, states that she was then 17 years of age, in February of 1987, and was 5½ years of age in August of 1975 when her mother first began dating the defendant Stuart. However, the affiant in handwriting corrected the affidavit both as to the spelling of her name, and also corrected her age to 16 years, rather

than 17. That would have made her age at the time of her acquaintanceship with the defendant Stuart variously between 4½ and 6 years. Since her affidavit was executed 12 years after the events, her young age and the lapse of time were relevant factors for the trial court to consider in deciding the weight to be given to that affidavit.

even though newly discovered, which is merely cumulative or impeaching, is not sufficient to justify granting a new trial. The trial court's conclusion that the information contained in the Matteoni affidavit, which occurred five to six years before the killing, did not meet the required standard of probably producing an acquittal, is not erroneous considering the entire record in this case.

Regarding the issue of whether the Matteoni affidavits constituted "newly discovered" evidence, the affidavit of Stuart's counsel states that he was only able to locate Lynn Matteoni as the result of an October 22, 1986, letter "written to me by Pearl Everson, the mother of Lynn Matteoni, requesting that I contact her." However, the affidavit of Lynn Matteoni states that during the time in 1975–76 when they periodically were living together at one another's homes, Stuart "would pick up my girls after work at my parents' home and take them [to his house] on a daily basis until I got off work." The affidavit demonstrates that Stuart was acquainted with Matteoni's parents and the location of their residence in the Seattle area. Nothing in the affidavits describes what, if any, efforts were made to contact Matteoni through her parents. The only effort described in Stuart's counsel's affidavit regarding the location of Lynn Matteoni was that he "personally went to an address believed by us to be the location of her [Matteoni's] residence, however was unable to locate her. I also attempted telephone contact, all to no avail. After several futile efforts while in Seattle, I presumed that Lynn Matteoni either could not or did not wish to assist us in the defense of this case." Given the fact that Stuart had been to Matteoni's parents' home on a regular basis, and given the fact that it was Matteoni's mother, Pearl Everson, who ultimately contacted Stuart's counsel, there is an inadequate showing that the failure to contact the Matteonis was not due to a lack of diligence on the part of the defendant in advising his counsel regarding the names and addresses of Matteoni's parents, the Eversons. 2 C. Wright, Federal Practice & Procedure: Criminal § 557 (1969); *State v.*

*Drapeau,* 97 Idaho 685, 551 P.2d 972 (1976).

For the reasons set out above, the trial court did not err in denying Stuart a hearing on his claim of newly discovered evidence. As the trial court found, that evidence was cumulative of evidence at trial and would probably not have produced an acquittal or change in sentencing, and further, there was an inadequate showing of due diligence in locating the Matteonis.

## III

On rehearing Stuart now argues for the first time that the trial court erred by weighing the mitigating circumstances against the aggravating circumstances collectively, rather than separately, relying on the recent decision of this Court in *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989). In *Charboneau* we held that I.C. § 19-2515(e) requires that the mitigating circumstances must be weighed against each aggravating circumstance separately, not against all aggravating circumstances collectively. While Stuart correctly recites our holding in *Charboneau,* we conclude that on the record in this case there was no improper weighing of the mitigating/aggravating circumstances.

In paragraph 4(G) of his findings, the district court held that:

*The court could find nothing in mitigation* and in fact analyzing this defendant in search for mitigation produces *a negative history* with respect to this defendant.

The court concluded in paragraph 5 that "as the court has indicated it could find *nothing in mitigation which would outweigh the aggravating circumstances of this crime and this defendant.*" Since the district court found "nothing in mitigation," the case is unlike the situation in *Charboneau,* where the trial court found mitigating circumstances, but improperly weighed them against the aggravating circumstances collectively. In this case there was no weighing process performed because the trial court found "nothing in mitigation." Consequently no issue under

*Charboneau* and no violation of I.C. § 19–2515 has occurred in this case.

The judgment of the district court denying and dismissing the petition for post conviction relief is affirmed.

BOYLE and McDEVITT, JJ., concur.

JOHNSON, Justice, concurring and dissenting.

I concur with the majority concerning the use of the preliminary hearing testimony in sentencing and concerning the allegations of newly discovered evidence. I dissent from the majority's decision to affirm the trial court's dismissal of that portion of Stuart's post conviction petition in which he alleges that the state offered not to recommend the death penalty if he would plead guilty to first degree murder by torture.

The majority agrees with the trial court's conclusion that there was no merit to Stuart's contention that, by entering into negotiations, his constitutional right to jury trial was violated. The rationale for both the trial court's decision and the majority's opinion is that Stuart did not accept the proposed plea bargain and that the sentencing court would not have been bound to accept the plea bargain in any event. In my view, when the prosecutor offered not to seek the death penalty, Stuart was impermissibly forced to choose between exercising his constitutional right to a jury trial and proceeding to sentencing with the prosecutor's recommendation that he not be sentenced to death. By choosing to assert his constitutional right, Stuart was penalized when the prosecutor recommended the death penalty following his conviction.

In his affidavit in support of Stuart's petition for post conviction review Stuart's attorney stated that on several occasions the prosecutor offered to withdraw his request for imposition of the death penalty if Stuart would agree to plead guilty to a charge of first degree murder by torture. In his unverified response the prosecutor stated that to the best of his recollection this offer was never made. Because it was not verified or in affidavit form, this response did not controvert the allegation of the petition concerning the proposed plea bargain. The facts stated in the affidavit of Stuart's attorney should have been considered as being true for the purpose of determining whether to dismiss the petition. *Cooper v. State*, 96 Idaho 542, 545, 531 P.2d 1187, 1190 (1975).

In my view, a proposed plea bargain in which a prosecutor proposes not to seek the death penalty must be treated differently than any other proposed plea bargain. Where the state seeks the imposition of the death penalty we should impose the strictest standard of review to determine whether the state has violated the rights of the defendant. Death penalty cases impose a special duty on us. This court has held that we must review a death sentence "qualitatively different than our review of an ordinary criminal sentence." *State v. Scroggins*, 110 Idaho 380, 387, 716 P.2d 1152, 1159 (1985). Justice O'Connor of the United States Supreme Court has recently pointed out:

Under the Eighth Amendment, the death penalty has been treated differently from all other punishments. See, *e.g.*, *California v. Ramos*, 463 U.S. 992, 998–999, and n. 9, 103 S.Ct. 3446, 3451–3452, and n. 9, 77 L.Ed.2d 1171 (1983). Among the most important and consistent themes in this Court's death penalty jurisprudence is the need for special care and deliberation in decisions that may lead to the imposition of that sanction. The Court has accordingly imposed a series of unique substantive and procedural restrictions designed to ensure that capital punishment is not imposed without the serious and calm reflection that ought to precede any decision of such gravity and finality.

*Thompson v. Oklahoma*, 487 U.S. 815, 856, 108 S.Ct. 2687, 2710, 101 L.Ed.2d 702, 733 (1988). While these cases did not address a death penalty defendant's rights to jury trial and to due process of law, we should apply the same degree of special care in determining whether those rights have been violated.

In *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), the Supreme Court struck down the death penalty provision of the Federal Kidnaping

Act because the death penalty could be imposed only if the defendant exercised the right to jury trial and was convicted. It could not be imposed if the defendant waived the right to jury trial or pled guilty. The Court stated:

Whatever the power of Congress to impose a death penalty for violation of the Federal Kidnaping Act, Congress cannot impose such a penalty in a manner that needlessly penalizes the assertion of a constitutional right.

390 U.S. at 583, 88 S.Ct. at 1217, 20 L.Ed.2d at 147.

In a later case not involving the death penalty the Court declined to apply *Jackson* to invalidate a more severe penalty imposed because the defendant chose to have a jury trial. In doing so the Court said that "the pressures to forgo trial and to plead to the charge ... are not what they were in *Jackson.*" *Corbitt v. New Jersey,* 439 U.S. 212, 217, 99 S.Ct. 492, 495, 58 L.Ed.2d 466 (1978). The Court focused on the fact that "the death penalty ... is 'unique in its severity and irrevocability,' *Gregg v. Georgia,* 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976)." *Id.*

In *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), the Court held that the due process clause of the fourteenth amendment was not violated when a prosecutor carried out a threat made during plea negotiations to have the accused reindicted on more serious charges, if he did not plead guilty to the offense with which he was originally charged. The death penalty was not involved in *Bordenkircher.* *Jackson* and *Corbitt* convince me that if the death penalty had been involved in *Bordenkircher* the Court would have held that the actions of the prosecutor did violate the defendant's rights to jury trial and due process. I would apply that principle to this case.

Following the verdict in this case the trial court requested the prosecutor to advise the court whether he would seek the death penalty at the time of sentencing. The prosecutor told the judge: "I anticipate that as a possibility, your Honor. I

need to research the Statute. I had not done that prior to finding—." Transcript at 973, *State v. Stuart,* No. 14865 (the direct appeal). The prosecutor subsequently filed a notice of intent to request the death penalty and sought the death penalty at the time of sentencing.

I would reverse the trial court's dismissal of the post conviction petition as it relates to the allegation that prior to trial the prosecutor offered not to seek the death penalty if Stuart would plead guilty to first degree murder by torture. I would hold that if the trial court were to be convinced after a hearing on this allegation that the prosecutor had in fact made such an offer, the trial court should have resentenced Stuart without considering any recommendation of the prosecutor for the imposition of the death penalty.

Where the death penalty is in issue the prosecutor as an agent of the state should not be allowed to penalize the defendant by recommending death after having forced the defendant to choose between the exercise of the right to a jury trial and the opportunity to go to sentencing with the recommendation of the prosecutor for life imprisonment. To allow the prosecutor to do so would violate the defendant's rights under both the federal and state constitutions to jury trial and to due process of law before being deprived of his life.

BISTLINE, Justice, dissenting.

*Stuart I* refers to Stuart's direct appeal, S.Ct. No. 14865. The opinions of the Court in *Stuart I* are found at 110 Idaho 163, 715 P.2d 833. *Stuart II,* S.Ct. No. 17014, refers to the March 1989 opinions of this Court on Stuart's appeal of the district court's denial of post conviction relief. However, the March 1989 opinion was withdrawn, a March 1990 opinion was also issued and withdrawn, and now the October 1990 opinion stands as *the Stuart II* opinion for the majority. Opinion No. 28, filed March 10, 1989, can be found at 89 ISCR 245; Opinion No. 35, filed March 12, 1990, can be found at 90 ISCR 375. In both *Stuart I* and *Stuart II,* rehearings were requested and granted, and the case rear-

gued, and in each the Court issued a first and second opinion.

It is now abundantly clear that the Court will issue its final opinion in the saga of *State v. Stuart*, Idaho's first torture murder case. Such being the state of affairs, this prologue is written not for the benefit of my respected brethren, but as an aid for those judges in the federal system who will preside over Stuart's endeavors at obtaining in those courts a more just treatment than that dealt to him in this system. My comments are offered for the purpose of enabling our federal counterparts to better wind their way through the many pages of transcript, record, and briefs. Added to that are the opinions written on the direct appeal (*Stuart I*), and now on denial of post-conviction relief (*Stuart II*).

## THE VARIANCE AND PROCEDURAL DEFAULT

My opinion in *Stuart I* called the attention of the other four members of this Court to the highly prejudicial error in the trial court's instructions. Unquestionably there is a fatal variance between the charge of the Amended Information and the trial court's instruction to the jury:

The defendant was charged with the fatal striking of the boy *with the intent* to inflict extreme pain, or with the intent to satisfy some sadistic inclination of the defendant, but the court instructed the jury that '*It shall also be torture to inflict on a human being extreme and prolonged acts of brutality irrespective of proof of intent to cause suffering*'— language which is found in § 18–4001, but which was wholly not included in the charge upon which the defendant was put to trial.

*State v. Stuart*, 110 Idaho 163, 195, 715 P.2d 833, 865 (1985) (Bistline, J. dissenting) (emphasis in original). Those justices in the majority were not in the least aroused on being alerted to the variance, which can only mean that they read what I wrote and ignored it, or, they did not bother to read it. For certain there was no response.

The opinions were issued in *Stuart I*, and a petition for rehearing was filed by Stuart's counsel. A supporting brief was thereafter filed. The brief raised five issues, one of which was the variance issue just mentioned. Counsel for Stuart set out the charging portion of the Amended Information. It alleges:

That Gene Francis Stuart of Orofino, Idaho, on or about the 19th day of September 1981, at Orofino, in the County of Clearwater, State of Idaho, then and there being, did then and there unlawfully and feloniously kill a human being, with the *intentional application of torture* to said human being, to wit: that the said Gene Francis Stuart did strike and hit Robert Miller, a human being, repeatedly with *the intent to cause suffering or to satisfy some sadistic inclination* of the said Gene Francis Stuart, thereby inflicting great bodily injury upon Robert Miller and mortally wounding Robert Miller, from which wounds the said Robert Miller, a three year old boy, sickened and died in the County of Clearwater, State of Idaho, on the 19th day of September 1981.

All of which is contrary to Section 18–4001, 18–4003 of the Idaho Code.

R., 14–15, S.Ct. No. 14865 (*Stuart I*), Amended Information (emphasis added). Counsel made no objection to the giving of Jury Instruction 16, which was in the exact language of the charge spelled out in the Amended Information:

## INSTRUCTION NO. 16

Ladies and Gentlemen of the Jury, you are instructed that the State of Idaho has filed a criminal information against the defendant, Gene Francis Stuart, charging him with First Degree Murder alleging that the crime was committed as follows:

That Gene Francis Stuart of Orofino, Idaho on or about the 19th day of September, 1981, at Orofino, in the County of Clearwater, State of Idaho, then and there being, did then and there unlawfully and feloniously kill a human being, with the intentional application of torture to said human being, to wit: that the said Gene Francis Stuart did strike and hit

Robert Miller, a human being, repeatedly with the intent to cause suffering or to satisfy some sadistic inclination of the said Gene Francis Stuart, thereby inflicting great bodily injury upon Robert Miller, and mortally wounding Robert Miller, from which wounds the said Robert Miller, a three year old boy, sickened and died in the County of Clearwater, State of Idaho, on the 19th day of September, 1981.

To this charge, the defendant, Gene Francis Stuart, has plead not guilty.

R., 53, *Stuart I.* However, the district court gave the jury another instruction in language inconsistent with the charge of the Amended Information:

### INSTRUCTION NO. 18

Murder is the unlawful killing of a human being with malice aforethought or the intentional application of torture to a human being, which results in the death of a human being. Torture is the intentional infliction of extreme and prolonged pain with the intent to cause suffering. *It shall also be torture to inflict on a human being extreme and prolonged acts of brutality irrespective of proof of intent to cause suffering.* The death of a human being caused by such torture is murder irrespective of proof of specific intent to kill; torture causing death shall be deemed the equivalent of intent to kill.

R., 55, *Stuart I* (emphasis added). Counsel for Stuart aptly wrote:

As noted by Justice Bistline, this Instruction relieved the jury from any responsibility to find proof of intent to cause suffering. It also permitted a finding of guilt if the jury found extreme and prolonged acts of brutality to have existed, despite the fact that such acts were not charged in the Amended Information, nor supported by any reasonable construction of the events which occurred September 19, 1981. Appellant readily acknowledged at trial that, on September 19, 1981, he poked young ROBERT MILLER in the chest, spanked him, and struck the blow which ultimately caused his death. The primary issue, considered both at trial and on Appeal, was not Appellant's actions, but his state of mind on September 19, 1981, the day these acts were committed. As the Trial Court indicated on pages 449–450 of the Trial Transcript, and quoted by this Court in its May 3, 1985, Opinion at pages 11–12:

'[THE COURT ... In] this particular case, the Prosecutor *must convince the trier of fact that your client was engaged in a course of torture.* And produced this child's death, not necessarily intending death *but only intending torture* ... And so this case, to a great extent, is going to turn upon what the jury thinks was going on in your client's mind during that interval when he dealt with this child ...'

As noted above, *all parties were aware that the charge* in question *could only be supported by a showing of intent* on the part of Appellant *to cause suffering or to satisfy some sadistic inclination.* Indeed, this element of intent was considered by the Trial Court to be so important that it allowed admittedly prejudicial evidence to be presented at Trial concerning events, unrelated to the crime charged or to its victim, and which allegedly occurred as distant as ten (10) years prior to the date of ROBERT MILLER'S death. Jury *Instruction Number 18,* which *obviated any necessity of a finding of intent to cause suffering, if extreme and prolonged acts of brutality were found to have existed,* was extremely improper given the specific language of the Amended Information. It is equally apparent that, if such intent need not be proven, the propriety of allowing admittedly prejudicial evidence for purposes establishing this intent, is seriously questioned. If intent to cause suffering need not be proven, it cannot be said that the probative value of this evidence outweighed its highly prejudicial effect.

Appellant's Memorandum in Support of Petition for Rehearing in *Stuart I,* 3–5 (filed July 8, 1985) (emphasis added).

A rehearing was granted but limited to the issue of error in the giving of Jury Instruction 18. An appropriate order was entered directing the State to file a brief responsive to Stuart's brief, but only to the single issue, and Stuart was allowed to file a reply brief.

The Solicitor General, Lynn E. Thomas, authored the State's five page brief, the gist of which was that Stuart was in "procedural default:"

The failure to raise this question in the appeal was a procedural default which precludes raising the issue not only here, but in post-conviction proceedings, *Watkins v. State*, 101 Idaho 758, 620 P.2d 792 (1980), and in the federal courts, *Wainwright v. Sykes*, 433 U.S. 72, 53 L.Ed.2d 594, 97 S.Ct. 2497 (1977).

Brief of Respondent in Response to Petition for Rehearing in *Stuart I*, 4 (filed October 21, 1985). At oral argument, "procedural default" was again urged to the Supreme Court but ran into an obstacle in the person of Justice Shepard:

[MR. THOMAS]: So, I think the Court should consider this to be a defaulted claim.

JUSTICE SHEPARD: Mr. Thomas, let me say this. I don't want you to believe that I'm arguing it, but I want to give you my impression at the moment, and then you either comment if you think I'm wrong, or ignore what I said and go on to your next point, which I assume you're about to do. *It seems to me that the legislature* in its wisdom or lack thereof *has said to this Court, 'Thou shalt review a death penalty case, whether there be an appeal or not.'* Right?

MR. THOMAS: *The death sentence is to be reviewed* whether this is an appeal or not, *but not other questions.*

JUSTICE SHEPARD: The legislature has said to this Court, 'You will examine the imposition of a death sentence and determine whether it is proportionate to other sentences imposed in other cases.' Something that certainly we don't expect trial courts to do and if they did it, we'd probably say they were in error in doing

it. The legislature has said, 'Death penalty cases are different,' for whatever reason, on the finality if nothing else. *I don't really accept what I perceive your argument to be, that we are to apply procedural default rule in a death penalty case because counsel for the appellant did not raise the point in the initial briefing and hearing on it but has raised it now.* Now you tell me why I shouldn't think that way, Mr. Thomas.

MR. THOMAS: Well, in the context of the federal constitution, if I can start there, the United States Supreme Court seems to have emphasized several times that as far as the procedural rules are concerned, it doesn't make any difference whether the case is a capital case or another kind of case. It's important for the state to have the right to enforce its procedural rules. Otherwise, these cases can go on forever. *From a procedural point of view there isn't any difference between a capital case and another kind of case.* The legislature, in capital cases, has asked the Court to review the sentence, but not the *procedural niceties* or the procedural aspects of the case unless an appeal is brought raising those questions specifically. I don't the believe the legislation creates a procedural distinction or was intended to create a procedural distinction between capital cases and other kinds of cases. It is just as important in a capital case to insist that one be precluded from interminable litigation of new ideas thought up after the decision comes down adversely to the defendant. As I say, *if there is a real question about the reliability of the result, the accuracy of the finding of guilt or innocence, that problem may be addressed,* even under *Wainwright v. Sykes* and even under this Court's procedural rules. *The fundamental error rule, for example, would permit that even if it were defaulted.* But the procedural rules do prevent the relitigation of claims that do not cast doubt on the reliability of the result and it seems to us that that is as it should be. Otherwise, capital cases will be carried on forever when counsel comes forward with another theory that

wasn't used at trial but might be successful this time around. Allowing that kind of undermining of the finality of these cases seems to me as only one possible result, and that is to undermine public confidence in the ability of the courts to enforce the law. So, both from a legal and a policy perspective, I think it would be a bad idea.

JUSTICE BISTLINE: Mr. Thomas, would I understand from your response to Justice Shepard's question is that if we had a defendant, like sometimes as Creech is and sometimes as he is not, says 'okay, I've been convicted, I don't want an appeal,' we still have to do the mandatory bit under the legislative direction. We have to do our review. And if Creech did not have a lawyer and we were doing our review, *are you saying that we would not,* besides reviewing the sentence, *look to ascertain to see that he had a fair and impartial trial?*

MR. THOMAS: Oh yes, absolutely, Your Honor. Sentence review is sentence review in the context of capital cases. The Court is to determine whether, assuming that the finding of guilt is accurate, the sentence of death was proper in the facts and circumstances of the case. But I don't believe that was an invitation to the Court to go into procedural questions or other kinds of questions relating to the admissibility of evidence of whatever that do not impact on the court's decision to impose a particular sentence.

JUSTICE BISTLINE: I'm not sure I understand. *Are you saying that we would or would not search the record* of the trial proceedings *to see if the defendant had had a fair trial?*

MR. THOMAS: It think that's correct. I think that the automatic review—

JUSTICE BISTLINE: *What's correct? That we would or would not?*

MR. THOMAS: *You would not have the authority to go beyond sentence review* which is the only thing specified *for automatic review* in the context of the capital case. It's almost inconceivable that there's not going to be an appeal in a capital case, but let us assume the defendant says I don't want an appeal. I want to be executed, such as Gary Gilmore did. The Court isn't off the hook in terms of sentence review, but it isn't entitled in those circumstances to go into the procedural and evidentiary aspects of the trial.

JUSTICE BISTLINE: *If you're correct,* then why would we require, which we do require, assuming there's no appeal by the defendant himself, *why do we require the transcript of trial proceedings?*

MR. THOMAS: Well, the transcript of the trial proceedings lays out the facts, gives the factual background of the crime. *It tells all the details relating to the crime and that's an important consideration in passing sentence* because the nature of the offense is, of course, a consideration under the capital aggravating factors that are set out in the aggravating list in the statute. In fact that's the fundamental premise of those aggravating factors, how the crime was committed and the defendant's culpability in the crime.

JUSTICE BISTLINE: So you would say, in effect, that when we have an appeal in a case where the death sentence has been imposed, that any member of the Court—and there is counsel for the defendant, and we're making the mandatory review—that any member of the Court who concerns himself with a question as to the fairness of the trial that hasn't been brought up by the defendant himself is just being sort of an intermeddler, a busybody? Such as myself.

MR. THOMAS: *Not only that,* Your Honor, but I think you are saying 'and finally, forget what I have said, because this case is going over to the federal court and they'll make the decision anyway.' Because that's really what you do when you don't insist on adherence to the state's procedural rules. And I don't think that's really a good idea, because you've got on a collateral review a federal court is at least twice removed from the facts. The record becomes more at-

tenuated. The chance of factual error becomes greater and greater and obviously the interest in finality is attenuated as well.

*Stuart I*, 110 Idaho at 231–33, 715 P.2d at 901–03 (Bistline, J. dissenting) (some emphasis in original; some emphasis added).

The justices who comprised the majority in *Stuart I* upheld both the conviction and the death sentence by relying in part on the talisman of procedural default. They have therefore yet to come to grips with the most egregious error committed by the trial court. The error may have been unintentional; however, all things considered, it more than likely was intentional. Simply put, at the end of a three week trial the court's instructions to the jury included an alternate ground for conviction which had *not* been pleaded in the Amended Information.

This Court granted a rehearing after the *Stuart I* opinion was issued specifically to address the issue of given Jury Instruction 18. After the rehearing, the Court stood on its old opinion. Whatever might have been in the mind of the majority is still there, because the majority addressed nothing on rehearing.[3]

The majority's treatment of the *Stuart I* rehearing is similar to the treatment afforded the petitioners by the Arkansas Supreme Court in *Cole v. State of Arkansas*, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948). In *Cole*, the state supreme court had affirmed the petitioners' convictions by invoking a charge *not* included in the information. The *Cole* defendants were tried and convicted of violating § 2, but the state supreme court upheld their convictions under § 1 of Act 193 of the 1943 Arkansas legislature. To compound the error, the state court:

> later denied a petition for rehearing in which petitioners argued: 'To sustain a conviction on grounds not charged in the information and which the jury had no opportunity to pass upon, deprives the defendants of a fair trial and a trial by jury, and denies the defendants that due process of law guaranteed by the 14th Amendment to the United States Constitution.'

*Cole*, 333 U.S. at 200, 68 S.Ct. at 516.

Here, a majority of this Court has decided not to consider the merits of Stuart's contention that Jury Instruction 18 varied substantially with the Amended Information. The majority must have also decided not to consider the important message the United States Supreme Court sent to the state supreme courts back in 1948:

> No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal.... It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made.

*Cole*, 333 U.S. at 201, 68 S.Ct. at 517 (citations omitted); quoted with approval in *State v. Smith*, 117 Idaho 891, 792 P.2d 916 (1990) (Bistline, J. specially concurring).

## FAILURE TO INSTRUCT AND OBJECT

As suggested above procedural default must have occupied the minds of the majority in deciding *Stuart I*, because that is how Stuart's initial challenge to the jury instructions was summarily treated:

> [W]e note that appellant's counsel accepted the instructions as given by the court, and noted that he had no objection to the instructions the court intended to give. Thus, any error in failing to instruct on this charge [of a lesser included offense], if indeed one exists, was invited error and will not be considered on appeal.

**3.** The full text of the majority opinion which issued following rehearing is this: "A petition for rehearing in this matter was granted and the cause reargued. The Court has reviewed the record and considered the arguments presented by counsel, and continues to adhere to the views expressed and the conclusion reached in the earlier opinion." *Stuart I,* 110 Idaho at 227, 715 P.2d at 897.

*State v. Lopez*, 100 Idaho 99, 593 P.2d 1003 (1979).

*Stuart I*, 110 Idaho at 170, 715 P.2d at 840.

*Lopez*, however, was discussed in my *Stuart I* opinion, under the section titled "FAILURE TO INSTRUCT," 110 Idaho at 188, 715 P.2d at 858. *See also State v. Eisele*, 107 Idaho 1035, 1037, 695 P.2d 420, 422 (1985) ("I.C.R. 30 as amended does not preclude assignment of error in instructing where the defendant in a criminal case fails to object to the instructions in question."). Moreover, instructing the jury in lesser included offenses is not discretionary with the court, where the evidence would reasonably support such a conviction on a lesser included offense. As our Court of Appeals has made clear:

> Idaho Code § 19–2132(b) states: 'The court shall instruct the jury on lesser included offenses when they are supported by any reasonable view of the evidence.' In *State v. Lopez*, 100 Idaho 99, 102, 593 P.2d 1003, 1006 (1979), our Supreme Court stated: 'It is clear that I.C. § 19–2132(b) makes it the duty of the trial court to instruct the jury on lesser included offenses when they are supported by a reasonable view of the evidence, even if the court is not requested to do so.' The same duty exists even if a defendant, for tactical reasons, expressly requests that no instruction on a lesser included offense be given.

*State v. Atwood*, 105 Idaho 315, 318, 669 P.2d 204, 207 (Ct.App.1983). The perceived procedural defaults no doubt flavored the entirety of the *Stuart II* majority opinion, making it more difficult for the justices in the majority to be at all concerned with the variance between the jury instruction and the information.

## PROPORTIONALITY TOUCHED UPON

Twenty-one years ago Justice Shepard, now recently departed, expressed the view that an appellate dissent "ordinarily occurs only when a Justice's sense of outrage overcomes his sense of inertia." *Deshazer v. Tompkins*, 93 Idaho 267, 272, 460 P.2d 402, 407 (1969). That was his first year of occupancy of a seat on the bench of the Idaho Supreme Court. The outrage which he experienced in *Deshazer* had to do with civil litigation which had been protracted over seven and one-half years. The relief Deshazer sought was for injuries to his arm. Justice Shepard closed his opinion in that case by remarking that "this case demonstrates the great truth contained in that simple statement, 'justice delayed is justice denied.'" *Deshazer*, 93 Idaho at 274, 460 P.2d at 409 (Shepard, J. dissenting).

*Stuart* is not a civil case. The stakes at issue here are somewhat higher than in *Deshazer*. Here, the statement Justice Shepard referred to in *Deshazer* may be worded thusly: "Justice denied is injustice, and injustice dealt out carelessly is outrageous enough to totally destroy all sense of inertia." It has been conceded that Gene Francis Stuart, the defendant, was responsible for the death of Robert Miller. It has been conceded that he is guilty of the crime of manslaughter. It has been established that a jury convicted him of first degree torture murder. It has been equally well-established that the judge, now retired from such office, long ago sentenced Stuart to death. It is now a historical fact that on the direct appeal the conviction and the sentence were both affirmed. What has not been established and is not true is that Stuart had a fair trial on the issue of his conviction and on the issue of the imposed death sentence. As Justice Shepard has also written, the law does not guarantee an accused person a perfect trial, but it does guarantee a fair trial.

In *Stuart I*, on the direct appeal challenging the conviction and sentencing, Justice Huntley wrote a separate concurrence in order to register his view that:

> [T]he Idaho capital sentencing process is unconstitutional in two respects:
>
> (1) It does not provide for utilization of the jury, which is in violation of both the Idaho and United States constitutions; and
>
> (2) The sentencing proceeding, as conducted by the trial courts with the approval of this court, by permitting the admission of the presentence inves-

tigation report and other hearsay evidence over objection of the accused *deprives the accused of the right to cross-examine and confront witnesses.*

*Stuart I,* 110 Idaho at 177, 715 P.2d at 847 (Huntley, J. concurring specially) (emphasis added). The second of Justice Huntley's constitutional views should have been everyone's concern.

Following the rehearing in *Stuart I* a second opinion for the Court was issued, the full text of which was these two sentences: "A petition for rehearing in this matter was granted and the cause reargued. The Court has reviewed the record and considered the arguments presented by counsel, and continues to adhere to the views expressed and the conclusion reached in the earlier opinion." *Stuart,* 110 Idaho at 227, 715 P.2d at 897 (on rehearing February 20, 1986). There was no discussion whatever of the variance, which issue the Court had deemed of sufficient importance to merit being reheard and reconsidered.

In that one year interval which produced nothing in Stuart's case, two more death penalty decisions emanated from this Court, namely *State v. Windsor,* 110 Idaho 410, 716 P.2d 1182 (1985); and *State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1985). In each case, the death penalty was reversed and remanded for resentencing of a penalty less than death. The majority, however, saw no reason to reconsider the proportionality of Stuart's sentence in light of those two decisions. That is a sad commentary, because:

The Court's reasoning in its *Windsor* and *Scroggins* opinions is equally applicable in *Stuart.* In *Scroggins* the child killed was but a few years older than the child killed by Stuart. The victim, by the very reason of being older, was not only killed in a manner more brutal than in

*Stuart,* but was kidnapped, raped, and robbed of any vestige of human dignity before she was murdered. Worse yet, the helpless handcuffed girl was made to suffer the knowledge that she was going to be killed. Obviously, where there is such a crime as torture murder, it was more in appearance in *Scroggins* than it was here.

Similarly with the *Windsor* case. Here the distinction between *Scroggins* and *Windsor* is only in the fact that the victim in the latter was not a child, but an older man who had befriended his captors, torturers, and killers.

Because the legislature has insisted on proportionality, and the Court heretofore made its proportionality analysis in this case without having the benefit of the proportionality analysis it would shortly thereafter make in *Windsor* and *Scroggins,* and the district court at sentencing in *Stuart* also was without the benefit of those opinions, my vote was tendered to treat Stuart as evenhandedly as the Court dealt justice to Scroggins and to Windsor.

*Stuart I,* 110 Idaho at 228, 715 P.2d at 898 (Bistline, J. dissenting).

The Court's initial opinion in *Stuart II,* issued on March 10, 1989, denied any post-conviction relief. Today's opinion, for whatever reason, and I know of none, withdraws that opinion of one year ago.[4] The majority now has the benefit of the views of two dissenting opinions (Justice Johnson and myself), and an excellent brief by Stuart's attorney (Robert E. Kinney).

## THE FACADE THAT THE DEFENDANT STIPULATED

In Part IIA of the March 1990 and today's *Stuart II* opinion for the Court, the majority has taken note of Stuart's contention that the trial court erred in considering

4. Most of my attention and effort has been directed at confronting the opinions which have been issued in this Court, which opinions, by a whim of the majority can be withdrawn. But although the majority perhaps cannot withdraw my opinion, a point upon which I am uncertain, it can withdraw what I have successfully assailed, and thus render my writings into utter-

ances made in a vacuum. My March 1989 opinion represents considerable effort, and, in one view at least, it opened for display the fallacies of the majority opinion which has now been withdrawn. So that the opinions in *Stuart II* are more readily understood, I have attached as Appendix B my March 1989 opinion.

preliminary hearing testimony at the sentencing hearing, but continues to deny any relief in post-conviction proceedings:

> The *trial court denied Stuart's claim of error* in the use of preliminary hearing testimony at sentencing, *specifically pointing out that* in Stuart's original direct appeal to this Court, *State v. Stuart*, 110 Idaho 163, 176, 715 P.2d 833, 846 (1985), that this Court had held that '[i]t *was stipulated at the sentencing hearing that* when sentencing the defendant *the court would consider evidence presented at the preliminary hearing* and trial along with the presentence investigation report.'

March 1990 Stuart II (emphasis added). There is no doubting that this accurately describes Judge Schilling's [5] ruling, which was based on what Judge Schilling had read in the *Stuart I* opinion issued by this Court, and which was written by Chief Justice Bakes for the majority. Finally the majority comes face to face with what it declared to be so, but concerning which nothing could have been further from the truth:

> **It was stipulated at the sentencing hearing that when sentencing the defendant the court would consider evidence presented at the preliminary hearing and trial along with the presentence investigation report.**

*Stuart I,* 110 Idaho at 176, 715 P.2d at 847 (emphasis added). This misstatement did not go unnoticed, but was immediately questioned in my dissent to the March 1989 *Stuart II.* However, in the March 1990 *Stuart II* majority opinion Chief Justice Bakes *now,* and much belatedly, attributes the misstatement to Judge Schwam. Judge Schwam's findings in sentencing Stuart to the penalty of death are contained in the record. The excerpt from Judge Schwam's findings now relied upon

in the March 1990 edition of the majority opinion in *Stuart II* is this: [6]

> 3. That a sentencing hearing was held on December 1st, 1982, pursuant to notice to counsel for the defendant and in the presence of the defendant the Court heard relevant evidence in aggravation and mitigation of the offense and arguments of counsel. Further, it was agreed and understood by both the State and the defendant that the Court would rely upon, as part of the sentencing hearing, the testimony at the preliminary hearing and the trial.

R., 220–21, Findings of the Court in Considering the Death Penalty (*Stuart I*). For certain Judge Schwam wrote that finding, and in doing so was perpetrating, and apparently perpetuating, what may well be the most insidious untruth in the history of Idaho criminal jurisprudence. *There was no such stipulation.*

Much effort and much time were expended in pointing out to the other members of the Court [7] in the March 1989 *Stuart II* opinions, that at the sentencing hearing:

> After the State had put on one witness, the jailer, who testified that he had observed no remorse on defendant's part, Judge Schwam ruled that he would discount [it] completely and did so by striking all of the jailer's testimony. The State presented no more witnesses. The following then took place:
>
> THE COURT: Does the defense have any witnesses?
>
> MR. KINNEY: Your Honor, in light of the fact that the State has presented no witnesses in aggravation in addition to, of course, the trial testimony, we tend to also rely on the trial and argument.
>
> THE COURT: Okay. *I gather it's the State's position that it has a right to and intends to rely upon all the cross-examination testimony elicited either*

---

5. Judge Schwam presided over the trial and sentencing. Judge Schilling presided over the post-conviction proceedings.

6. Explicit reliance is placed on this passage. *See* footnote 1 to the March 1990 *Stuart II* opinion for the Court.

7. The membership a year ago did not include Justices Boyle and McDevitt.

*at the Preliminary Hearing or the trial;* is that correct?

MR. CALHOUN: Yes, sir, that is correct.

THE COURT: Okay.

MR. KINNEY: Just a moment, please?

THE COURT: Yes.

MR. CALHOUN: I believe I've so stated in the paperwork that I filed.

The prosecutor's statement that the *State* would rely upon preliminary testimony was just that, the *State's position.* For certain it was not the stipulation which this Court's opinion elevated it to on the direct appeal—apparently on the sole basis of Judge Schwam's finding of such a stipulation, and without anyone on this Court making an independent examination of the record in order to ascertain the validity of Judge Schwam's finding.[8]

March 1989 *Stuart II,* (Bistline, J. dissenting) (emphasis in original; footnote added).

The author of the Court's majority opinion has wondered and speculated as to why it appears that the issue of Judge Schwam's utilization of the preliminary hearing transcript was not raised on the appeal in *Stuart I.* He surmises in the March 1990 *Stuart II* majority opinion that:

The reason for not raising the issue on direct appeal was no doubt because this Court, at the time of sentencing, had previously held in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), that the use of a preliminary hearing transcript at the sentencing/aggravation/mitigation hearing was not in error, and that no formal sentencing hearing as provided in I.C. § 19–2516 had been requested.

March 1990 *Stuart II.* This mirrors the majority's statement in today's *Stuart II*

opinion. (*See* my discussion on this point in my opinion dissenting on the denial of petition for rehearing, which follows immediately after this opinion.) When one examines *State v. Osborn,* however, this conjecture becomes of highly doubtful validity. One only need turn to 102 Idaho at 408, 631 P.2d at 190, to discover that: .

After submission of a presentence report, an aggravation-mitigation hearing was held. I.C. § 19–2515. At that hearing, neither prosecution nor defense called any witnesses. The state advised the court that 'because I think we do have a—a good record of what transpired in the preliminary hearing instead of calling witnesses today, [I choose] to rely on the testimony presented at the preliminary hearing. . . .' Similarly, appellant's counsel relied upon the facts brought forth in the preliminary hearing and in the reports to the court, and called no additional witnesses, although the appellant did address the court in his own behalf.

*Osborn, Id.* (insertion and deletion in original). Osborn had plead guilty to first degree murder. The most that can be made of *Osborn* is that counsel for the defendant and for the state entertained the same thought—that some favor might be gained from the sentencing judge if he were not burdened with having to hear live witnesses regarding the commission of the crime.[9]

A holding, said to be attributable to *Osborn* "that no formal sentencing hearing as provided in I.C. § 19–2516 had been requested" was *not* a holding, but was only a reason for purporting to justify what was *the* holding in *Osborn* that the use of a preliminary hearing transcript was not, under the circumstances *there* present, preju-

---

**8.** As stated in footnote 3 to my dissent in the March 1989 *Stuart II:*

By the nature of things we naturally rely upon the justice who has drawn the case to correctly portray the record. Otherwise, all five of us would have to painstakingly read all of the appeal records and transcripts—an exercise which time constraints do not allow. It may have been noted that on occasion, of which this is one, I do so notwithstanding that

the responsibility is not mine in the first place. When one perceives gross prejudicial misstatements in a majority opinion, the only answer is either to get to work or get out of the kitchen.

**9.** The defendant, in addressing the court in his own behalf, did so in the exercise of his traditional right of allocution and not as a witness. The right of allocution is now contained in the Court promulgated Idaho Criminal Rule 33.

dicial error.[10]  Nevertheless, utilizing *Osborn*, the majority rules Stuart out of court:

> *Stuart's claim* now, *that he did not stipulate* at the sentencing hearing *for the use of preliminary hearing testimony, comes too late.*  Stuart should have raised the issue by petitioning for rehearing of our decision in *Stuart I*, the direct appeal.  The trial court did not err in rejecting Stuart's post conviction claim on the issue of the use of preliminary hearing testimony at sentencing.

March 1990 *Stuart II* (emphasis added; footnote omitted).

The majority no longer insists that there was such a stipulation.  That is understood.  Instead the majority's author perforce switches to holding that Stuart forfeited that issue by not requesting a rehearing of the initial *Stuart I* opinion released on May 3, 1985:

> Our holding in *Stuart I* that the parties had 'stipulated' to the use of the preliminary hearing testimony in the sentencing proceeding was based upon the finding of the trial court in the December 1, 1982, sentencing hearing in which the trial court found, 'Further, it was agreed and understood by both the state and the defendant that the court would rely upon, as part of the sentencing hearing, the testimony at the preliminary hearing and the trial.'  There is nothing in the record to demonstrate that Stuart ever questioned the finding, either before the trial court by way of motion for reconsideration, or on appeal to this Court in *Stuart I.*  After the issuance of our opinion in *Stuart I* in which we held, based upon the trial court's finding, that the parties had stipulated to the use of the preliminary hearing testimony in the sentencing proceeding, **the defendant Stuart did not petition this Court for rehearing in order to question either the trial court's finding or this Court's holding that Stuart had stipulated** to the use of the preliminary hearing testimony at the sentencing hearing.

March 1990 *Stuart II* n. 1 (emphasis added).  Quaere, will this cause wonderment among the trial judges and the experienced practitioners of criminal law?  First, it was initially declared that defense counsel had so stipulated, but when that thought was discarded, the claim became that Stuart should have moved for a rehearing on first seeing in the May 1985 opinion that he had so stipulated.  This is manifestly unfair, because Chief Justice Bakes was the first Supreme Court Justice ever to write that Stuart's counsel had stipulated.  First, Judge Schwam's misstatement had been accepted by Chief Justice Bakes at face value, with no showing of any resort to the court reporter's transcript.  Second, the record is voluminous and somewhat convoluted, but it is not all that difficult to peruse.  And third, why is it that the reader has been left with the inference from the majority opinion that Stuart did not petition for a rehearing, said to be the proper remedy?  The answer is that Stuart did do so, and he raised the very issue Chief Justice Bakes later asserts should have been raised.  (*See* Appendix A.)

It now appears that the Court's March 1989 *Stuart II* opinion has been withdrawn in order to erase from sight the glaring untruth of the stipulation which never was.  But withdrawing an opinion cannot strike or erase from memory the apparent, indifferent carelessness with which the opinion was written.  This is not fun time, but serious business.  While to some these thoughts may come across as being a bit on the strong side, one cannot help but stand wholly aghast at what would be happening here if Bistline, J., too, were gone from the appellate scene along with Justices Shepard, Donaldson, and Huntley.

Chief Justice Bakes has, by lot, inherited all of the *Stuart* appeals.  It is disheartening to be placed in the position of telling an experienced and capable appellate justice that he should have had more regard for the record.  By comparison, no practicing

---

**10.**  *Osborn* at best stands for little.  An aberration, there has not been a second such case where counsel at sentencing implicitly stipulated to the admission of a preliminary hearing transcript.

attorney handling criminal defenses could have done any more (at great personal and financial cost) than did Robert Kinney in his attempts at seeing that Stuart was at least dealt with fairly. Mr. Kinney attempted to get the Court concerned about Judge Schwam's misuse of the preliminary hearing testimony but was turned away empty handed. Continuing that same effort, Mr. Kinney in post-conviction relief proceedings presented to the district court the absolutely irrefutable assignment of error that Stuart *had not,* in person or by counsel, stipulated to the use of the preliminary hearing transcript. Again defense counsel was turned away. Judge Schilling read that Chief Justice Bakes, with three justices joining his opinion, had ruled in *Stuart I* that Stuart *had so stipulated.* Because of the doctrine of the law of the case, the district court was powerless to say otherwise,[11] even though the fact of the matter was as plain to see as the proverbial nose on Dooley's face. Attached hereto as Appendix A is Part III of Mr. Kinney's brief supporting the petition for rehearing in *Stuart I,* which he *did* timely file. Appendix B is a true copy of my March 1989 opinion wherein an attempt was made to dissuade the other members of the Court from heaping as much or more error on Mr. Stuart than was visited upon him by the district court. It is in augmentation of my response to today's October 1990 opinion for the Court, and contains an analysis which is equally pertinent to this day's opinion for the Court. Attached as Appendix C is my dissent to this Court's March 1990 opinion. Attached as Appendix D are excerpts from the majority opinions of March 1989, March 1990, and October 1990, which have been removed from sight by the questionable expediency of withdrawing the entire opinions, and then reissuing the same as modified.

## APPENDIX A

[Being an excerpt from appellant's brief in support of his petition for rehearing of *Stuart I.* Rehearing was granted, but only in part.]

## III

THE SENTENCING JUDGE IGNORED THE CLEAR MANDATE OF IDAHO CODE SECTION 19–2516 IN UTILIZING HEARSAY EVIDENCE AS A BASIS FOR IMPOSING THE DEATH PENALTY.

Idaho Code Section 19–2515(f) states:

(f) The following are statutory aggravating circumstances, at least one (1) of which must be found to exist *beyond a reasonable doubt* before a sentence of death can be imposed: ... (emphasis added)

Idaho Code 19–2516 provides as follows:

INQUIRY INTO CIRCUMSTANCES— EXAMINATION OF WITNESSES.— *(The circumstances must be presented by the testimony of witnesses examined in open Court* ), except that when a witness is so sick or infirm as to be unable to attend, his deposition may be taken by a Magistrate of the County, out of Court, upon such notice to the adverse party as the Court may direct. *No affidavit or testimony, or representation of any kind, verbal or written, can be offered to or received by the Court,* or a Judge thereof, *in aggravation or mitigation of the punishment,* except as provided in this and the preceding section. (emphasis added)

It is clearly the duty of the sentencing Court in capital cases to receive testimony in open Court concerning aggravating or mitigating circumstances under Idaho Code Section 19–2515. At the Sentencing Hearing held December 1, 1982, the State presented one (1) witness, who was the Clearwater County Jail Administrator. His testimony was presented in an attempt to demonstrate that the defendant had not

---

**11.** *See Ada County Highway Dist. v. Smith,* 113 Idaho 878, 880, 749 P.2d 497, 499 (Ct.App.1988), citing with approval to *Suitts v. First Sec. Bank of Idaho, N.A.,* 110 Idaho 15, 21–22, 713 P.2d 1374, 1380–81 (1985). The operation of the doctrine requires that (in further proceedings in a case which after appeal has been remanded) the lower courts are not at liberty to disregard the answer to any question upon which the higher court has spoken and ruled. The higher court itself is not so constrained. A district court cannot be so independent and thoughtful.

shown remorse while incarcerated and awaiting Trial. In striking all testimony of this witness, the sentencing Judge deemed his testimony irrelevant and improper. (Transcript of Sentencing Hearing, page 27). Thereafter, Appellant was called by the defense as a witness, in an attempt to illustrate that he had cooperated with the police in the investigation of ROBERT MILLER'S death. There were no other witnesses who testified at the Sentencing Hearing held December 1, 1982.

After the Court had stricken the testimony presented by the State's only witness, the defense indicated clearly its understanding that the State would rely only upon Trial testimony and argument presented at the sentencing in support of its claim that statutory aggravating circumstances existed. This understanding is reflected in the transcript of the December 2, 1982, Hearing on page 28 as follows:

MR. CALHOUN: In light of that, your Honor, the State has no further witnesses.

THE COURT: Does the Defense have any witnesses?

MR. KINNEY: Your Honor, in light of the fact that the State has presented no witnesses in aggravation in addition to, of course, the Trial testimony, we tend to also rely on the Trial and argument.

At the direction of the Sentencing Judge, Appellant's counsel argued first, in an effort to persuade the Court against imposing the Death Penalty. (Transcript of December 1, 1982, Hearing, pages 34 and 35). Appellant's attorney argued that testimony taken outside that introduced at Trial could not be used as aggravation at the Sentencing Hearing. (Transcript of December 1, 1982, Hearing, page 46 lines 7, 8, 9, 10, and 11). The Prosecuting Attorney, however, insisted upon arguing incidents alleged to have occurred at the Preliminary Hearing, and not admitted at Trial. (Transcript of December 1, 1982, Hearing page 70).

After arguments of counsel were completed, the Court indicated that it would not consider hearsay evidence unfavorable to defendant in determining whether a statutory aggravating circumstance had been proven beyond a reasonable doubt. The sentencing Judge's comments concerning use of hearsay evidence at this stated of the proceedings, are set forth as follows:

THE COURT: I would like to make one comment at this time before we recess. This report does contain—a Pre Sentence report contains a hearsay statement from the defendant's natural child. *I am convinced* that because I must find any aggravating circumstance to be demonstrated beyond a reasonable doubt *it would be inappropriate for me to resort to that kind of unchallengeable hearsay* in determining an aggravated circumstance ... When determining the existence or nonexistence of a particular mitigating circumstance that often involves the consideration of negative information, negative to the defendant as well as positive information. But I think it is inappropriate even in those circumstances for me to consider damaging negative information produced in a hearsay fashion in this report for the purpose of determining this question which is supposed to be determined beyond a reasonable doubt. And that is the facts necessary to support the imposition of the Death Penalty. (Transcript of December 1, 1982, Hearing, Pages 88 and 89).

Despite his clear statement that negative hearsay comments could not and would not be used to support imposition of the Death Penalty, the Sentencing Judge acted exactly opposite to his own comments. The Transcript reflects clearly this change of attitude on the part of Judge Schwam after he had determined two (2) aggravating circumstances to be applicable:

Now, defense has raised some interesting questions which I think I should address. Defense has raised the fact that much of the testimony which gives me insight into this defendant's background was legitimately admitted at Trial for a limited purpose. And defense has argued that I should only use that testimony with the same limitation for a demonstration of intent on the part of the defendant at the time of the offense in

question. I disagree with the defense. And I have not limited my use of that testimony.... And I don't feel that it is inappropriate or that it is illegal for me to use that evidence for all purposes in considering these aggravating circumstances and the mitigating circumstances. Furthermore, I observed those witnesses testify once myself, I, of course, read this testimony at the preliminary hearing, and it would be utterly cruel for this justice system to require those women to return a third time to testify. And I would not make ruling that would require such a result. (Transcript of December 1, 1982, Hearing pages 108 and 109).

The Sentencing Hearing Transcript reflects with cold arrogance the fact that defendant was misled into believing that hearsay evidence would not be used in aggravation of sentence, and that the *Court totally ignored the mandate of Idaho Code Section 19–2516 which does not permit aggravating circumstances to be shown other than through testimony presented in Open Court.*
Memorandum in Support of Petition for Rehearing, 9–12, filed July 8, 1985, S.Ct. No. 14865 (*Stuart I*) (emphasis added).

That issue was further addressed by Stuart's counsel in support of another petition for rehearing after Stuart's petition for post conviction relief was denied without an evidentiary hearing. In this Court's opinion affirming that denial was said to be properly based upon a stipulation, Mr. Kinney, in May 1990, laid out nicely how the stipulation that never was came to be:

Appellant readily acknowledges that, on direct appeal, the finding of Judge Schwam that appellant had stipulated to use of preliminary hearing testimony at the time of sentencing, was not specifically phrased as an issue. Although appellant challenged the use of hearsay testimony by the sentencing Court in his opening brief, the specific question of a purported 'stipulation' was not therein raised as an issue. In its initial Decision, issued May 3, 1985, this Court addressed

the issue of proportionality of the Sentence imposed in this case, both in response to Mr. Stuart's contentions that the Sentence imposed violated the provisions of the Eighth Amendment to the United States Constitution, and in accordance with the duty imposed by Idaho Code Section 19–2827. In so doing, this Court adopted the Trial Court's finding that a stipulation was entered into between the parties concerning use of the preliminary hearing testimony at sentencing (*State v. Stuart*, 110 Idaho 163, 176 [715 P.2d 833] (1985)).

Following the Decision of this Court in Stuart I, issued May 3, 1985, appellant filed a Petition for Rehearing. Subsequently, on July 8, 1985, a Memorandum in Support of Appellant's Petition for Rehearing was filed. That Memorandum set forth five separate issues which appellant requested that the Court consider on rehearing. As noted in Appendix A to the Dissenting Opinion of Justice Bistline in the most recent Decision of this Court issued March 12, 1990, Appellant's Memorandum in Support of Petition for Rehearing, filed after the decision in Stuart I, directly addressed the alleged 'stipulation' concerning use of preliminary hearing testimony at sentencing. The Memorandum in Support of Petition for Rehearing, filed by appellant on July 8, 1985, stated:

After the court had stricken the testimony presented by the state's only witness, the defense indicated clearly its understanding that the state would rely only on trial testimony and argument presented at the sentencing in support of its claim that statutory aggravating circumstances existed. This understanding is reflected in the transcript of the December 1, 1982, hearing on page 28 as follows:

MR. CALHOUN: In light of that, your honor, the state has no further witnesses.

THE COURT: Does the defense have any witnesses?

MR. KINNEY: Your honor, in light of the fact that the state has presented no witnesses in aggravation in addition

to, of course, the trial testimony, we (in)tend to also rely upon the trial and argument.

(*Appellant's Memorandum in Support of Petition for Rehearing*, filed July 8, 1985—p. 10).

Appellant's July 8, 1985, Memorandum, filed in support of his Petition for Rehearing, directed this Court's attention to portions of the sentencing hearing transcript wherein counsel for Mr. Stuart contended that testimony taken outside trial could not be used as aggravation at the sentencing hearing (Memorandum in Support of Petition for Rehearing, filed July 8, 1985—p. 11). This memorandum also referred to excerpts from the sentencing hearing transcript wherein Judge Schwam initially indicated that he would not consider hearsay evidence unfavorable to defendant in determining whether a statutory aggravating circumstance had been proven beyond a reasonable doubt. Also noted were excerpts from the sentencing hearing transcript indicating that the Court subsequently acted exactly opposite to Judge Schwam's earlier comments, and considered preliminary hearing testimony over the objection of the defense (Appellant's Memorandum in Support of Petition for Rehearing, filed July 8, 1985—pp. 11–12).

As the Record in this case will illustrate, Mr. Stuart indeed did file a Petition for Rehearing challenging the purported 'stipulation' concerning use of preliminary hearing testimony at sentencing. The Petition for Rehearing filed by appellant also noted the fact that the Court relied upon preliminary hearing testimony over the objection of the defense, in finding beyond a reasonable doubt that two statutory aggravating circumstances had been proven. As further illustration of the fact that no such stipulation occurred the Court's attention is also directed to the following words of Judge Schwam, at the time of sentencing:

I think the prosecutor is correct that I must consider the evidence at the preliminary hearing and at the trial.

(Transcript of December 1, 1982, Sentencing Hearing, p. 102, ls. 16–18).

After the Memorandum in Support of Petition for Rehearing had been filed, this Court granted Rehearing under an Order dated September 20, 1985, concerning only the issue of jury instruction number 18. The issue raised on Rehearing concerning the alleged 'stipulation' to the use of preliminary hearing testimony at sentencing, and the Trial Court's reliance upon hearsay evidence in finding beyond a reasonable doubt that statutory aggravating circumstances existed, was not permitted to be argued on Rehearing in Stuart I.

As earlier noted, appellant acknowledges that the nonexistent 'stipulation' was not precisely phrased as an issue on direct appeal. It was, however, directly referred to in the Memorandum in Support of Petition for Rehearing filed by Mr. Stuart on July 8, 1985. To maintain now that this issue was not raised on direct appeal is to exalt form over substance in direct violation of well established rules providing for 'qualitatively different' review of death penalty cases. *State v. Scroggins*, 110 Idaho 380, 387, 716 P.2d 1152, 1159 (1985); *State v. Osborn*, 102 Idaho 405, 410–11, 631 P.2d 187 (1981); *State v. Sivak*, 105 Idaho 900, 903, 674 P.2d 396 (1983).

In its Decision entered March 12, 1990, the majority of this Court erred in concluding that Mr. Stuart had not raised, in his Petition for Rehearing from Stuart I, an issue concerning improper use of preliminary hearing testimony by the Sentencing Court. As hereinbelow noted, even if this issue were raised for the first time on post conviction relief proceedings, Idaho Code Section 19–4901, as presently written, is inapplicable to this case. The fact remains, however, that appellant not only addressed the purported 'stipulation' in his Rehearing Memorandum filed July 8, 1985, but was denied an opportunity to present an argument in support of this issue at the Rehearing ultimately held.

## II

### APPELLANT IS NOT PRECLUDED FROM ADDRESSING THE ISSUE OF IMPROPER USE OF PRELIMINARY HEARING TESTIMONY BY THE SENTENCING COURT IN POST CONVICTION RELIEF PROCEEDINGS.

In the opinion of this Court issued March 10, 1989, subsequently withdrawn and replaced by the Opinion entered March 12, 1990, the majority of this Court indicated that Mr. Stuart's allegations concerning improper use of preliminary hearing testimony by the Sentencing Court were forfeited under the provisions of Idaho Code Section 19–4901(b) (*Stuart v. State*, No. 17014, Slip Op. No. 28 (Sup.Ct. March 10, 1989, p. 8). Incorporating what appears to be the same reasoning, the majority of this Court in the most recent Decision entered March 12, 1990, indicated that 'Stuart is foreclosed from raising the issue of the use of preliminary hearing testimony at sentencing because of our decision in Stuart I' (*Stuart v. State*, No. 17014, Slip Op. No. 35 (Sup.Ct., March 12, 1990, p. 6).

As previously noted, appellant did indeed raise the issue of improper use of preliminary hearing testimony by the Sentencing Court, in seeking rehearing of the Decision in Stuart I. As hereafter illustrated, however, even if the issue had never been raised, Mr. Stuart is not procedurally barred from raising this issue in post conviction proceedings.

Idaho Code Section 19–4901 was initially enacted in 1967. It has thereafter been amended effective July 1, 1975, and July 1, 1986. Until July 1, 1986, Idaho Code Section 19–4901(b) read as follows:

**19–4901. REMEDY—TO WHOM AVAILABLE—CONDITIONS.**

(b) This remedy is not a substitute for nor does it affect any remedy incident to the proceedings in the trial court, or of appeal from the sentence of conviction. Except as otherwise provided in this act, it comprehends and takes the place of all other common law, statutory, or other remedies heretofore available for challenging the validity of the conviction or sentence. It shall be used exclusively in place of them.

On July 1, 1986, the present amendment of Idaho Code Section 19–4901(b) took effect. As presently written, the statute contains the following language:

**19–4901. REMEDY—TO WHOM AVAILABLE—CONDITIONS.**

(b) This remedy is not a substitute for nor does it affect any remedy incident to the proceedings in the trial court, or of an appeal from the sentence or conviction. **Any issue which could have been raised on direct appeal, but was not, is forfeited and may not be considered in post conviction proceedings, unless it appears to the court, on the basis of a substantial factual showing by affidavit, deposition or otherwise, that the asserted basis for relief raises a substantial doubt about the reliability of the finding of guilt and could not, in the exercise of due diligence, have been presented earlier.** Except as otherwise provided in this act, it comprehends and takes the place of all other common law, statutory, or other remedies heretofore available for challenging the validity of the conviction or sentence. It shall be used exclusively in place of them. (emphasis added).

As the Record will reflect, Mr. Stuart was arrested on September 19, 1981, and subsequently charged with the crime of murder by torture on October 1, 1981. After his trial and conviction, Mr. Stuart was sentenced to death on December 1, 1982. His direct appeal was then taken to the Supreme Court and, on May 3, 1985, the conviction and ultimate sentence of death were affirmed on appeal. His Petition for Post Conviction Relief, which included an allegation concerning improper use of preliminary hearing testimony by the Sentencing Court, was filed June 3, 1986. Accordingly, the Record well illustrates that Mr. Stuart was charged, convicted, sentenced, his direct appeal decided, and post conviction

relief petition filed, all prior to the time I.C. 19–4901(b), as presently written, took effect.

Appellant's Memorandum in Support of Petition for Rehearing, filed May 11, 1990, 8–14.

## APPENDIX B

The Bistline, J., dissent in the 1989 Opinion No. 28, filed March 10, 1989, deals with (a) the use made by the district court at sentencing of the preliminary hearing testimony of defendant's abuse of women in Washington state over ten years earlier; (b) the actual circumstances and events in *State v. Coutts*, 101 Idaho 110, 609 P.2d 642 (1980), and *State v. Osborn*, 104 Idaho 809, 663 P.2d 1111 (1983), did not establish the precedent that there were no limits on what a district court could consider at sentencing; and (c) a chronicle of the systematic efforts of the district court which consisted of inappropriate conduct making extremely difficult the efforts of Stuart's counsel at obtaining a fair trial, *i.e.*, no investigator, no money, penurious monetary reward, and grossly wrong orders and rulings:

The judgment of the district court denying and dismissing the petition for post conviction relief is affirmed.

SHEPARD, C.J., and HUNTLEY, J., concur.

JOHNSON, J., concurs in Part I, Part II(A) and Part II(C), and dissents as to Part II(B).

BISTLINE, J., specially concurring and dissenting. [The concurrence, Part I, was with the dissenting parts of the opinion authored by JOHNSON, J.]

## PART II.

**"The evidence demonstrates beyond a reasonable doubt that this defendant attempted to drown a woman as a means of torture and that this defendant inflicted brutal beatings upon his second wife and raped her while she was in the hospital recovering from an automobile accident."**

Judge Andrew Schwam, Findings of the Court in Imposing the Death Penalty.

The amended information upon which Stuart was put on trial did not allege any such criminal conduct on the part of the defendant. The charging part of the information was this:

That Gene Francis Stuart of Orofino, Idaho, *on* or about the *19th day of September 1981*, at Orofino, in the County of Clearwater, State of Idaho, then and there being, *did then and there* unlawfully and feloniously *kill* a human being, with the intentional application of torture to said human being, to wit: that the said Gene Francis Stuart did *strike and hit Robert Miller*, a human being, *repeatedly with the intent to cause suffering or to satisfy some sadistic inclination* of the said Gene Francis Stuart, *thereby inflicting great bodily injury upon Robert Miller* and mortally wounding Robert Miller, *from which wounds the said Robert Miller*, a three year old boy, sickened and *died* in the County of Clearwater, State of Idaho, *on the 19th day of September 1981.*

*State v. Stuart, supra,* [110 Idaho] at 185, [715 P.2d] (emphasis added). Judge Schwam's finding of defendant's guilt on the two totally unrelated charges of attempted drowning of one woman, and the rape of another clearly was the strong factor which supported his imposition of a death sentence. Equally clear, the defendant in Judge Schwam's courtroom in the presence of the jury was being tried on not just the filed charge of murdering the child, but also on the non-filed charges of aggravated assaults committed against the two women—one of whom had been his wife. Not only was the defendant not formally charged anywhere by information with those two acts of criminal assault, but he could not have been charged in Idaho. The adduced evidence shows that such purported acts, although found by the judge alone to have been "proved beyond a reasonable doubt," took place entirely in the state of Washington, and in the western part thereof, and over ten years in the then distant past.

Judge Schwam recited in his Findings that the evidence upon which he relied in so pronouncing defendant guilty of the two assaults beyond a reasonable doubt was first found by him in a transcript of the preliminary hearing, which the Judge had read prior to presiding at trial.

Defendant's Petition for Post–Conviction Relief, Part *D,* accurately assesses that:

**It is evident from the Court's findings that testimony presented at the Preliminary Hearing was accepted as factual in its entirety, despite the fact that Petitioner had not then even commenced discovery proceedings, nor was he later able to cross examine these witnesses concerning these allegations.**

Petition for Post Conviction Relief, p. 6. In said Part *D,* the defendant particularly challenged a Judge Schwam finding, No. 3,

**It was agreed and understood by both the state and the defendant that the Court would rely upon, as part of the sentencing hearing, the testimony at the preliminary hearing and the trial.**

Following Judge Schwam's retirement from the bench, Judge Schilling presided in the post-conviction proceedings. In entering a summary judgment denying defendant any hearing or any relief, Judge Schilling in his written decision turned first to this Court's opinion on defendant's first appeal, and stated: "On direct appeal, the Idaho Supreme Court noted that **USE OF THIS TESTIMONY WAS STIPULATED TO, AND WAS PROPERLY BEFORE THE COURT.**" Judge Schilling's reading ability was not at fault in making that statement. Unfortunately, as it is now discovered, Justice Bakes in authoring the Court's opinion was misled by Judge Schwam, and in turn misled the other four of us as to the actual content of the written record.[1] Justice Bakes wrote:

**IT WAS STIPULATED AT THE SENTENCING HEARING THAT WHEN SENTENCING THE DEFENDANT THE COURT WOULD CONSIDER EVIDENCE PRESENTED AT THE PRELIMINARY HEARING AND TRIAL ALONG WITH THE PRESENTENCE INVESTIGATION REPORT.**

Supreme Court on Direct Appeal, per Bakes, J., 110 Idaho at 176, 715 P.2d at 846.

A time-consuming search through Volume 5 of the appeal record appears to have produced the "stipulation" which Judge Schwam declared had been entered into. Justice Bakes in turn appears to have utilized Judge Schwam's finding in his opinion.[2] After the State had put on one witness, the jailer, who testified that he had observed no remorse on defendant's part, Judge Schwam ruled that he would discount completely and did so by striking all of the jailer's testimony. The State presented no more witnesses. The following then took place:

THE COURT: Does the defense have any witnesses?

MR. KINNEY: Your Honor, in light of the fact that the State has presented no witnesses in aggravation in addition to, of course, the trial testimony, we tend to also rely on the trial and argument.

THE COURT: Okay. *I gather it's the STATE'S POSITION that it has a right to and intends to rely upon all the cross-examination testimony illicited either at the Preliminary Hearing or the trial;* is that correct?

MR. CALHOUN: Yes, sir, that is correct.

THE COURT: Okay.

MR. KINNEY: Just a moment, please?

THE COURT: Yes.

MR. CALHOUN: I believe I've so stated in the paperwork that I filed.

---

1. By the nature of things we naturally rely upon the justice who has drawn the case to correctly portray the record. Otherwise, all five of us would have to painstakingly read all of the appeal records and transcripts—an exercise which time constraints do not allow.

2. The search was made solely because, by reason of the three appearances defense counsel has made at oral argument in this defendant's appeals, his verity and sincerity are beyond question, and he has assured us that he made no such stipulation.

The prosecutor's statement that the *State* would rely upon preliminary testimony was just that, the *State's position.* For certain it was not the stipulation which this Court's opinion elevated it to on the direct appeal—apparently on the sole basis of Judge Schwam's finding of such a stipulation, and without anyone on this Court making an independent examination of the record in order to ascertain the validity of Judge Schwam's finding.

Nor is there anything in *State v. Osborn,* 104 Idaho 809, 663 P.2d 1111 (1983), which gives the sentencing authority any carte blanche authority to resort to preliminary hearing transcripts as acceptable evidence at a hearing on the question of imposing a sentence of life or death. *Osborn* does not do that. There is a considerable amount of wishy-washy meanderings in the Court's opinion, pp. 410 through 412 [of 102 Idaho, pp. 192 through 194 of 631 P.2d], but in essence it distills to the proposition of law which West Publishing found therefrom and set out in Headnote 2:

> Use of the preliminary hearing transcript by State at sentencing aggravation-mitigation hearing instead of live testimony was not error where defendant had pled guilty prior to trial, [and] *at no time did either State or defendant object to proceeding in such manner,* ... **AND DEFENDANT ALSO RELIED UPON INFORMATION CONTAINED IN RECORD [SIC, TRANSCRIPT] OF THE PRELIMINARY HEARING. ...**[3]

Although the author of the Court's opinion in *Osborn* honored me by utilizing a goodly share of that which I had *previously written* in the same case, undoubtedly more important than what was borrowed is that which I had written and which was not recycled. The *Osborn* author and myself in my *Osborn* opinion, on this one narrow point, made these like statements. "We hold today that those cases in which the death penalty may be imposed do not represent 'ordinary circumstances.' " 102 Idaho at 424, 631 P.2d at 206 (per Bistline, J.) "We recognize that cases where the death penalty may be imposed are not 'ordinary circumstances.' " 102 Idaho at 412, 631 P.2d at 638 (per McFadden, J.)[4] But, there we parted. Unlike the author of the Court's *Osborn* opinion, my view then, and fortified as more and more death penalty cases came under review, was that the Court should insist on adherence to the procedure set out by the legislature, without judicial improvising.

Following the statement that death penalty cases do not present ordinary circumstances, that statement in my opinion was expanded:

> The gravity and infrequency of a sentence of death are such that it is necessary that all procedural formalities be

---

3. Footnote 4 to the Court's opinion on the direct appeal, 102 Idaho at 412, 631 P.2d at 194, sets out the basis of what West Publishing observed to be the holding:

> While appellant's counsel did not object to the use of the preliminary hearing transcript, it is noted that he did indeed object to the sufficiency of the evidence disclosed therein. Thus, he relied upon the preliminary hearing record to show arguably mitigating circumstances and to facially show the absence of statutory aggravating factors beyond a reasonable doubt....

A remarkable non sequitor. An objection is transformed into reliance.

4. McFadden, J., for the majority, relied entirely on an opinion which he had written, *State v. Coutts,* 101 Idaho 110, 609 P.2d 642 (1980), for the proposition that,

> ... in the absence of an explicit request for the formal hearing contemplated by I.C. Sec. 19–2516, the court may reach its sentencing decision by receiving the unsworn formal

statements presented by both sides, together with the presentence report and arguments of the respective counsel.

*Osborn,* 102 Idaho at 412, 631 P.2d at 638. As there conceded, the questions were not identical, but,

> ... we find the analogy persuasive. Where the defendant expressly or impliedly agrees to dispense with the formality possible under the statute, i.e., the presentation of all statements orally and under oath, and instead allows presentation of facts through prior evidence, presentence reports, argument of counsel, and the like, we find no prima facie error due to such use.

*Osborn, supra,* at 412 [631 P.2d at 638]. The lack of identity consisted of: Coutts had been handed a 14-year indeterminate term; Osborn's sentence was a decidedly determinate term of death by execution. This is not a distinction without a difference.

followed with the utmost care. Such a proposition need not be belabored.

Our conclusion is buttressed by our decisions with regard to the use of preliminary hearing testimony at trial. In that regard, we have noted that the only function of a preliminary hearing is to determine whether a crime has been committed and whether there is probable cause to believe that the crime was committed by the accused. *State v. Ruddell*, 97 Idaho 436, 546 P.2d 391 (1976); *State v. Haggard*, 94 Idaho 249, 486 P.2d 260 (1971). At a preliminary hearing neither the prosecutor not the defense counsel has any incentive to go to great lengths in presenting his case, or in cross-examining the other side's witnesses. The preliminary hearing is usually held at an early stage in the proceedings so that the defense counsel has had little time to prepare, or having prepared, sees no reason to display, his hand—or, in some situations may well realize that the examining magistrate is not inclined to hear any testimony which merely raises questions of fact. A magistrate does not pass upon guilt, and there seems to be some view in the state that issues of fact ought not be passed upon either. In fact, in *Freeman v. State*, 87 Idaho 170, 392 P.2d 542 (1964), the Court put the matter wholly at rest:

> ' "*A preliminary examination before a committing magistrate is in no sense a trial.* The purpose is to obtain the judgment of a magistrate to the effect that a crime has or has not been committed, and if committed that there is reasonable ground to believe that the person accused is guilty of committing the crime. It is not to be expected, nor is it required, that the same formality and precision must be in a preliminary examination as is required at trial." *State v. Bilboa*, 33 Idaho 128, 190 P. 248.' 87 Idaho at 177, 392 P.2d at 546 (emphasis added).

Later in the opinion the Court quoted the Supreme Court of Minnesota for an almost identical statement as to a preliminary hearing being in no sense a trial,

also describing it as being merely a process whereunder the state may determine if it wants to proceed further against the accused. 87 Idaho at 179, 392 P.2d at 547.

The same reasoning applies to the case at bar. Before a sentence of death can be imposed, I.C. § 19–2515(f) requires that at least one aggravating circumstance must be proven beyond a reasonable doubt. **A PRELIMINARY HEARING IS SIMPLY NOT DESIGNED NOR INTENDED TO PRODUCE EVIDENCE ESTABLISHING FACTS BEYOND A REASONABLE DOUBT; A DEFENDANT WHO PLEADS GUILTY, AND HENCE HAS NO TRIAL, IS ENTITLED TO A PROCEDURE AS SEARCHING AND RELIABLE AS A TRIAL BEFORE IT IS DETERMINED THAT HE SHOULD BE PUT TO DEATH.**

*State v. Osborn*, 102 Idaho 405, 424–425, 631 P.2d 187, 205–206 (emphasis added).

It has been abundantly shown that Judge Schilling, although himself not in error in relying upon the misstatement of the Court's *Stuart I* opinion on direct appeal, was led into error thereby, and but for his blameless but faulty reliance on *Stuart I* there was no sound basis for a summary judgment which turned away a death penalty defendant without any hearing. It is rather apparent that Judge Schilling did not have brought to his attention the so-called "stipulation" as it actually took place. Hence, Judge Schilling noted that "petitioner did intend to rely on trial testimony and argument." In that regard Judge Schilling was entirely correct, because that is what defense counsel said, and which counsel has never denied. The statutory scheme for a sentencing hearing *does* provide that trial testimony may be utilized. There is no problem whatever in that regard.

But, and a big but it is, Judge Schilling utilized Justice Bakes' conclusion that defense counsel had stipulated—which was not so, and Judge Schilling added a bit of gloss that was not justified: "However, it is clear that petitioner did intend to rely on

trial testimony and argument, *and was not demanding strict compliance with the live testimony formality of I.C. § 19–2516.*" The final phrase, emphasized above, has no support whatever, and at best amounts to no more than sheer surmise. Yet, it is crucial. Judge Schilling was looking at § 19–2516 when he should have been looking at the same statute both counsel, for the state and for defendant, were looking at, I.C. § 19–2515. Said statute specifically states that: "**EVIDENCE ADMITTED AT TRIAL SHALL BE CONSIDERED AND NEED NOT BE REPEATED AT THE SENTENCING HEARING.**"

Judge Schilling on the following page of his opinion mentioned only one sentence of I.C. § 19–2515(d), which was incorporated into the final sentence of his addressing the issue of the use of a transcript of preliminary hearing testimony: "More importantly, the Court in *Osborn* concluded that the use of relevant preliminary hearing testimony was proper and desirable in sentencing, especially where the sentencing court is mandated to consider all relevant evidence under I.C. § 19–2515(d). *Osborn*, 102 Idaho at 410–413 [631 P.2d 187]."

In the *Osborn* case, McFadden, J. with only Bakes, J. and Donaldson, J. concurring,[5] also took an extremely wide latitude of literary license in converting this sentence of I.C. § 19–2515(c):

> At such hearing, the state and the defendant *shall be entitled* to present all *relevant* evidence in aggravation and mitigation,

into a transformation of his own desire:

> The section speaks *of the entitlement* of the parties to present *whatever evidence* they desire at the aggravation-mitigation hearing.

From which vantage point, of transmuting the statute's "relevant" into the Justice's "whatever," he saw I.C. § 19–2515(c) as creating an *"entitlement of the parties"* but only after first stating:

... the precise question raised ... is whether the live testimony mandate of I.C. § 19–2516 displaces **the discretion granted to the state** on how to proceed at the hearing, *i.e.*, whether the statute absolutely requires live testimony in open court at the aggravation-mitigation hearing.

Having considerably rewritten the plain language of the statute to his own liking, he delivered his punch line: *"We decide that it does not." Osborn*, all quotations found at 102 Idaho at 411, 631 P.2d at 193. The statute allocates to the State no such discretion. Nor to the sentencing court.

Unfortunately, the district judges feel bound to apply this Court's holdings no matter how unsubstantiated, and no matter how result-oriented, and no matter whether this Court has indulged in rewriting the statutory law or the Constitution itself. What Justice McFadden wrote in *Osborn* was used to Stuart's disadvantage by Judge Schilling, and unless curbed by this Court of its own volition will continue to be a source of prejudicial error in the district courts

Here, greatly to the defendant's prejudice in his attempt to gain relief by post-conviction proceedings, Judge Schilling obediently applied the McFadden, J. tamperings with the statutory process: "More importantly, the Court in *Osborn* concluded that the use of *relevant preliminary hearing* testimony was proper and desirable in sentencing, especially *where the sentencing court is mandated to consider all relevant evidence* under I.C. section 19–2515(d). *Osborn*, 102 Idaho at 410–413 [631 P.2d 187]." McFadden, J. extended himself to the ultimate in *Osborn* with this statement:

> While, admittedly, the section speaks of evidence from the prior *trial*, in light of the purpose of the statute, *we see no need to read into the statute* a requirement that other previously considered, relevant information from the preliminary hearing is to be excluded unless presented once again by live testimony.

5. Shepard, J. did not join the opinion for the Court, but dissented for reasons unstated.

*Osborn, supra,* at 412 [631 P.2d 187]. The "other previously considered, relevant information from the preliminary hearing," raises the questions, *"Considered by whom, and for what purpose?"* The answers should hardly need be supplied. 'Tis not the district judge who considers the preliminary evidence, but rather 'tis the magistrate who does so. The purpose is, as was well pointed out in my *Osborn* dissent, to determine whether a crime has been committed, and if there is probable cause for determining that the accused appears to have been the perpetrator.[6]

This Court's *Osborn* opinion gave Judge Schilling precious little opportunity to hold other than he did, even though obviously in violation of a clearly written statute.

There was not any justification from any source for Judge Schwam to have considered the preliminary hearing transcript as admissible evidence at the sentencing hearing in this case. Add to the last quotation above set forth that which McFadden, J. went on to say on the very point:

**This is certainly true where the appellant (defendant) relied upon the information contained in the record of the preliminary hearing,** *as occurred here.* 102 Idaho at 412, 631 P.2d at 194. Bakes, J. cannot point to where at the sentencing hearing in this *Stuart* case, reliance was placed by the defendant on the preliminary hearing transcript. The fact is quite the contrary. Nonetheless, the Bakes, J. opinion on the direct-appeal/mandatory-review, as has been herein above documented, indulged in the misstatement that there was a stipulation to the use of that transcript as relevant evidence.

If there were forthcoming a display of a reasonable amount of intellectual integrity, this opinion could be discontinued at this point, and the majority would now reverse Judge Schilling. But such reversal would not be for his own error, but because those in the majority would candidly assume the

responsibility for misguiding Judge Schilling.

With that thought expressed, we proceed to the decision in post-conviction proceedings.

PART III.

Because it is a highly important, integral element of Judge Schwam's sentencing, a second look at Part IIA of the Court's opinion on the mandatory-review/direct-appeal is merited. Part IIA dealt with the admissibility of the testimony of the two women who testified to the assaults suffered by each—but for which no charge was ever made. Before delving into the admissibility issue, the author of the Court's opinion first set the stage by explaining the prosecution's problem: "To obtain a first degree murder by torture conviction, the state is required to prove that the defendant had an intent to cause pain and suffering." The prosecution's so-called problem was, however, of the prosecution's own making. In the last previous child-abuse death case which came before us, the prosecution experienced no trouble in satisfying the jury that the 8–month old child "died from blows to the head, a minimum of two and probably three blows.... Testimony indicated that the injuries could not have been inflicted accidentally or by the activities of (the child) herself." *State v. Aragon,* 107 Idaho 358, 361, 690 P.2d 293, 296 (1984).

The charge in that case was first degree murder, in the usual form. An instruction gave the jury the definition of the homicide which the defendant there was convicted of: "Murder in the first degree is defined in this case as all murder which is perpetrated by any kind of willful, deliberate and premeditated killing." 107 Idaho at 362, 690 P.2d at 297. That was the *only* charge of first degree murder. As I explained in *Stuart I,* the prosecution made a poor choice in not also charging Stuart with a count for deliberate, willful, and premedi-

---

**6.** When an opinion issues out of this Court doing as much damage to statutory provisions, as Justices McFadden, Bakes, and Donaldson accomplished in *Osborn,* the prosecuting attorney and defense counsel would perform high public service by joining in presenting remedial legislation to the legislature.

tated killing. As previously alluded to, and having on this review of Stuart's final effort at obtaining a fair trial in the Idaho judicial system, and by reason of those many reviews of the transcripts of the proceedings having obtained my own sense that the prosecutor in this case was capable as well as conscientious, I am more and more inexorably drawn to the conclusion that the poor choice of charging torture murder, and only that, was made by the some other person higher in officialdom.

The author of the Court's *Stuart I* opinion, after noting that the charge was torture murder then rationalized that the anticipated defense to that charge would be to show the jury that the homicide resulted from an over-abundance of discipline. Because of such anticipated defense, the Court's opinion then spoke to: "The state's only chance to refute that defense, other than by showing the severity of the treatment of the victim, would be to introduce *other evidence* which might tend to show that appellant's treatment of this victim was for purposes other than discipline." *Stuart, supra,* 110 Idaho at 170, 715 P.2d at 840 (emphasis added).

The Court's opinion, having not yet held such extraneous evidence admissible, detailed its value:

> In this case, the state presented an abundance of evidence concerning appellant's abuse of other women and their minor children with whom he had lived over a period of ten years. Appellant's treatment of these other persons was substantially similar to appellant's treatment of the victim. Thus, this evidence was relevant to show that appellant had an intent other than that of discipline in his treatment of the victim because he treated other persons close to him in a similar manner. It was also relevant to show appellant's sadistic nature, thus supporting the state's theory that appellant's treatment of the victim was torture, inflicted to satisfy the sadistic inclinations of appellant.

*Stuart, supra,* 110 Idaho at 170 [715 P.2d 833]. With the stage thus well set as to the nature and purpose of the extraneous evidence, the Court's opinion moved on to the real issue—admissibility under Idaho precedential case law. First was candidly **CONCEDED THE GENERAL INADMISSIBILITY** of such evidence, but then was noted the exception *where offered to prove motive,* for which two cases cited were *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979), and *State v. Wrenn,* 99 Idaho 506, 584 P.2d 1231 (1978). Sally Needs was convicted of first degree murder for killing her husband—an unwitnessed homicide. Approximately two weeks before his death, according to the testimony of an eye-witness, she had assaulted the then live husband with a butcher knife. I joined an unanimous opinion which upheld the admissibility of that testimony. Our opinion stated, "Specifically, in homicide and assault cases involving spouses, Idaho courts have allowed testimony as to a defendant's prior assaults on the deceased spouse to illustrate the mental attitude of the accused toward the deceased spouse and to prove motive." 99 Idaho at 893, 591 P.2d at 140.

*State v. Wrenn* was *not* a homicide case, leaving me to wonder why it was cited along with *Needs.* Perhaps, it is because a "string" of two cases is more impressive than a single citation. The two defendants in *Wrenn* were charged and convicted of robbing an itinerant previously unknown to them. The itinerant complained to authorities that the two defendants robbed him at gun point. The three had been seen together by other witnesses. The defendants at trial admitted being with the itinerant, but denied the robbery. The two defendants had been apprehended in Billings, Montana; the crime was alleged to have taken place in Pocatello, Idaho.

I joined a majority opinion (there was no dissent), which reversed and remanded because the trial judge, based on an officer's testimony that the automobile which the two defendants drove was a stolen vehicle, gave the jury an instruction that the defendant's flight could be considered indicative of guilt. So much for *Wrenn* and *Needs.*

The third precedential case in the Court's *Stuart I* opinion relied upon for upholding the admission of the wholly extraneous, unrelated, and ancient history testimony of the two purportedly assaulted women from western Washington was *State v. Sanchez*, 94 Idaho 125, 483 P.2d 173 (1971). It was first preceded by these introductory remarks:

> In this case, appellant also argues that the prejudicial effect of this evidence outweighs its relevancy, and thus it should have been excluded. In cases where evidence is claimed to be highly prejudicial, a balancing test is conducted where the probative value of the evidence is balanced against the prejudice to the defendant. Here, as we have already discussed, the evidence was relevant to show the intent of appellant in his treatment of the victim. *See State v. Sanchez*, 94 Idaho 125, 483 P.2d 173 (1971) (*in child beating case, evidence of bad acts of defendant, in form of beating of other children, relevant to show defendant's attitude toward children*). The evidence tended to support the existence of the intent to cause pain and suffering. The inclusion or exclusion of this type of evidence is a matter for the exercise of the sound discretion of the trial court.

Regretfully, I must submit that the author of *Stuart I* should have been better acquainted with *Sanchez*. It was *not wholly extraneous* evidence of the treatment of *other* wholly not-at-all connected children. This is readily discernible by reading very briefly in the *Sanchez* opinion, which produces the fact that Sanchez and his wife at the time of the charged homicide had a household which included four children, and the youngest who was 18–months old, was the victim of the homicide. At the trial testimony was given by a number of witnesses who testified as to prior acts of discipline by the defendant against not only the young victim, but the other children in the household. The opinion of the Court conceded that such was not evidence of criminal conduct, but nevertheless admissible:

> These cases are not directly in point on the issue here, as they all dealt with facts that reflected the commission by the defendant of other crimes. In this case involving the death of an eighteen month old boy, there was evidence that the defendant at various times had disciplined the decedent as well as the other children. There was evidence that the discipline had been imposed by the defendant slapping the children with his hand on occasion, and on other occasions by the use of a belt. There was also evidence that this discipline had been imposed not only with the consent of the children's mother, but that she had expected him to discipline the children in order that they gain respect for their step-father. This evidence interjected another issue into this case, i.e. whether the corporal discipline employed was excessive. The trial court was aware of the problem of whether the probative value of it outweighed the prejudicial effect on defendant's position. In this type of case involving abuse of a small child, the facts are not easily unraveled, and the state is faced with a most difficult problem of attempting to prove exactly what did take place. It is the conclusion of this court that in such a situation the trial court properly admitted this evidence in order to give to the jury the full picture of the situation in the home where the tragedy occurred. It is recognized that this testimony might have tended to inflame the minds of the jurors, especially where children of the tender age of those involved here are concerned, yet this testimony was of probative value to bring out the attitude of the defendant towards his step-children, and towards the deceased child.

*Sanchez*, 94 Idaho 125, 128, 483 P.2d 173, 176 (1971). There was strong circumstantial evidence that the defendant had placed the infant in an electric clothes dryer, as shown by blood stains on the admitted in evidence dryer door. It is much doubted that any one would challenge the *Sanchez* holding affirming *the conviction* of *involuntary* manslaughter. It is much more doubtful that mature minds legally educat-

ed would use the *Sanchez* case as authority for upholding the validity of the testimony of the two women allegedly assaulted by Stuart. The two cases are poles apart.

Yet the opinion for the Court states: "In this case the evidence presented of appellant's *prior* relationships [the two women in Washington ten years earlier] was introduced for the specific purpose of showing sadistic intent and frame of mind of appellant *at the time of the commission of the acts directed toward the victim* [Robert "Bobby" Miller]. 110 Idaho at 170 [715 P.2d 833]. That rationale is as logical as the proposition that opposite angles are unequal, and neither common sense logic nor the three discussed Idaho cases sustain the Court's opinion in *Stuart I,* as the above passage goes on to say, "Thus the evidence was admissible under our rule." If admissible, the rule is one of a necessity made therein in order to assure that in Idaho no conviction of capital murder will be overturned, although on rare occasion this Court will find reasons for interfering with the imposition of the death penalty, or for perceived error put the district judge to a resentencing. *See State v. Osborn, supra; State v. Windsor,* 110 Idaho 410, 716 P.2d 1182 (1986); and *State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1986).

## PART IV.

Defense counsel at oral argument gave a cogent synopsis of the many obstacles placed in his path in attempting to prepare for the trial judge's anticipated, but never declared, determination to allow the two women from western Washington to testify. True, this was considered on the direct appeal, at is only one small component in the overall picture, and of a necessity permeates throughout all of the proceedings since Stuart was charged by a complaint and bound over to stand trial after the preliminary hearing. That synopsis is convincing to any member of the trial bar that defense counsel was not able to obtain any semblance of a fair trial. My separate opinion in *Stuart I* reported how, on a motion for change of venue because of undue publicity Judge Schwam procrasti-

nated in making any ruling, and then, when he did venue was not changed to some place out of the Second District, but to Moscow, Idaho, which is not only in the same judicial district, but is an environment closer to the source of the notorious publicity than Orofino, where the homicide occurred, but also happened to be the place of Judge Schwam's residence. Moreover, it required defense counsel, a sole practitioner residing in Orofino, to find temporary quarters in Moscow, which would in an ordinary criminal trial be a substantial handicap. In a murder defense, it would be more so, and in Idaho's first torture murder case—obviously a spectacular production—it would be a well-nigh impossible situation. Add to all of that the bizarre circumstance that defense counsel would eventually find himself defending against the two long-ago assault charges to which the two women from western Washington would testify on behalf of the prosecution. Defense counsel, even had he been ably staffed with an assistant, with an investigator, and with the funds which are necessary to engage in combat with the prosecution, might as well have thrown in the towel. However, he was made of sterner stuff.

Although a great deal of the pathos is lost in the transition from the spoken word to the printed page, even just the printed word will spell out a message to members of the bar who opt to undertake such a mission as that here undertaken.

The following is defense counsel's statement of the frustrations visited upon him in his attempt to provide his client with a defense and a fair trial:

MR. KINNEY: To address the issue, the primary issue we are presenting on appeal at this juncture, it is necessary to go through a bit of the facts surrounding Mr. Stuart's conviction and ultimate sentence. As the Court is aware from the record, Mr. Stuart was convicted of, was the first person convicted in this state of the crime of murder by torture. Mr. Stuart was ultimately sentenced to death after his conviction, and several matters of significance arose in trial preparation and during trial which I feel are espe-

cially relevant here and which were not matters raised on direct appeal earlier. As reflected by the record, Mr. Stuart was represented by myself at all stages of the proceedings since his initial arrest through and including the present date. Mr. Stuart was charged, excuse me, has been charged with the crime of murder by torture. The state's counsel at the preliminary hearing conceded that it could not prove that offense without the use of testimony of girl friends and wives of defendant, alleging events up to one decade prior to the event. We have previously litigated the issue of whether or not that testimony should have been admitted at trial and will not argue it at this point. The central issue we are now presenting to the Court is whether the district court erred in refusing to allow an evidentiary hearing on the post conviction relief proceeding filed by Mr. Stuart by myself.

In Mr. Stuart's petition for post conviction relief, his initial petition was supplemented by the affidavit of one David Simmons. Mr. Simmons was a psychiatric technician at State Hospital North in Orofino in the year 1981. Mr. Simmons stated in his affidavit that in early September or late August of 1981, he was approached by Mr. Stuart who asked Mr. Simmons questions surrounding appropriateness of discipline of Robert Miller, the child who died and is concerned in these proceedings. Mr. Simmons in his affidavit indicated that he instructed Mr. Stuart as to appropriateness of discipline, what he should do under given circumstances and that the meeting took place only three weeks prior to Robert Miller's death. We originally submitted only Mr. Simmons' affidavit in supplementation, if you will, to our petition for post conviction relief. That original petition was denied by the district court without hearing. Then, in a response to the court's denial, and in the interim between the time we filed our original petition for post conviction relief and the court's denial of it, a matter came to light, a matter which I feel is critical to this Court's consideration of the evidence in this case. In that interim period of time, **myself and then counsel for the state, Mr. Calhoun, were contacted by the U.S. Attorney who had in turn received correspondence from one Leila Smith, the mother of Lynn Matieoni. Mrs. Smith advised that Lynn Matieoni had heard of Mr. Stuart's conviction death sentence and had evidence to present to anyone who would listen at the suggestion, and after receiving the correspondence from the U.S. Attorney, and both myself and Mr. Calhoun wrote to Leila Smith, and I in turn was able to contact Lynn Matieoni. The relevance of Lynn Matieoni's testimony is overwhelming at this point. Lynn Matieoni has supplied affidavits in our supplemental petition for post conviction relief to the effect that in 1975, from August of that year until October of 1976, she virtually resided on a full time basis with Mr. Stuart. Mind you, her affidavit does not say that they lived together as man and wife or as a couple, but her affidavit clearly says that they were either at one or the other's home virtually every night. Lynn Matieoni had two daughters at that time. Katrina, her oldest, was then five. Mr. Stuart cared for Katrina on a daily basis. Mr. Stuart, the man who was characterized by Judge Schwam as a being a torturer of women and children, a murderer, Mr. Stuart cared for not only Lynn Matieoni's children but did so in a fashion which was exemplary according to her affidavit.**

THE COURT (JUSTICE JOHNSON): Mr. Kinney, if I could interrupt you a moment.

MR. KINNEY: Certainly, sir.

THE COURT (JUSTICE JOHNSON): At the time you filed the motion for investigative assistance, prior to trial, did you have in mind locating Lynn Matieoni.

MR. KINNEY: Yes, Your Honor. Very much so.

THE COURT (JUSTICE JOHNSON): By name?

MR. KINNEY: Yes. And. Yes, sir.

THE COURT (JUSTICE JOHNSON): Can you tell me, and I've reviewed your affidavits, in this matter, what other evidence you were seeking at that time through the investigative assistant.

MR. KINNEY: I'd like to address that, if I could. And I think that a motion for investigative assistance is especially relevant here. Mr. Stuart had informed me of a special relationship he had with an individual by the name of Lynn Matieoni during trial preparation. At all times I was aware of her name. **At the time I filed my motion for investigative assistance, we were seeking not only to find Ms. Matieoni, if she were to exist, but we were also seeking to find witnesses who resided in the Woodenville area who could contradict the testimony of Theresa Jacobsen, Vicki Nelson, and Sharie Dally concerning events which occurred in Seattle.** Please, and I ask the Court to remember that the motion in limine we filed, was filed because the trial court requested that we file a motion in limine so that he would tell us what portions of the preliminary hearing transcript, ah, testimony, he would allow at trial. He denied that motion, as I recall ten weeks prior to trial. Immediately after his denial of our motion in limine in asking him to segregate which portions he would hear, I filed the motion for investigative assistance because we were then faced with the prospect of addressing each and every issue which was presented at the preliminary hearing.

THE COURT (JUSTICE JOHNSON): At that time did you specify to Judge Schwam exactly what investigative efforts you wanted to pursue.

MR. KINNEY: Your Honor, I'm afraid I'm going to trust my recollection. The court directed me in response to its, when I filed my motion for investigative assistance, the court directed me to file an affidavit setting forth what I wanted to do. I do not recall whether that affidavit specifically mentioned Lynn Matieoni by name, or specifically mentioned who I wished to contact. The court, trial court, directed that I have access to Se-attle telephone directories. The sheriff's department gave me a set of Seattle directories. The trial court then instructed me to come up at night, in district court chambers, in Clearwater County Courthouse, and telephone as many people, reach them by telephone, if I could. Then at the following, our law and motion day in Clearwater County is every other Thursday, the following law and motion day I reported to him on the contacts I had made by telephone. He then authorized $300 and that was it, for investigative expenses. That $300 was intended to compensate me for an airplane ticket to Seattle and motel and rental car—

THE COURT (JUSTICE JOHNSON): That was your specific purpose in going to Seattle to seek Lynn Matieoni?

MR. KINNEY:—among other things, Your Honor.

THE COURT (JUSTICE JOHNSON): What other things?

MR. KINNEY: The other things were to investigate witnesses in the Woodenville area, where Mr. Stuart had resided. Witnesses who could testify to events which had been alleged to have occurred by Theresa Jacobsen. The allegations of a drowning, the allegations of a beating of Theresa Jacobsen right when she left Mr. Stuart. I interviewed neighbors, friends, and ex-roommates of Mr. Stuart to contradict those allegations. Some of my efforts were successful. We were able to get four witnesses at trial consisting of roommates, I believe, ex-roommates of Mr. Stuart, who were there prior to and during the day that Lynn Matieoni, ah, not Lynn Matieoni, Theresa Jacobsen left.

THE COURT (JUSTICE JOHNSON): Were there any leads that you intended to pursue through investigative assistance, as you had originally requested, other than the location of Lynn Matieoni and her daughters, that you were unable to complete through the $300 grant and the other assistance the court did provide you?

MR. KINNEY: Oh, yes, Your Honor. I feel that there were a multitude of

matters which I feel I was unable to complete, that being I couldn't track down several of Mr. Stuart's relatives who had lived in the Woodenville area. I was there for a period of five days, using my vacation as a time to personally look after these people, or try to find them. People who had moved out of the Woodenville area and were living south of Tacoma, I couldn't find. I feel that an investigator could have uncovered evidence that Mr. Stuart knew of, relatives who had seen him with Theresa Jacobsen, who had seen him with Vicki Nelson, and who had seen him with Sherry Lee Dallie. But specifically Vicki Nelson and Theresa Jacobsen.

THE COURT (JUSTICE JOHNSON): When you returned from that trip, did you report your efforts in any form to Judge Schwam?

MR. KINNEY: We certainly did not file a written report of who we found. What we advised the court was that we found some witnesses that we would ultimately call at trial. I don't have any specific recollection of a report of my efforts.

THE COURT (JUSTICE JOHNSON): Did you renew your motion for investigative assistance at that time?

MR. KINNEY: I don't recall that I did, no. I don't recall that I did.

THE COURT (JUSTICE JOHNSON): Did you feel satisfied with the results of your investigation?

MR. KINNEY: No. At no time did I.

THE COURT (JUSTICE JOHNSON): Did you do anything else to put the court on notice that the assistance had been granted to you was not sufficient?

MR. KINNEY: Your Honor, we did not take the effort to tell the court, "we don't think that we have enough witnesses to counteract the testimony," *because I didn't know what testimony Judge Schwam would allow until trial. In fact, he told us he would not rule on which, if any of this past business, he would allow at trial until trial.* And so it's hard for me to answer this question *because I was not apprised,* and never was apprised, *until trial,* when, ah, *what witnesses he would allow and what testimony taken at the preliminary hearing he would permit.*

THE COURT (JUSTICE JOHNSON): I assume being cautious you assumed he would permit all of it.

MR. KINNEY: Yes, sir. And because of that we made a very strenuous effort, as much as I could, to uncover the witnesses that would contradict everything that was said at the preliminary hearing.

THE COURT (JUSTICE JOHNSON): Were there any other investigative efforts by you or anyone else to locate any witnesses or other evidence during that period of time?

MR. KINNEY: Only my telephone calls, Your Honor, made almost nightly from the courthouse to the Seattle vicinity, and I had no one else helping me, if that's your question.

THE COURT (JUSTICE JOHNSON): Thank you.

THE COURT (JUSTICE BISTLINE): I have a question or two, Mr. Kinney.

MR. KINNEY: Yes, sir.

THE COURT (JUSTICE BISTLINE): You're a sole practitioner?

MR. KINNEY: Not at this time, but at that time I certainly was, Your Honor.

THE COURT (JUSTICE BISTLINE): And where?

MR. KINNEY: In Orofino.

THE COURT (JUSTICE BISTLINE): And where was the trial held in this case?

MR. KINNEY: Moscow.

THE COURT (JUSTICE BISTLINE): How long have you practiced?

MR. KINNEY: I've now practiced 12 years.

THE COURT (JUSTICE BISTLINE): Before that were you a private investigator?

MR. KINNEY: No, sir, I never had any experience in that area.

THE COURT (JUSTICE BISTLINE): And at the time you were appointed to handle this defense, were you, I suppose, obliged, were you trying to keep up your

private practice and stay afloat as it might be put?

MR. KINNEY: That's a very apt characterization. The office of public defender is in Clearwater County, and presently is a part-time position. What remnants were left of my private practice—after Mr. Stuart's case—I was trying to keep up with, I guess is the best way to characterize it. I was working Mr. Stuart's case on an average of half time, half a day every day, and in the evening hours and every weekend. The rest of the time I tried to dedicate to keeping my practice alive.

THE COURT (JUSTICE BISTLINE): I think, unlike Ada County, you have nobody, no assistance, no legal assistance on this case?

MR. KINNEY: None at all, Your Honor. And I might add that further, the contract for public defender[7] in Orofino, as far as I know today, and I'm no longer public defender, I quit after the Stuart case, but the contract still is such that it's a privately contracted matter. The county does not provide secretarial or any other assistance, it is up to the individual who contracts the office to budget all that himself.

THE COURT (JUSTICE BISTLINE): Do you have any thoughts on what you'll do next time some judge asks you to undertake a capital case?

MR. KINNEY: Your Honor, I have no doubt what I would do, and would assure this Court as I have in the past, that I do not think that any person should undertake a capital case single handedly. I think its a tough undertaking for any two people, but it was rendered in my opinion, in my strenuous opinion, almost impossible in these circumstances. I recognize that small counties have budgetary constraints, and I recognize that when a person bids any type of contractual employment you take what comes, and I'm ready and willing to accept that, and I'm not here to whine about the fact that I was alone in representing Mr. Stuart, but I respectfully submit that 19–852[8] was not complied with here.

7. Idaho Code § 19–861 provides as follows:

**19–861. Public defender's office—Employees—Compensation—Facilities.**— (a) If an office of public defender has been established, the public defender may employ. in the manner and at the compensation prescribed by the board of county commissioners, as many assistant public defenders, clerks, investigators, stenographers, and other persons as the board considers necessary for carrying out his responsibilities under this act. A person employed under this section serves at the pleasure of the public defender.

(b) If an officer of public defender has been established, the board of county commissioners shall:

(1) Provide appropriate facilities (including office space, furniture, equipment, books, postage, supplies, and interviewing facilities in the jail) necessary for carrying out the public defender's responsibilities under this act; or

(2) grant the public defender an allowance in place of those facilities.

(c) A defending attorney is entitled to use the same state facilities for the evaluation of evidence as are available to the county prosecutor. If he considers their use impractical, the court concerned may authorize the use of private facilities to be paid for on court order by the county board of commissioners.

8. Idaho Code § 19–852 provides as follows:

**19–852. Right to counsel of needy person—Representation at all stages of criminal and commitment proceedings—Payment.**— (a) A needy person who is being detained by a law enforcement officer, who is confined or is the subject of hospitalization proceedings pursuant to sections 18–212, 18–214, 66–322, 66–326, 66–329 or 66–409, Idaho Code, or who is under formal charge of having committed, or is being detained under a conviction of, a serious crime, is entitled:

(1) to be represented by an attorney to the same extent as a person having his own counsel is so entitled; and

(2) to be provided with the necessary services and facilities of representation (including investigation and other preparation). The attorney, services, and facilities and the court costs shall be provided at public expense to the extent that the person is, at the time the court determines need, unable to provide for their payment.

(b) A needy person who is entitled to be represented by an attorney under subsection (a) is entitled:

(1) to be counseled and defended at all stages of the matter beginning with the earliest time when a person providing his own counsel would be entitled to be represented by an attorney and including revocation of probation;

(2) to be represented in any appeal;

(3) to be represented in any other post-conviction or post-commitment proceeding that the

We were not given any meaningful assistance, financial or otherwise. We asked for it; at every step we asked for, we were denied. The only time we had any professional expertise was a psychiatric opinion and ultimate psychiatric testimony at trial, and even then the bill submitted by the psychiatrist was questioned severely.

I see my green light's going on.

THE COURT (JUSTICE BISTLINE): I have one more question. I've taken some of your time.

MR. KINNEY: That's quite all right.

THE COURT (JUSTICE BISTLINE): These are things I'd like to know. I thought I understood you to say that the judge asked you to file a motion in limine.

MR. KINNEY: Yes, he did.

THE COURT (JUSTICE BISTLINE): And then he denied it?

MR. KINNEY: Yes, he did.

THE COURT (JUSTICE BISTLINE): Did he say why, was there something in the record that explains his reasoning for compelling you to do something, and then denying it?

MR. KINNEY: The court minutes reflect that the trial court, ah, I'm sure the record reflects this, the trial court asked us to file the motion in limine because, at a hearing at the, after the appellant's initial arraignment, I questioned what, if any, evidence of the preliminary hearing would be allowed. Please bear in mind that *the preliminary hearing evidence consisted of an allegation of a rape in a hospital, it consisted of an allegation that one of his girl friends said he attempted to drown her in a lake in the Seattle area,* and there was *also a psychiatric opinion by an individual who had never seen Mr. Stuart.* And those were very troublesome to me, so I asked

the court, in open court, then Judge Schwam directed that we file a motion in limine asking him to instruct, to limit. He then read the preliminary hearing transcript, apparently, in conjunction with another motion we had, and after reading that on July 29th, I believe, ten weeks prior to trial, denied the motion in limine and said he couldn't at this point decide which of that testimony he would allow.

There is just, this entire case, and I can't over-stress this, this entire case was permeated with hostility and an atmosphere of intense hatred to Mr. Stuart. I have never in 12 years of practice had a trial that was conducted in such an emotional environment, and we now have people who can contradict the state's witnesses that produced the only evidence to convict Mr. Stuart. The, and I feel its especially important because Judge Schwam, in his opinion, in his finding of aggravating circumstances under 19–2515, said that he *found the defendant beyond a reasonable doubt had attempted to kill his girl friend by drowning,* he *found that beyond a reasonable doubt the defendant had raped his ex-wife in a hospital.* Those were matters which were discussed at a preliminary hearing when the defendant had never even been apprised of what line the testimony was going to take, ah, was going to be given at the preliminary hearing, until it was given. And then, and what Judge Schwam does is take the quantum leap and never again discusses that during trial, but at the time of sentencing he says, "I find that the defendant, beyond a reasonable doubt, tried to kill his ex-wife—his girl friend, and raped his ex-wife in a hospital. Which is sheer and utter nonsense. And it was stuff that we couldn't even rebut at the preliminary hearing and was not allowed at trial. That's our position. We recognize

attorney or the needy person considers appropriate, unless the court in which the proceeding is brought determines that it is not a proceeding that a reasonable person with adequate means would be willing to bring at his own expense and is therefore a frivolous proceeding.

(c) A needy person's right to a benefit under subsection (a) or (b) is unaffected by his having provided a similar benefit at his own expense, or by his having waived it, at an earlier stage.

that *State v. Osborn*, the sentencing court can hear preliminary hearing testimony. This case deviates from that by a substantial degree in the sense that the sentencing court found beyond a reasonable doubt that Mr. Stuart had committed these alleged acts.

Oral argument at Moscow, Idaho, April 7, 1988.

Thereafter the Court was furnished with defense counsel's supplemental briefing which both clarified his responses to Bench questions at oral argument and provided us with citations to the appeal records:

At the Oral Argument held in this cause on April 7, 1988, at Moscow, several of the Justices expressed concern over the findings of Judge Schwam in considering the death penalty under Idaho Code Section 19–2515. Specifically, the Court considered certain findings of the Trial Court based upon testimony presented at the Preliminary Hearing and not at Trial. The purpose of this correspondence is to set forth the specific portions of the record which illustrate the findings entered by Judge Schwam, and the location of any relevant data in the Preliminary Hearing and Trial Transcript. This letter is mailed to you, and is intended only to provide assistance to the Clerks who are no doubt reviewing the record as a result of our Oral Argument.

The specific finding of Judge Schwam which was raised at the time of Oral Argument is located at page 225 of the original Clerk's Transcript on Appeal. At that point in the record, the Trial Court entered a finding pursuant to Idaho code Section 19–2515(f)(8) that the defendant, by prior conduct in the commission of the murder at hand had exhibited a propensity to commit murder which will probably constitute a continuing threat to society. Judge Schwam's comments, in pertinent part, are set forth as follows:

The evidence demonstrates beyond a reasonable doubt that this defendant attempted to drown a woman as a means of torture and that this defendant inflicted brutal beatings upon his second wife and raped her while she was in the hospital recovering from an automobile accident.

Judge Schwam was referring to the testimony of Theresa Jacobsen, a former girlfriend of Mr. Stuart, and Vicki Nelson, his former wife. The testimony of Ms. Jacobsen concerning the alleged drowning attempt was taken at the Preliminary Hearing, and contained on pages 151–154 of the Preliminary Hearing Transcript. After a thorough review of the Trial Transcript I find that Ms. Jacobsen testified briefly concerning this incident at Trial, however **did not offer the opinion that Mr. Stuart was trying to drown her.** Her Trial testimony relating to this incident is contained on pages 616–617 of the Trial Transcript.

With respect to the incident involving an alleged rape of defendant's former spouse while she was in the hospital recovering from an automobile accident, **Judge Schwam is referring to the testimony of Vicki Nelson, taken only at the Preliminary Hearing.** Her testimony concerning this matter appears in the Preliminary Hearing **Transcript on pages 222–224.** At Trial, Ms. Nelson testified commencing at page 636 of the Trial Transcript, with her testimony on direct examination concluding at page 651. **She was not permitted at Trial to testify concerning the alleged hospital rape which was earlier testified to at the Preliminary Hearing. No reference to that incident is contained anywhere in the Trial Transcript.**

At the time our Oral Argument was held, I did not have before me the first Clerk's Transcript on Appeal which contained the Court's findings. Also, the Preliminary Hearing Transcript and the Trial Transcript were not before us for reference. Upon review of both transcripts, and the specific language of Judge Schwam in entering the finding pursuant to Idaho

Code Section 19–2515(f)(8), it appears that the incident involving Ms. Jacobsen was indeed testified to at Trial, however without the detail or conclusions drawn at Preliminary Hearing. **The incident involving Ms. Nelson and her alleged rape at the hospital was clearly not part of her Trial Testimony,** having been presented only at Preliminary Hearing. Since the Preliminary Hearing was taken before a Magistrate, Judge Schwam did not at any time hear live testimony concerning this incident.

Mr. Kinney's assertions are fully substantiated by the appeal record. At the preliminary hearing the witness Theresa Jacobsen did not testify that the defendant had tried to drown her in the lake, but rather that at a time thereafter she had considered making such a statement to the person in a car adjoining the car she and defendant were in while parked at a 7–11 store. Preliminary Hearing Tr., p. 154.

She did not give any testimony at the trial which in any way related to the preliminary testimony concerning any "attempted drownings," other than that at some unidentified trial there had been testimony as to her state of sobriety on the evening of the lake incident, "... Gene [defendant] said he threw me in the lake to sober me up ... I was not drunk." Trial Tr., p. 634. On direct examination she had told the prosecutor that she had purchased two bottles of Lancer's wine for consumption by her and the defendant. Vicki Nelson at the preliminary hearing did testify to what she would "consider him raping me in the bathroom of the hospital room." Preliminary Hearing Tr., p. 223. At the trial before the jury no such testimony was given.

The foregoing serves to point out the accuracy of defense counsel's briefing. It is extremely important in that, as has been seen, Judge Schwam at sentencing utilized as gospel what he remembered as being the Jacobsen testimony, *i.e.,* that defendant attempted to drown her—*found as a fact proven beyond a reasonable doubt,* and also relied on the Nelson testimony that she was raped in the hospital—found to be been proven beyond a reasonable doubt.

What actually has been now established—beyond the cavil of dispute—is that such judge-made findings were based solely on a cold written preliminary hearing which Judge Schwam admittedly read long prior to trial. Moreover, that trial commenced and proceeded without Judge Schwam making any ruling whatever on the *in limine* motion filed by defense counsel at the judge's direction.

One of the main thrusts of defendant's post-conviction proceeding, as also well stated in his narration at oral argument, was the frustrating impossibility of adequately preparing for trial of a capital murder charge without knowing whether the trial judge would keep out or allow in all of the preliminary hearing testimony which was extrinsic to the charge properly filed in Idaho, *i.e.,* that of taking the life of Bobby Miller in Clearwater County on the 19th day of September, 1981. To which must be added the handicap of inadequate assistance and funding with which to combat unlaid charges of incidents which took place five hundred miles away in western Washington ten years prior to the charged homicide.

Unfortunately, the manner in which Judge Schwam conducted the trial has made appellate review troublesome, if not difficult. In his short supplemental brief, set out supra, for instance, defense counsel states as to the Nelson testimony, "She was not permitted at Trial to testify concerning the alleged hospital rape ..." Why she was not permitted to do so is not reflected in the record. The only reason for this, and other inexplicable trial happenings was Judge Schwam's *sua sponte in limine* ruling that on all matters of procedure counsel would approach the bench rather than put the jury to the exercise of being returned to the jury room. While it was indeed an ingratiating courtesy extended to the local jurors, it left the court

reporter out in the cold as well. The record is replete with bench-attorneys discussions held "off the record." Nowhere in the record is there found any suggestion that the prosecutor and defense counsel both waived the statutory requirement, I.C. § 1-1103, that the reporter is required to take down all proceedings in a criminal case. *See State v. Wright*, 97 Idaho 229, 542 P.2d 63 (1975), ("appellant contends that the failure of the district court to require the court reporter to record closing arguments of counsel was error and contrary to the requirements of I.C. § 1-1103. We agree.") *See also* in the same case the dissenting opinion of Justice Bakes, concurred in by then Chief Justice McQuade. Justice Bakes and Chief Justice McQuade strongly disagreed with the majority's conclusion that the failure of the trial court to comply with the statutory requirement was harmless error, and that it was not fundamental or constitutional error which entitles the defendant to a new trial:

> When this Court is unable to review the proceedings of the lower court because, in violation of the statues of this state, the record of those proceedings was not properly taken and preserved, and due to the record's deficiencies we are unable to determine whether a defendant's judgment of conviction has been obtained in a proceeding tainted with fundamental error, then we must apply the rule of *Ebersole v. State*, 91 Idaho 630, 428 P.2d 947 (1967), where we stated:

>> Appellant's dilemma was not of his own making. The statutory provisions requiring the recording of oral proceedings by the court reporter ... are fairly designed ... to protect a defendant from the very situation now before this Court.

*Wright*, 97 Idaho at 235, 542 P.2d at 69, quoting with approval to *Ebersole, supra* (Bakes, J. dissenting). *Wright* was *not* a case where the defendant was at risk as a prosecutor's candidate for the death penal-

ty. Rather that defendant was tried and convicted on a charge of robbery. I very much believe that, had the defendant in *Wright* be convicted of murder and sentenced to death, at least one and more likely two or three, of the justices who comprised the majority would have swung to the views of Justice Bakes, and there would have been a retrial.

Which brings me to the point of making two observations regarding the trial court's conducting the trial in such a manner, *i.e.*, unrecorded bench discussions as well as unrecorded decisions made with counsel in chambers has deprived the members of this Court from performing our statutory obligation—independent of whether the defendant chooses or declines to appeal, of making the mandatory review required by I.C. § 19-2827:

> **Review of death sentences—Preservation of records.—** (a) Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the sentence shall be reviewed on the record by the Supreme Court of Idaho. The clerk of the trial court, within ten (10) days after receiving the transcript, shall transmit the entire record and transcript to the Supreme Court of Idaho and to the attorney general together with a notice prepared by the clerk and a report prepared by the trial judge setting forth the findings required by section 19-2515(d), Idaho Code, and such other matters concerning the sentence imposed as may be required by the Supreme Court.

The legislative requirement that the Court conduct an automatic review of a death penalty case irrespective of the defendant appealing is, and properly so, an expression of the legislative intent that no person suffer the extreme penalty without the safeguard of judicial review of the entire record and transcript. Up until this time all death penalty sentences have been appealed by counsel representing the defendants.

One day, however, there will be the defendant who elects not to appeal, as has

happened elsewhere. When that chances to happen this Court will find itself independently reviewing the record and transcript without the guidance of the briefing of counsel, which naturally has been of great value.

Because in the past we have had the aid of counsel, representing the State and the defendants, it can safely be said that practically all, if not absolutely all, of our focus has been on the appeal procedure and none on the review mandated by the statute. My own belief, which has been mentioned heretofore only within these marble walls, is that we have an obligation *in death penalty cases* to delve into the record to satisfy ourselves that it is free of error regardless of and in addition to the briefing of counsel.

If I were to command a majority, a ruling would be made this day that in any death penalty case, where we do not have the complete record, *i.e.*, clerk's and reporter's transcripts of *all* proceedings, as required by both I.C. §§ 1–1103 and 19–2827, reversal for a new trial will result in accordance with the views espoused by Justice Bakes in the *Wright* case. "The statutes are there to be followed," per Justice Donald Burnett in *State v. Goldman*, 107 Idaho 209, 687 P.2d 599 (Ct.App.1984) and *State v. Toohill*, 103 Idaho 565, 650 P.2d 707 (Ct.App.1982). The stakes are far too high in death penalty cases to look the other way where we see noncompliance with the statutory requirements.

## CONCLUSION

A thorough review of the appeal record establishes to my complete satisfaction that an extremely diligent and conscientious defense attorney did all in his power, and within his devastatingly insufficient financial means, toward trying to obtain the fair trial which all defendants deserve, but especially those who face the extreme penalty of death.

In particular my concerns were with the treatment defense counsel received at the hands of the trial judge where counsel was deprived until midway through trial of any ruling whether to allow the prosecution to bolster its case by testimony of altercations and alleged abuse of two women which took place ten years in the past. On Thursday, October 7, 1982, shortly before adjourning for the noon recess, the fourth day of trial, under continued pressing for a ruling, finally the court verbalized one:

THE COURT: I am aware the State bears an enormous burden in trying to convict anyone of any crime because it must convince the trier of the fact that every material element is true beyond a reasonable doubt. In this particular case, the Prosecutor must convince the trier of the fact that your client was engaged in a course of torture. And produced this child's death, not necessarily intending death but only intending torture. And in that sentence alone I've had to use the word 'intending' a number of times. And so this case, to a great extent, is going to turn upon what the jury thinks was going on in your client's mind during that interval when he dealt with this child. And as you yourself have said, the surface evidence indicates an effort to discipline. However, the evidence before me is such that that allegation or implication, I should say, of discipline is very questionable. At this point in time I would suspect that if the jury had to deliberate, determining whether or not your client was engaged in discipline by ordering a two and a half to three year old to conduct his eating in such a precise manner and then punishing him each time he could not comply, I think it would be very difficult for me to assume that the jury could not responsibly decide that that was not discipline. That that was a form of more serious teasing or in other words, torture. That that was a process by which to emotionally punish that boy. The whole process. I think the jury could conclude that with this evidence alone. But I think they could also conclude that it was an effort

to train him to eat in a certain way. In other words, I think that the intent is not clear at this time. If I felt the intent was overwhelmingly clear in either direction—in other words, that either the Prosecutor had failed or had totally succeeded to demonstrate his case at this point I would probably be very hesitant to allow evidence of past behavior which will in fact be prejudicial to this case. But I feel in fact what we have in is an unclear situation and I think that the evidence of these other women in your client's life does bear directly on the underlying state of mind he has while he's acting with respect to this boy.

Now, I'm not convinced that all I read in the preliminary hearing from each of those witnesses bears on that. And that creates for me some difficulty as I realize the uncomfortable position for your if you have to object to every single question the Prosecutor attempts to ask the present witness or others he will call. I have already cautioned the Prosecutor that I'm troubled by this situation. And in your presence indicated that at no time did I think I was prepared to admit everything that came out in that preliminary hearing. And that, therefore, there would have to be some means adopted to—if I let any of this past behavior in to structure the way in which it comes in so that we can control the incidences that we deal with without you having to appear to be engaged in a process of trying to prevent everything reaching the jury. I don't think I want to put you in that position.

I am convinced from reading the preliminary hearing transcript that the Prosecutor's assertion that he feels he can prove to a trier of the fact that your client simply needs someone to torture, something like a whipping boy, for his own pleasure is actually something that he may in fact be able to prove beyond a reasonable doubt. And I am aware from reading the preliminary hearing transcript that the present witness suffered noticeably less than those other women in his life, especially the more recent ones, although it did go back as much as ten years. And I think the Prosecutor has the opportunity to prove or should have the opportunity to prove the state of mind he alleges your client to have and that in fact it became this child's role to do the suffering for the benefit of your client. And I think that's his basic intention. He's in effect said it and I think he has the evidence that might allow the trier of the fact to conclude that beyond a reasonable doubt that that is what's going on with your client.

If I exclude all of this evidence from this proceeding, then, I leave this jury trying to determine the status of your client's mind with virtually no evidence available on the subject. When in fact that's the heart of this case to a great extent. And I don't think I can impose that situation on the Prosecutor simply because so much of what your client did in his past which indicates status of his mind in dealing with this child were reprehensible acts. It is unfortunate for your client that his reprehensible acts show the status of the mind in dealing with this child.[9] And as prejudicial as they will be, I think giving the status of the law on Prosecutor's proving death by torture that the Prosecutor does have to show very clearly this was not a discipline situation. That the intent was in fact to torture. And I think that the Prosecutor has through that preliminary hearing demonstrated substantial amount of evidence which is highly relevant to your client's state of mind. So as reluctant as I am to go into these matters and as much as I understand they will lengthen these proceedings as well as possibly prejudice the jury against your client, I think I would in effect be

---

**9.** Whether he understood it or not, the judge here demonstrated that his mind was closed on the question from his reading of the transcript of the preliminary hearing. He had already decided the fact.

depriving the State of highly relevant evidence which is so relevant that it overcomes any prejudicial effect it might have in terms of its being admissible.

Although the trial court said a great deal in ruling on the motion, there is not readily seen therein that Judge Schwam advanced any reason for not having arrived at that conclusion much earlier than midway in trial. Yet, it is inescapable from the Judge's own mouth that he had read the preliminary hearing transcript and knew that the testimony of the two women would be prejudicial to the defendant in a trial on a charge of killing a small child by the infliction of torture, wholly unrelated to the incidents if true, as to the two women. The trial court acknowledged the exceptionally high potential for extreme prejudice when he instructed the jury—in mid-trial—with a single isolated special instruction: [10]

> Some of the testimony which will hereafter be presented by the State concerns allegations of acts committed by the Defendant against people other than Robert Miller. And are in no way the basis of any charge against the Defendant. Notwithstanding the fact that this testimony does not relate directly in any way to the death of Robert Miller, I will permit the State to present it for the single purpose of attempting to show motive or intent on the part of the Defendant to torture the deceased. It is not to be considered by you as evidence or proof on whether or not the Defendant committed any other material element or aspect of the crime charged. It may only be considered by you as evidence bearing on the intent or motive of the Defendant on September nineteenth, 1981. **You are instructed that these allegations concern acts not involving the deceased which if they occurred at all occurred only in the presence of the Defendant and his accuser.** For this reason and

because these allegations are not involving the deceased are highly laden with emotion against the accused you must weigh carefully the credibility of each such witness giving the benefit of every doubt to the accused and viewing critically the motive or possible prejudice of his accuser.

Not only was defense counsel hamstrung in his preparation efforts by the court's unreasonable and totally unacceptable delay in not making the ruling until mid-trial, but the monstrosity of the proposition is found in the failure to offer any meaningful explanation for such a judicial display of obduracy.

The judge did, however, make an attempt at explaining the hypothesis upon which he rationalized that he could rule in the wholly unrelated evidence of alleged mistreatment of the two preliminary female witnesses, Jacobsen and Nelson. The judge found a "continuum," a fine-sounding word which we older practitioners have recently learned from law clerks, although it has not yet made its way into Black's Law Dictionary, 5th ed., To defense counsel's assertion that that key preliminary hearing testimony of those two witnesses "comes as far back as *ten years prior to the child's death*," the judge responded with his continuum hypothesis. Tr. Vol II., p. 457, 1. 21:

> THE COURT: Of course, I have familiarity with the State's evidence because I reviewed the preliminary hearing transcript. *I feel he is in a position to demonstrate a continuum such that after that demonstration he has the possibility of convincing the jury beyond a reasonable doubt* that your client simply behaves in a certain way and that that explains his behavior towards this child. *Since I feel he can do this in a continuum I feel he is entitled to present the totality of that continuum because the final end of that continuum would be this child.* That is what the State's case

10. As with the conferences of the court and counsel in chambers, and off-the-record bench discussions, the instructions given at the end of the trial are not found anywhere in the appeal record.

is and I think his evidence works in that fashion. So, yes, I am prepared to let him go well back because I feel it's all a *continuum* of behavior which culminates in this child and explains your client's intent. At least offers an explanation which would allow the jury to conclude beyond a reasonable doubt what was the motivating intent of your client at the time he was acting towards this child. *So I realize some of the evidence is very remote in time from this incident but because it is part of a continuum* I don't think—that there's a reason for me to give a cutoff date to say five years is reasonable or—and seven years is not, or seven years is reasonable and nine years is not, *it's all a continuum,* it's either all reasonable or all unreasonable. *I'm not convinced that we've reached a point that it is all appropriately admitted on this issue of intent.*[11]

In some minds a continuum which jumps a gap of ten years may be acceptable. Not in mine, however. Webster's New Collegiate Dictionary, published by Merriam, suggests that a continuum is akin to continuity, and is "something absolutely continuous and homogeneous, ... an unintentional ordered sequence." But, if reasonable and legally trained minds can differ on the judge's observation of a continuum, it simply cannot be that the judge was justified in requiring almost a half year in which to fashion that rationale by which he would, in mid-trial, declare that the preliminary hearing testimony of Jacobsen and Nelson could be repeated to the "live" jury. The preliminary hearing transcript was completed and certified to by the reporter on the 10th of December, 1981, all 851 pages spanning five days of testimony. At that time the case was no longer before the preliminary hearing magistrate, but in district court where the transcript was filed.

As noted earlier, the district judge conceded his familiarity with the contents of the transcript.

Being entirely satisfied with the accuracy of defense counsel's assertions made in the colloquy between the court and counsel at oral argument, at this point, for the benefit of the other members of the Court, and because on the direct appeal none of this was discussed in the opinions, it is believed in order to reproduce pertinent supporting portions from the clerk's record:

> This hearing held to hear the defense Motion to Dismiss Information. ·Court rendered it's decision on the preliminary transcript and found the evidence substantially supports the allegations that the death was by torture and that the person responsible for the death is the defendant. Court denied the Motion to Dismiss the Information.

Motion to Dismiss Information, Court Minutes of March 25, 1982, Clerk's Record, p. 20.

> COMES NOW, the above named defendant, by and through his attorney of record, ROBERT E. KINNEY, and respectfully moves this Court for an Order setting forth the scope and extent of testimony and evidence to be presented by SHARIE LEE DALLY, THERESA JACOBSEN and VICKI NELSON, witnesses called on behalf of the prosecution at the preliminary hearing held in this matter on November 2, 3, 4, 6, and 10, 1981.
>
> *This Motion is brought in accordance with the directive of this Court, following a hearing held on defendant's Motion to Dismiss heretofore filed, argued and presented.*

Motion in Limine, dated May 27, 1982, Clerk's Record, p. 22 (emphasis added).

> COMES NOW, GENE FRANCIS STUART, by and through his attorney of record, ROBERT E. KINNEY, and re-

---

11. This interrupted continuum over a ten year span is hardly supported by the two weeks continuum in *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979), and *State v. Sanchez,* 94 Idaho 125, 483 P.2d 173 (1971).

spectfully moves this Court for an order permitting the expenditure of public funds to hire a private investigator for purposes of discovering facts and information which defendant believes will impeach the testimony of prosecution witnesses testifying at the preliminary hearing in this cause, and which are expected to testify at trial now scheduled for October 4, 1982.

This Motion is based upon the provisions of Idaho Code Section 19–852 and upon the Affidavit of defendant's counsel annexed hereto.

DATED this 29 day of July, 1982.

/s/ Robert E. Kinney
ROBERT E. KINNEY
Attorney for Defendant

Motion for Investigative Assistance, Clerk's Record, p. 28.

Defendant not present in court but was represented by attorney, Mr. Kinney. State was represented by Mr. Calhoun. *A motion in Limine, filed by Mr. Kinney, was presented for argument. Court denied this Motion.* Court instructed that the Prosecutor and the Sheriff may undertake an investigation of criminal records of all witnesses used at the preliminary hearing.

Mr. Kinney informed the court and State that the psychiatric report from Dr. Wetzler had not been received but when it arrives, all will receive a copy of the report.

Court set date for JURY TRIAL for MONDAY, OCTOBER 4, 1982 at 9:00 A.M. and advised the defense to have all legal matters out of the way by 9–1–82. *The place for the Jury Trial will be announced at a later date.*

Court Minutes of July 15, 1982, Clerk's Record, p. 29 (emphasis added).

Defendant not present in court but was represented by his attorney, Mr. Kinney. Mr. Calhoun was present on behalf of the State.

The Court states this matter on for hearing the defendant's Motion for Investigative assistance filed on this date. Mr. Kinney was heard in support of his motion. MR. CALHOUN CONCURRED THAT IF DEFENDANT WAS TO HAVE A FAIR TRIAL, HE NEEDS AN INVESTIGATOR.

Court is prepared to grant the motion but requests defendant submit an additional Affidavit on who it will be and what the investigation is to reveal and why. Mr. Kinney stated he would need some time to prepare his demonstration and can send it in writing to Judge Schwam.

Court Minutes of July 29, 1982, Clerk's Record, p. 30 (emphasis added).

Defendant was present in court with attorney, Mr. Kinney. State was represented by Mr. Swayne. Mr. Kinney gave the court the specifics on request for payment of investigation for defendant and listed the names of those he felt would impeach witnesses Dally, Jacobsen and Nelson.

*Court findings were that not all these witnesses required investigator....* Court prefers the defense attorney attempt to contact witnesses first by telephone. *Court denies an investigator at this time* and proposes that defendant and attorney give all the information possible (on the location of prospective witnesses to be used) to the authorities.... The court will sign an order that authorities will cooperate to locate these individuals but their effort must not include any actual contact. *Mr. Kinney is to make the contact;* & prepare Order.

Mr. Kinney asks that the house involved in one incident be investigated to provide information for defense. Court allowed that the house be located and that photographs be taken for investigation.

Court Minutes of August 12, 1982, Clerk's Record, p. 31 (emphasis added).

Defendant not present in court but was represented by his attorney, Mr. Kinney. State was represented by Mr. Calhoun.

Mr. Kinney advised the court he had contacted all the witnesses but one, who had an unlisted number. Court requested that Mr. Calhoun request the unpublished number on that witness. Mr. Kinney moved that he be allowed to travel to Seattle to personally contact the witnesses at court expense. No objection by the State. *Court grants and authorizes up to $300.00 allowance for expenses of Mr. Kinney for a few days.*

**Court announced the trial, which is set for October 4, 1982, will be held in Latah County on Change of Venue. Mr. Kinney objected to the location and moved for a location of greater distance from Orofino. Denied.**

Mr. Calhoun to prepare the order on the Change of Venue location.

Court Minutes of August 25, 1982, Clerk's Record, p. 37 (emphasis added). (The list of witnesses Mr. Kinney referred to he had earlier said would be sent to the judge. The judge did not make it of record. Obviously Lynn Matieoni, who only surfaced after trial and after conclusion of the direct appeal, was not on the list.)

Defendant present in court with attorney, Mr. Kinney. State was represented by Mr. Calhoun.

Court advised a Motion to Dismiss on for hearing today. Mr. Kinney was heard in support of his motion. Court denies. *Mr. Kinney moved that the jury in the forthcoming trial be sequestered. Court denies and advised defense that after jury is picked, defense can renew the motion again. Court will rule at that time.*

Court advised of petitions in file concerning payment of witness fees for a witness at the jury trial. Petitions were all signed by Judge Haley. Mr. Calhoun explained reasons for this to the Court. Judge Schwam grants petitions and signs Order over Judge Haley's signature, indicating his ratification of same.

Motion for payment of costs to defense, filed by defense, was heard. Court requests that Mr. Kinney submit his statement of expenses incurred in investigation to the Board of County Commissioners of Clearwater County for payment and if denied, the Court will grant the motion for payment from District Court Funds.

Court Minutes of September 30, 1982, Clerk's Record, p. 44 (emphasis added). (The caprice of the judge in this regard was exposed to public view in *Stuart I* on direct appeal, but *not* in the majority opinion. *See* 110 Idaho at 190, 715 P.2d at 860.)

One would like to think that when the prosecuting attorney had the courage to advise the judge that defense counsel could not obtain a fair trial for his client without the assistance of an investigator, the prosecutor knew well that of which he spoke. For the court to persist in denying defense counsel's request, joined in by the prosecutor, displays a quality of judicial arrogance that has likely not been seen in this country since King George III chose his own English judges for the colonists or, worse yet in serious crimes, had those American colonists charged with capital offenses against the Crown transported to England. That same quality of arrogance also prevailed when venue was changed, belatedly, in this case from Orofino, Idaho, to Moscow, Idaho, as previously discussed when this Court had the direct appeal. The defendant not only did not avoid the publicity which precipitated the motion, but as in the change lost the benefit of being tried before a jury of his peers.

There may be another reported case where defense counsel was so much shortchanged by the presiding judge in a criminal case as here transpired, and as completely undermined in his efforts to render dedicated service to an accused defendant, but it has not been brought to my attention.

In sum, only if there are three members of this Court who are willing to close their eyes, can this Court affirm Judge Schilling's order denying any hearing on the

defendant's petition for post conviction relief. Too well documented is Judge Schwam's finding, prominent in his written sentencing decision, that defense counsel stipulated that the court could make use of the testimony contained in the preliminary hearing transcript.

Moreover, as to the same type of testimony which the court allowed the jury to hear at trial, it must be remembered that also was the linch-pin upon which imposition of the death penalty was fastened.

Note should also be taken, as it was in my opinion on the direct appeal from the conviction and the sentence, that the trial judge cut off defense counsel's right to request sequestration of the jury in his opening remarks to the entire panel of prospective jurors:

> In fact, this is probably as good a time as any to explain that this is a type of case in which the Defense can request that the jury be sequestered. That means that all during the trial whoever is chosen to be on the jury would have to be under the control of the bailiff at all times. That means you'd be placed in a motel and whatever you saw or heard would be censored. You'd be away from your families, you wouldn't have evenings to deal with any business matters you might have. It is, in other words, an enormous inconvenience. That's not going to happen in this case. The jury is not going to be sequestered. *I am no longer required by law to do that.*

State v. Stuart, supra, 110 Idaho at 190, 715 P.2d at 403.

The law until amended by the 1981 legislature, and prior thereto and as it had been even prior to statehood did not allow a jury in any murder case to separate after the cause was submitted to them. Judge Schwam would be the first judge to take advantage of the change in the law which became effective just two months and 19 days before the homicide in this case. Undoubtedly his announcement to the jurors placed him in high favor. The law which he did not declare to those jurors, however, placed upon a judge the onus of exercising discretion in such a matter, a circumstance also heretofore discussed. *Stuart I, supra,* 110 Idaho at 192, 715 P.2d at 863 (Bistline, J. dissenting).

Not discussed therein, however, was that the legislature, after the majority blithely had held on this point that there was "no indication that any juror was exposed to prejudicial publicity during the course of the trial," [12] at the very next ensuing session withdrew that grant of judicial discretion "in causes where the defendant has been charged with first degree murder." Ch. 145, 1987 Idaho Sess.Laws 289–290. The legislative sense clearly was that in a capital case where the awesome penalty of execution may be imposed the jury must be sequestered. What that translates into is simply this: The risk of jurors being tainted by the comments of well-meaning people is too great, especially where all of those people and probably the jurors, too, are being exposed to media publicity, which by the nature of the very beast is ordinarily attuned to the sensational.[13] Except for

12. *See* 25 pages of thoroughly devastating daily *reporting* by two local papers which were available to all kith and kin of the jurors, and friends and acquaintances as well.

13. Obviously, where defendant is charged with first degree murder, the legislature fulfilled its intent, but because of a readily apparent clerical mistake left what will be seen as a readily clarified ambiguity.

The 1981 Amendment continues to give the trial court discretion in *any* felony case to allow the jury to separate, or to be kept together. *"Any"* case, however, does not include first degree murder charges, which is treated separately by two consecutive sentences, the first of which is sound: "Provided, however, that in causes where the defendant has been charged with first degree murder, the jury may not be permitted to separate after submission of the cause. Before permitting the jury to separate after the cause has been submitted, the court shall permit counsel to place objections, if any, on the record outside the presence of the jury." 1987 Idaho Sess. Laws, 290. The second sentence is intended to deal with separating before submission. Where the word "after" appears, the word "before" was intended. Thus is

**914**

the gap, the legislatures of Idaho, Territorial and State, have recognized that in such emotional cases as first degree murder a defendant may see very little of procedural due process unless the jurors are isolated from improper influences. In Idaho's celebrated first torture murder case, so much worse was the opportunity for prejudicing the accused.

A parting shot, the statement which the prosecutor made to the judge: MR. CALHOUN CONCURRED THAT IF DEFENDANT WAS TO HAVE A FAIR TRIAL, HE NEEDS AN INVESTIGATOR. Instead, per the discretionary generosity of the trial court, no investigator was allowed and only $300 for expense money for Mr. Kinney to travel to the Seattle area for a few days of investigation on his own. This is not even a scintilla of compliance with the legislature's statutes, I.C. §§ 19–852 and 19–861, *supra*, p. 26, 27, and 28. If the actions of the trial judge in this case did not deprive the defendant of procedural due process then there will never be such a case.

### APPENDIX C

The Bistline, J., dissent to the 1990 Opinion No. 35, filed March 12, 1990, which states on its face: "1989 Opinion No. 28, issued March 10, 1989, is hereby withdrawn and this opinion is substituted therefor" deals with: (a) the variance that took place and the State's claim of defendant's procedural default, which did not take place; (b) the majority's conclusion that Stuart was responsible for invited error as to the court's instructions; (c) the proportionality as considered by the majority; and (d) the facade that the defendant stipulated to use of testimony given at the preliminary hearing:

achieved continuity with the ensuing sentence which requires the court to hear from counsel before exercising discretion.

1. *Stuart I* refers to Stuart's direct appeal, S.Ct. No. 14865. The opinions of the Court in *Stuart I* are found at 110 Idaho 163–234, 715 P.2d 833–904. *Stuart II*, S.Ct. No. 17014, refers to the

BISTLINE, Justice, dissenting.

It is now abundantly clear that the Court will issue its final opinion in the saga of *State v. Stuart,* Idaho's first torture murder case.[1] Such being the state of affairs, this prologue is written not for the benefit of my respected brethren, but as an aid for those judges in the federal system who will preside over Stuart's endeavors at obtaining in those courts a more just treatment than that dealt to him in this system. My comments are offered for the purpose of enabling our federal counterparts to better wind their way through the many pages of transcript, record, and briefs. Added to that are the opinions written on the direct appeal (*Stuart I*), and now on denial of post-conviction relief (*Stuart II*).

### THE VARIANCE AND PROCEDURAL DEFAULT

My opinion in *Stuart I* called the attention of the other four members of this Court to the highly prejudicial error in the trial court's instructions. Unquestionably there is a fatal variance between the charge of the Amended Information and the trial court's instruction to the jury:

The defendant was charged with the fatal striking of the boy *with the intent* to inflict extreme pain, or with the intent to satisfy some sadistic inclination of the defendant, but the court instructed the jury that *'It shall also be torture to inflict on a human being extreme and prolonged acts of brutality irrespective of proof of intent to cause suffering'*—language which is found in § 18–4001, but which was wholly not included in the charge upon which the defendant was put to trial.

*State v. Stuart,* 110 Idaho 163, 195, 715 P.2d 833, 865 (1985) (Bistline, J. dissenting)

March 1989 opinions of this Court on Stuart's appeal of the district court's denial of post-conviction relief. In both *Stuart I* and *Stuart II,* rehearings were requested and granted, and the case reargued, and in each the Court issued a first and second opinion.

(emphasis in original). Those justices in the majority were not in the least aroused on being alerted to the variance, which can only mean that they read what I wrote and ignored it, or, they did not bother to read it. For certain there was no response.

The opinions were issued in *Stuart I*, and a petition for rehearing was filed by Stuart's counsel. A supporting brief was thereafter filed. The brief raised five issues, one of which was the variance issue just mentioned. Counsel for Stuart set out the charging portion of the Amended Information. It alleges:

> That Gene Francis Stuart of Orofino, Idaho, on or about the 19th day of September 1981, at Orofino, in the County of Clearwater, State of Idaho, then and there being, did then and there unlawfully and feloniously kill a human being, with the *intentional application of torture* to said human being, to wit: that the said Gene Francis Stuart did strike and hit Robert Miller, a human being, repeatedly with *the intent to cause suffering or to satisfy some sadistic inclination* of the said Gene Francis Stuart, thereby inflicting great bodily injury upon Robert Miller and mortally wounding Robert Miller, from which wounds the said Robert Miller, a three year old boy, sickened and died in the County of Clearwater, State of Idaho, on the 19th day of September 1981.
>
> All of which is contrary to Section 18–4001, 18–4003 of the Idaho Code.

R., 14–15, S.Ct. No. 14865 (*Stuart I*), Amended Information (emphasis added). Defense counsel made no objection to the giving of Jury Instruction 16, which was in the exact language of the charge spelled out in the Amended Information:

### INSTRUCTION NO. 16

Ladies and Gentlemen of the Jury, you are instructed that the State of Idaho has filed a criminal information against the defendant, Gene Francis Stuart, charging him with First Degree Murder *alleg-ing that the crime was committed as follows:*

> That Gene Francis Stuart of Orofino, Idaho on or about the 19th day of September, 1981, at Orofino, in the County of Clearwater, State of Idaho, then and there being, did then and there unlawfully and feloniously kill a human being, with the intentional application of torture to said human being, to wit: that the said Gene Francis Stuart did strike and hit Robert Miller, a human being, repeatedly with the intent to cause suffering or to satisfy some sadistic inclination of the said Gene Francis Stuart, thereby inflicting great bodily injury upon Robert Miller, and mortally wounding Robert Miller, from which wounds the said Robert Miller, a three year old boy, sickened and died in the County of Clearwater, State of Idaho, on the 19th day of September, 1981.
>
> To this charge, the defendant, Gene Francis Stuart, has plead not guilty.

R., 53, *Stuart I* (emphasis added). However, the district court gave the jury another instruction in language inconsistent with the charge of the Amended Information:

### INSTRUCTION NO. 18

Murder is the unlawful killing of a human being with malice aforethought or the intentional application of torture to a human being, which results in the death of a human being. Torture is the intentional infliction of extreme and prolonged pain with the intent to cause suffering. *It shall also be torture to inflict on a human being extreme and prolonged acts of brutality irrespective of proof of intent to cause suffering.* The death of a human being caused by such torture is murder irrespective of proof of specific intent to kill; torture causing death shall be deemed the equivalent of intent to kill.

R., 55, *Stuart I* (emphasis added). Counsel for Stuart aptly remarked:

As noted by Justice Bistline, this Instruction relieved the jury from any responsibility to find proof of intent to cause suffering. It also permitted a finding of guilt if the jury found extreme and prolonged acts of brutality to have existed, despite the fact that such acts were not charged in the Amended Information, nor supported by any reasonable construction of the events which occurred September 19, 1981. Appellant readily acknowledged at trial that, on September 19, 1981, he poked young ROBERT MILLER in the chest, spanked him, and struck the blow which ultimately caused his death. The primary issue, considered both at trial and on Appeal, was not Appellant's actions, but his state of mind on September 19, 1981, the day these acts were committed. As the Trial Court indicated on pages 449–450 of the Trial Transcript, and quoted by this Court in its May 3, 1985, Opinion at pages 11–12:

> '[THE COURT ... In] this particular case, the Prosecutor *must convince the trier of fact that your client was engaged in a course of torture.* And produced this child's death, not necessarily intending death *but only intending torture* ... And so this case, to a great extent, is going to turn upon what the jury thinks was going on in your client's mind during that interval when he dealt with this child ...'

As noted above, *all parties were aware that the charge* in question *could only be supported by a showing of intent* on the part of Appellant *to cause suffering or to satisfy some sadistic inclination.* Indeed, this element of intent was considered by the Trial Court to be so important that it allowed admittedly prejudicial evidence to be presented at Trial concerning events, unrelated to the crime charged or to its victim, and which allegedly occurred as distant as ten (10) years prior to the date of ROBERT MILLER'S death. Jury *Instruction Number 18,* which *obviated any necessity of a finding of intent to cause suffering, if extreme and prolonged acts of brutality were found to have existed,* was extremely improper given the specific language of the Amended Information. It is equally apparent that, if such intent need not be proven, the propriety of allowing admittedly prejudicial evidence for purposes establishing this intent, is seriously questioned. If intent to cause suffering need not be proven, it cannot be said that the probative value of this evidence outweighed its highly prejudicial effect.

Appellant's Memorandum in Support of Petition for Rehearing in *Stuart I,* 3–5 (filed July 8, 1985) (emphasis added).

A rehearing was granted but limited to the issue of error in the giving of Jury Instruction 18. An appropriate order was entered directing the State to file a brief responsive to Stuart's brief, but only to the single issue, and Stuart was allowed to file a reply brief.

The Solicitor General, Lynn E. Thomas, authored the State's five page brief, the gist of which was that Stuart was in "procedural default:"

> The failure to raise this question in the appeal was a procedural default which precludes raising the issue not only here, but in post-conviction proceedings, *Watkins v. State,* 101 Idaho 758, 620 P.2d 792 (1980), and in the federal courts, *Wainwright v. Sykes,* 433 U.S. 72, 53 L.Ed.2d 594, 97 S.Ct. 2497 (1977).

Brief of Respondent in Response to Petition for Rehearing in *Stuart I,* 4 (filed October 21, 1985). At oral argument, "procedural default" was again urged by the Solicitor General but he ran into an obstacle in the person of Justice Shepard:

> [MR. THOMAS]: So, I think the Court should consider this to be a defaulted claim.
>
> JUSTICE SHEPARD: Mr. Thomas, let me say this. I don't want you to believe that I'm arguing it, but I want to give you my impression at the moment, and

then you either comment if you think I'm wrong, or ignore what I said and go on to your next point, which I assume you're about to do. *It seems to me that the legislature* in its wisdom or lack thereof *has said to this Court, 'Thou shalt review a death penalty case, whether there be an appeal or not.'* Right?

MR. THOMAS: *The death sentence is to be reviewed* whether there is an appeal or not, *but not other questions.*

JUSTICE SHEPARD: The legislature has said to this Court, 'You will examine the imposition of a death sentence and determine whether it is proportionate to other sentences imposed in other cases.' Something that certainly we don't expect trial courts to do and if they did it, we'd probably say they were in error in doing it. The legislature has said, 'Death penalty cases are different,' for whatever reason, on the finality if nothing else. *I don't really accept what I perceive your argument to be, that we are to apply procedural default rule in a death penalty case because counsel for the appellant did not raise the point in the initial briefing and hearing on it but has raised it now.* Now you tell me why I shouldn't think that way, Mr. Thomas.

MR. THOMAS: Well, in the context of the federal constitution, if I can start there, the United States Supreme Court seems to have emphasized several times that as far as the procedural rules are concerned, it doesn't make any difference whether the case is a capital case or another kind of case. It's important for the state to have the right to enforce its procedural rules. Otherwise, these cases can go on forever. *From a procedural point of view there isn't any difference between a capital case and another kind of case.* The legislature, in capital cases, has asked the Court to review the sentence, but not the *procedural niceties* or the procedural aspects of the case unless an appeal is brought raising those

questions specifically. I don't believe the legislation creates a procedural distinction or was intended to create a procedural distinction between capital cases and other kinds of cases. It is just as important in a capital case to insist that one be precluded from interminable litigation of new ideas thought up after the decision comes down adversely to the defendant. As I say, *if there is a real question about the reliability of the result, the accuracy of the finding of guilt or innocence, that problem may be addressed,* even under *Wainwright v. Sykes* and even under this Court's procedural rules. **The fundamental error rule, for example, would permit that even if it were defaulted.** But the procedural rules do prevent the relitigation of claims that do not cast doubt on the reliability of the result and it seems to us that that is as it should be. Otherwise, capital cases will be carried on forever when counsel comes forward with another theory that wasn't used at trial but might be successful this time around. Allowing that kind of undermining of the finality of these cases seems to me as only one possible result, and that is to undermine public confidence in the ability of the courts to enforce the law. So, both from a legal and a policy perspective, I think it would be a bad idea.

JUSTICE BISTLINE: Mr. Thomas, would I understand from your response to Justice Shepard's question is that if we had a defendant, like sometimes as Creech is and sometimes as he is not, says 'okay, I've been convicted, I don't want an appeal,' we still have to do the mandatory bit under the legislative direction. We have to do our review. And if Creech did not have a lawyer and we were doing our review, *are you saying that we would not,* besides reviewing the sentence, *look to ascertain to see that he had a fair and impartial trial?*

MR. THOMAS: Oh yes, absolutely, Your Honor. Sentence review is sentence review in the context of capital cases. The Court is to determine wheth-

er, assuming that the finding of guilt is accurate, the sentence of death was proper in the facts and circumstances of the case. But I don't believe that was an invitation to the Court to go into procedural questions or other kinds of questions relating to the admissibility of evidence of whatever that do not impact on the court's decision to impose a particular sentence.

JUSTICE BISTLINE: I'm not sure I understand. *Are you saying that we would or would not search the record* of the trial proceedings *to see if the defendant had had a fair trial?*

MR. THOMAS: I think that's correct. I think that the automatic review—

JUSTICE BISTLINE: *What's correct? That we would or would not?*

MR. THOMAS: *You would not have the authority to go beyond sentence review* which is the only thing specified *for automatic review* in the context of the capital case. It's almost inconceivable that there's not going to be an appeal in a capital case, but let us assume the defendant says I don't want an appeal. I want to be executed, such as Gary Gilmore did. The Court isn't off the hook in terms of sentence review, but it isn't entitled in those circumstances to go into the procedural and evidentiary aspects of the trial.

JUSTICE BISTLINE: *If you're correct,* then why would we require, which we do require, assuming there's no appeal by the defendant himself, *why do we require the transcript of trial proceedings?*

MR. THOMAS: Well, the transcript of the trial proceedings lays out the facts, gives the factual background of the crime. *It tells all the details relating to the crime and that's an important consideration in passing sentence* because the nature of the offense is, of course, a consideration under the capital aggravating factors that are set out in the aggra-

vating list in the statute. In fact that's the fundamental premise of those aggravating factors, how the crime was committed and the defendant's culpability in the crime.

JUSTICE BISTLINE: So you would say, in effect, that when we have an appeal in a case where the death sentence has been imposed, that any member of the Court—and there is counsel for the defendant, and we're making the mandatory review—that any member of the Court who concerns himself with a question as to the fairness of the trial that hasn't been brought up by the defendant himself is just being sort of an intermeddler, a busybody? Such as myself.

MR. THOMAS: *Not only that,* Your Honor, but I think you are saying 'and finally, forget what I have said, because this case is going over to the federal court and they'll make the decision anyway.' Because that's really what you do when you don't insist on adherence to the state's procedural rules. And I don't think that's really a good idea, because you've got on a collateral review a federal court is at least twice removed from the facts. The record becomes more attenuated. The chance of factual error becomes greater and greater and obviously the interest in finality is attenuated as well.

*Stuart I,* 110 Idaho at 231–33, 715 P.2d at 901–03 (Bistline, J. dissenting) (some emphasis in original; some emphasis added).

The justices who comprised the majority in *Stuart I* upheld both the conviction and the death sentence by relying in part on the talisman of procedural default. They have therefore yet to come to grips with the most egregious error committed by the trial court. The error may have been unintentional; however, all things considered, it more than likely was intentional. Simply put, at the end of a three week trial the court's instructions to the jury included an alternate ground for conviction which had *not* been pleaded in the Amended Information.

This Court granted a rehearing after the *Stuart I* opinion was issued specifically to address the issue of given Jury Instruction 18. After the rehearing, the Court stood on its initial opinion. Whatever might have been in the mind of the majority is still there, because the majority addressed nothing on rehearing.[2]

The majority's treatment of the *Stuart I* rehearing is similar to the treatment afforded the petitioners by the Arkansas Supreme Court in *Cole v. State of Arkansas*, 333 U.S. 196, 68 S.Ct. 514 [92 L.Ed. 644] (1948). In *Cole*, the state supreme court had affirmed the petitioners' convictions by applying a charge *not* included in the information. The *Cole* defendants were tried and convicted of violating § 2, but the state supreme court upheld their convictions under § 1 of Act 193 of the 1943 Arkansas legislature. Compounding the error, the state court:

> later denied a petition for rehearing in which petitioners argued: 'To sustain a conviction on grounds not charged in the information and which the jury had no opportunity to pass upon, deprives the defendants of a fair trial and a trial by jury, and denies the defendants that due process of law guaranteed by the 14th Amendment to the United States Constitution.'

*Cole*, 333 U.S. at 200, 68 S.Ct. at 516.

Here, a majority of this Court has decided not to consider the merits of Stuart's contention that Jury Instruction 18 varied substantially with the Amended Information. The majority must have also decided not to consider the important message the United States Supreme Court sent to the state supreme courts back in 1948:

> No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance

to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal.... It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made.

*Cole*, 333 U.S. at 201, 68 S.Ct. at 517 (citations omitted); quoted with approval in *State v. Smith*, [117] Idaho [891, 792] P.2d [916] (1990) (Bistline, J. specially concurring).

### FAILURE TO INSTRUCT AND EFFECT OF OBJECTION OR WITHDRAWAL

As suggested above procedural default must have occupied the minds of the majority in deciding *Stuart I*, because that is how Stuart's initial challenge to the jury instructions was summarily treated:

> [W]e note that appellant's counsel accepted the instructions as given by the court, and noted that he had no objection to the instructions the court intended to give. Thus, any error in failing to instruct on this charge [of a lesser included offense], if indeed one exists, was invited error and will not be considered on appeal. *State v. Lopez*, 100 Idaho 99, 593 P.2d 1003 (1979).

*Stuart I*, 110 Idaho at 170, 715 P.2d at 840.

*Lopez*, however, was discussed in my *Stuart I* opinion, under the section titled "FAILURE TO INSTRUCT," 110 Idaho at 188, 715 P.2d at 858. On page 188, my opinion laid out the complete chronological history of Rule 30. *See also State v. Eisele*, 107 Idaho 1035, 1037, 695 P.2d 420, 422 (1985) ("I.C.R. 30 as amended does not preclude assignment of error in instructing where the defendant in a criminal case fails

---

2. The full text of the majority opinion which issued following rehearing is this: "A petition for rehearing in this matter was granted and the cause reargued. The Court has reviewed the record and considered the arguments presented

by counsel, and continues to adhere to the views expressed and the conclusion reached in the earlier opinion." *Stuart I*, 110 Idaho at 227, 715 P.2d at 897.

to object to the instructions in question."). Moreover, instructing the jury in lesser included offenses is not discretionary with the court, where the evidence would reasonably support such a conviction on a lesser included offense. As our Court of Appeals has made clear:

> Idaho Code § 19–2132(b) states: 'The court shall instruct the jury on lesser included offenses when they are supported by any reasonable view of the evidence.' In *State v. Lopez*, 100 Idaho 99, 102, 593 P.2d 1003, 1006 (1979), our Supreme Court stated: 'It is clear that I.C. § 19–2132(b) makes it the duty of the trial court to instruct the jury on lesser included offenses when they are supported by a reasonable view of the evidence, *even if the court is not requested to do so*.' The same duty exists even if a defendant, for tactical reasons, expressly requests that no instruction on a lesser included offense be given.

*State v. Atwood*, 105 Idaho 315, 318, 669 P.2d 204, 207 (Ct.App.1983). The perceived procedural defaults no doubt flavored the entirety of the *Stuart II* majority opinion, making it more difficult for the justices in the majority to be at all concerned with the variance between the jury instruction and the information.

## PROPORTIONALITY TOUCHED UPON

Twenty-one years ago Justice Shepard, now recently departed, expressed the view that an appellate dissent "ordinarily occurs only when a Justice's sense of outrage overcomes his sense of inertia." *Deshazer v. Tompkins*, 93 Idaho 267, 272, 460 P.2d 402, 407 (1969). That was his first year of occupancy of a seat on the bench of the Idaho Supreme Court. The outrage which he experienced in *Deshazer* had to do with civil litigation which had been protracted over seven and one-half years. The relief Deshazer sought was for injuries to his arm. Justice Shepard closed his opinion in that case by remarking that "this case demonstrates the great truth contained in that simple statement, 'justice delayed is justice denied.'" *Deshazer*, 93 Idaho at 274, 460 P.2d at 409 (Shepard, J. dissenting).

*Stuart* is not a civil case. The stakes at issue here are somewhat higher than in *Deshazer*. Here, the statement Justice Shepard referred to in *Deshazer* may be worded thusly: "Justice denied is injustice, and injustice dealt out carelessly is outrageous enough to totally destory all sense of inertia." It has been conceded that Gene Francis Stuart, the defendant, was responsible for the death of Robert Miller. It has been conceded that he is guilty of the crime of manslaughter. It has been established that a jury convicted him of first degree torture murder. It has been equally well-established that the judge, now retired from such office, long ago sentenced Stuart to death. It is now a historical fact that on the direct appeal the conviction and the sentence were both affirmed. What has not been established and is not true is that Stuart had a fair trial on the issue of his conviction and on the issue of the imposed death sentence. As Justice Shepard has also written, the law does not guarantee an accused person a perfect trial, but it does guarantee a fair trial.

In *Stuart I*, on the direct appeal challenging the conviction and sentencing, Justice Huntley wrote a separate concurrence in order to register his view that:

> [T]he Idaho capital sentencing process is unconstitutional in two respects:
>
> (1) It does not provide for utilization of the jury, which is in violation of both the Idaho and United States constitutions; and
>
> (2) The sentencing proceeding, as conducted by the trial courts with the approval of this court, by permitting the admission of the presentence investigation report and other hearsay evidence over objection of the accused *deprives the accused of the right to cross-examine and confront witnesses.*

*Stuart I,* 110 Idaho at 177, 715 P.2d at 847 (Huntley, J. concurring specially) (emphasis added). The second of Justice Huntley's constitutional views should have been everyone's concern.

Following the rehearing in *Stuart I* a second opinion for the Court was issued, the full text of which was these two sentences: "A petition for rehearing in this matter was granted and the cause reargued. The Court has reviewed the record and considered the arguments presented by counsel, and continues to adhere to the views expressed and the conclusion reached in the earlier opinion." *Stuart,* 110 Idaho at 227, 715 P.2d at 897 (on rehearing February 20, 1986). There was no discussion whatever of the variance, which issue the Court had deemed of sufficient importance to merit being reheard and reconsidered.

In that one year interval which produced nothing in Stuart's case, two more death penalty decisions emanated from this Court, namely *State v. Windsor,* 110 Idaho 410, 716 P.2d 1182 (1985); and *State v. Scroggins,* 110 Idaho 380, 716 P.2d 1152 (1985). In each case, the death penalty was reversed and remanded for resentencing of a penalty less than death. The majority, however, saw no reason to reconsider the proportionality of Stuart's sentence in light of those two decisions. That is a sad commentary, because:

> The Court's reasoning in its *Windsor* and *Scroggins* opinions is equally applicable in *Stuart.* In *Scroggins* the child killed was but a few years older than the child killed by Stuart. The victim, by the very reason of being older, was not only killed in a manner more brutal than in *Stuart,* but was kidnapped, raped, and robbed of any vestige of human dignity before she was murdered. Worse yet, the helpless handcuffed girl was made to suffer the knowledge that she was going to be killed. Obviously, where there is such a crime as torture murder, it was more in appearance in *Scroggins* than it was here.
>
> Similarly with the *Windsor* case. Here the distinction between *Scroggins* and *Windsor* is only in the fact that the victim in the latter was not a child, but an older man who had befriended his captors, torturers, and killers.
>
> Because the legislature has insisted on proportionality, and the Court heretofore made its proportionality analysis in this case without having the benefit of the proportionality analysis it would shortly thereafter make in *Windsor* and *Scroggins,* and the district court at sentencing in *Stuart* also was without the benefit of those opinions, my vote was tendered to treat Stuart as evenhandedly as the Court dealt justice to Scroggins and to Windsor.

*Stuart I,* 110 Idaho at 228, 715 P.2d at 898 (Bistline, J. dissenting).

The Court's initial opinion in *Stuart II,* issued on March 10, 1989, denied any post-conviction relief. Today's opinion, for whatever reason, and I know of none, withdraws that opinion of one year ago.[3] The majority now has the benefit of the views of two dissenting opinions (Justice Johnson and myself), and an excellent brief by Stuart's attorney (Robert E. Kinney).

### THE FACADE THAT THE DEFENDANT STIPULATED

In Part IIA of today's *Stuart II* opinion for the Court, the majority has taken note of Stuart's contention that the trial court erred in considering preliminary hearing testimony at the sentencing hearing, but continues to deny any relief in post-conviction proceedings:

**3.** Most of my attention and effort has been directed at confronting the opinions which have been issued in this Court, which opinions, by a whim of the majority can be withdrawn. But the majority cannot withdraw my opinion. My March 1989 opinion represents *considerable* effort, and, in one view at least, it opened for display the fallacies of the majority opinion which has now been withdrawn. So that the opinions in *Stuart II* are more readily understood, I have attached as Appendix B the withdrawn March 1989 *opinions.*

The *trial court denied Stuart's claim of error* in the use of preliminary hearing testimony at sentencing, *specifically pointing out that* in Stuart's original direct appeal to this Court, *State v. Stuart*, 110 Idaho 163, 176, 715 P.2d 833, 846 (1985), that this Court had held that '[i]t *was stipulated at the sentencing hearing that* when sentencing the defendant *the court would consider evidence presented at the preliminary hearing* and trial along with the presentence investigation report.'

Majority Op., 1218–1219 (emphasis added). There is no doubting that this accurately describes Judge Schilling's[4] ruling, which was based on what Judge Schilling had read in the *Stuart I* opinion issued by this Court, and which was written by Chief Justice Bakes for the majority. Finally the majority comes face to face with what it declared to be so, but concerning which nothing could have been further from the truth:

> *It was stipulated at the sentencing hearing that when sentencing the defendant the court would consider evidence presented at the preliminary hearing and trial along with the presentence investigation report.*

*Stuart I*, 110 Idaho at 176, 715 P.2d at 847 (emphasis added). This misstatement did not go unnoticed, but was immediately questioned in my dissent to the March 1989 *Stuart II*. However, In today's *Stuart II* majority opinion Chief Justice Bakes *now*, and much belatedly, attributes the misstatement to Judge Schwam. Judge Schwam's findings in sentencing Stuart to the penalty of death are contained in the record. The excerpt from Judge Schwam's findings now relied upon in the final edition of the majority opinion in *Stuart II* is this:[5]

**4.** Judge Schwam presided over the trial and sentencing. Judge Schilling presided over the post-conviction proceedings.

**5.** Explicit reliance is placed on this passage. *See* footnote 1 to today's *Stuart II* opinion for the Court.

3. That a sentencing hearing was held on December 1st, 1982, pursuant to notice to counsel for the defendant and in the presence of the defendant the Court heard relevant evidence in aggravation and mitigation of the offense and arguments of counsel. Further, it was agreed and understood by both the State and the defendant that the Court would rely upon, as part of the sentencing hearing, the testimony at the preliminary hearing and the trial.

R., 220–21, Findings of the Court in Considering the Death Penalty (*Stuart I*). For certain Judge Schwam wrote that finding, and in doing so was perpetrating, and apparently perpetuating, what may well be the most insidious untruth in the history of Idaho criminal jurisprudence. **There was no such stipulation.**

Much effort and much time were expended in pointing out to the other members of the Court[6] in the March 1989 *Stuart II* opinions, that at the sentencing hearing:

> After the State had put on one witness, the jailer, who testified that he had observed no remorse on defendant's part, Judge Schwam ruled that he would discount [it] completely and did so by striking all of the jailer's testimony. The State presented no more witnesses. The following then took place:
>
> THE COURT: Does the defense have any witnesses?
>
> MR. KINNEY: Your Honor, in light of the fact that the State has presented no witnesses in aggravation in addition to, of course, the trial testimony, we tend to also rely on the trial and argument.
>
> THE COURT: Okay. *I gather it's the State's position that it has a right to and intends to rely upon all the cross-examination testimony elicited either*

**6.** The membership a year ago did not include Justices Boyle and McDevitt.

*at the Preliminary Hearing or the trial;* is that correct?

MR. CALHOUN: Yes, sir, that is correct.

THE COURT: Okay.

MR. KINNEY: Just a moment, please?

THE COURT: Yes.

Mr. CALHOUN: I believe I've so stated in the paperwork that I filed.

The prosecutor's statement that the *State* would rely upon preliminary testimony was just that, the *State's position.* For certain it was not the stipulation which this Court's opinion elevated it to on the direct appeal—apparently on the sole basis of Judge Schwam's finding of such a stipulation, and without anyone on this Court making an independent examination of the record in order to ascertain the validity of Judge Schwam's finding.[7]

*Stuart II,* S.Ct. No. 17014, 1989 Opinion No. 28, 19–20, filed March 10, 1989 (Bistline, J. dissenting) (emphasis in original; footnote added).

The author of the Court's majority opinion has wondered and speculated as to why it appears that the issue of Judge Schwam's utilization of the preliminary hearing transcript was not raised on the appeal in *Stuart I.* He surmises in *today's Stuart II* majority opinion that:

The reason for not raising the issue on direct appeal was no doubt because this Court, at the time of sentencing, had previously held in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), that the use of a preliminary hearing transcript at

the sentencing/aggravation/mitigation hearing was not in error, and that no formal sentencing hearing as provided in I.C. § 19–2516 had been requested.

Today's *Stuart II* Majority Op., 1219–1220. When one examines *State v. Osborn,* however, this conjecture becomes of highly doubtful validity. One only need turn to 102 Idaho at 408, 631 P.2d at 190, to discover that:

After submission of a presentence report, an aggravation-mitigation hearing was held. I.C. § 19–2515. At that hearing, neither prosecution nor defense called any witnesses. The state advised the court that 'because I think we do have a—a good record of what transpired in the preliminary hearing instead of calling witnesses today, [I choose] to rely on the testimony presented at the preliminary hearing....' Similarly, appellant's counsel relied upon the facts brought forth in the preliminary hearing and in the reports to the court, and called no additional witnesses, although the appellant did address the court in his own behalf.

*Osborn, id.* (insertion and deletion in original). *Osborn* had pled guilty to first degree murder. The most that can be made of *Osborn* is that counsel for the defendant and for the state entertained the same thought—that some favor might be gained from the sentencing judge if he were not burdened with having to hear live witnesses regarding the commission of the crime.[8]

A holding, said to be attributable to *Osborn* "that no formal sentencing hearing as provided in I.C. § 19–2516 had been requested" was *not* a holding, but was only a reason for purporting to justify what was *the* holding in *Osborn* that the use of a

---

7. As stated in footnote 3 to my dissent in the March 1989 *Stuart II:*
   By the nature of things we naturally rely upon the justice who has drawn the case to correctly portray the record. Otherwise, all five of us would have to painstakingly read all of the appeal records and transcripts—an exercise which time constraints do not allow.
   It may have been noted that on occasion, of which this is one, I do so notwithstanding that the responsibility is not mine in the first place.

When one perceives gross prejudicial misstatements in a majority opinion, the only answer is either to get to work or get out of the kitchen.

8. The defendant, in addressing the court in his own behalf, did so in the exercise of his traditional right of allocution and not as a witness. The right of allocution is now contained in the Court promulgated Idaho Criminal Rule 33.

preliminary hearing transcript was not, under the circumstances *there* present, prejudicial error.[9] Nevertheless, utilizing *Osborn*, the majority rules Stuart out of court:

> Stuart's claim now, *that he did not stipulate* at the sentencing hearing *for the use of preliminary hearing testimony, comes too late.* Stuart should have raised the issue by petitioning for rehearing of our decision in *Stuart I*, the direct appeal. The trial court did not err in rejecting Stuart's post conviction claim on the issue of the use of preliminary hearing testimony at sentencing.

Today's *Stuart II* Majority Op., 1235 (emphasis added; footnote omitted).

The majority no longer insists that there was such a stipulation. That is understood. Instead the majority's author perforce switches to holding that Stuart forfeited that issue by not requesting a rehearing of the initial *Stuart I* opinion released on May 3, 1985:

> Our holding in *Stuart I* that the parties had 'stipulated' to the use of the preliminary hearing testimony in the sentencing proceeding was based upon the finding of the trial court in the December 1, 1982, sentencing hearing in which the trial court found, 'Further, it was agreed and understood by both the state and the defendant that the court would rely upon, as part of the sentencing hearing, the testimony at the preliminary hearing and the trial.' There is nothing in the record to demonstrate that Stuart ever questioned the finding, either before the trial court by way of motion for reconsideration, or on appeal to this Court in *Stuart I*. After the issuance of our opinion in *Stuart I* in which we held, based upon the trial court's finding, that the parties had stipulated to the use of the preliminary hearing testimony in the sentencing proceeding, ***the defendant Stuart***

***did not petition this Court for rehearing in order to question either the trial court's finding or this Court's holding that Stuart had stipulated*** to the use of the preliminary hearing testimony at the sentencing hearing.

Today's *Stuart II* Majority Op., 1219 n. 1 (emphasis added). Quaere, will this cause wonderment among the trial judges and the experienced practitioners of criminal law? First, it was initially declared that defense counsel had so stipulated, but when that thought was discarded, the claim became that Stuart should have moved for a rehearing on first seeing in the May 1985 opinion that he had so stipulated. This is manifestly unfair, because Chief Justice Bakes was the first Supreme Court Justice ever to write that Stuart's counsel had stipulated. First, Judge Schwam's misstatement had been accepted by Chief Justice Bakes at face value, with no showing of any resort to the court reporter's transcript. Second, the record is voluminous and somewhat convoluted, but it is not all that difficult to peruse. And third, why is it that the reader has been left with the inference from the majority opinion that Stuart did not petition for a rehearing, said to be the proper remedy? The answer is that Stuart did do so, and he raised the very issue Chief Justice Bakes later asserts should have been raised. (*See* Appendix A.)

It now appears that the Court's March 1989 *Stuart II* opinion has been withdrawn in order to erase from sight the glaring untruth of the stipulation which never was. But withdrawing an opinion cannot strike or erase from memory the apparent, indifferent carelessness with which the opinion was written. This is not fun time, but serious business. While to some these thoughts may come across as being a bit on the strong side, one cannot help but stand wholly aghast at what would be happening here if Bistline, J., too, were gone from the appellate scene along with Justices Shepard, Donaldson, and Huntley.

---

**9.** *Osborn* at best stands for little. An aberration, there has not been a second such case where counsel at sentencing implicitly stipulated to the admission of a preliminary hearing transcript.

Chief Justice Bakes has, by lot, inherited all of the *Stuart* appeals. It is disheartening to be placed in the position of telling an experienced and capable appellate justice that he should have had more regard for the record. By comparison, no practicing attorney handling criminal defenses could have done any more (at great personal and financial cost) than did Robert Kinney in his attempts at seeing that Stuart was at least dealt with fairly. Mr. Kinney attempted to get the Court concerned about Judge Schwam's misuse of the preliminary hearing testimony but was turned away empty handed. Continuing that same effort, Mr. Kinney in post-conviction relief proceedings presented to the district court the absolutely irrefutable assignment of error that Stuart *had not*, in person or by counsel, stipulated to the use of the preliminary hearing transcript. Again defense counsel was turned away. Judge Schilling read that Chief Justice Bakes, with three justices joining his opinion, had ruled in *Stuart I* that Stuart *had so stipulated.* Because of the doctrine of the law of the case, the district court was powerless to say otherwise,[10] even though the fact of the matter was as plain to see as the proverbial nose on Dooley's face. Attached hereto as Appendix A is Part III of Mr. Kinney's brief supporting the petition for rehearing in *Stuart I,* which he *did* timely file.

### APPENDIX D

Being an illustration of how highly pertinent parts of the majority opinion in *Stuart II* (Petition for Post-conviction relief) have been drastically changed, thereby circumventing Stuart's challenges to the majority's ever-changing opinions. The first opinion was issued March 10, 1989. A year later it was withdrawn and the Court issued a new opinion of March 12, 1990. Today it is being withdrawn. Those parts which have been changed are Part II and Part IIA, and a new part which has been added is Part III.

In the majority's March 1990 opinion Part III was added. As written in the March 1990 Opinion Part III of today's October 1990 majority opinion is identical.

PART II and IIA of the March 1989 opinion read:

### II

Stuart argues that three separate grounds existed for the district court to grant a hearing on his petition for post conviction relief. Those grounds are (A) the use of preliminary hearing testimony for purposes of sentencing; (B) Stuart's claim that his rights were violated by plea bargaining negotiations; and (C) newly discovered evidence which was raised by the four affidavits submitted to the district court. We will deal with each of these in turn.

### A.

*Use of Preliminary Hearing Testimony*

Stuart argues first that he raised a material issue of fact relating to the improper use of preliminary hearing testimony by the trial court at the time of sentencing. First, we note that under Idaho's Uniform Post–Conviction Procedure Act all post conviction relief actions must be brought pursuant to the statutory grounds set forth in I.C. § 19–4901. The statute specifically provides that "[a]ny issue which could have been raised on direct appeal, but was not, is forfeited and may not be considered in post conviction proceedings, unless it appears to the court, on the basis of a

---

**10.** *See Ada County Highway Dist. v. Smith,* 113 Idaho 878, 880, 749 P.2d 497, 499 (Ct.App.1988), citing with approval to *Suitts v. First Sec. Bank of Idaho, N.A.,* 110 Idaho 15, 21–22, 713 P.2d 1374, 1380–81 (1985). The operation of the doctrine requires that (in further proceedings in a case which after appeal has been remanded) the lower courts are not at liberty to disregard the answer to any question upon which the higher court has spoken and ruled. The higher court itself is not so constrained. A district court cannot be so independent and thoughtful.

substantial factual showing by affidavit, deposition or otherwise, that the asserted basis for relief raises a substantial doubt about the reliability of the finding of guilt and could not, in the exercise of due diligence, have been presented earlier." I.C. § 19–4901(b). *See State v. Beam,* [115] Idaho [208, 766] P.2d [678] (1988). *See also Palmer v. Dermitt,* 102 Idaho 591, 635 P.2d 955 (1981); *Kraft v. State,* 100 Idaho 671, 674, 603 P.2d 1005, 1008 (1979); *Hernandez v. State,* 100 Idaho 581, 602 P.2d 539 (1979); *Potter v. State,* [114] Idaho [612, 759] P.2d [903] (Ct.App. 1988).

In this case the validity of Stuart's sentence was considered by this Court in his direct appeal, and no issue regarding the use of the preliminary hearing testimony in the sentencing proceeding was raised, no doubt because this Court, at the time of sentencing, had previously held in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), that the use of a preliminary hearing transcript at the sentencing/aggravation/mitigation hearing is not error. Accordingly, the trial court did not err in denying an evidentiary hearing on Stuart's claim that error was committed in the use of preliminary hearing testimony in Stuart's sentencing. *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981).

Part II and IIA of the March 1990 opinion read:

## II

Stuart argues that three separate grounds existed for the district court to grant a hearing on his petition for post conviction relief. Those grounds are (A) the use of preliminary hearing testimony for purposes of sentencing; (B) Stuart's claim that his rights were violated by plea bargaining negotiations; and (C) newly discovered evidence which was raised by the four affidavits submitted to the district court. In the rehearing granted by this Court on June 12, 1989, Stuart raises for the first time the issue of whether or not there was a proper weighing of the mitigating circumstances against *each* of the aggravating circumstances as required in our April 4, 1989, opinion in *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989). We will deal with each of these in turn.

### A.

### *Uses of Preliminary Hearing Testimony*

Stuart argues that the trial court committed fundamental error by considering preliminary hearing testimony in finding, at the sentencing hearing, that statutory aggravating circumstances had been proven beyond a reasonable doubt. The trial court denied Stuart's claim of error in the use of preliminary hearing testimony at sentencing, specifically pointing out that in Stuart's original direct appeal to this Court, *State v. Stuart,* 110 Idaho 163, 176, 715 P.2d 833, 846 (1985), that this Court had held that '[i]t was stipulated at the sentencing hearing that when sentencing the defendant the court would consider evidence presented at the preliminary hearing and trial along with the presentence investigation report.' Furthermore, the trial court relied upon our decision in *State v. Osborn,* 104 Idaho 809, 663 P.2d 1111 (1983), in which this Court upheld the use of preliminary hearing testimony in sentencing in a death penalty case. Furthermore, the district court noted that the petitioner himself 'intend[ed] to rely on trial testimony and argument, and was not demanding strict compliance with the live testimony formality of I.C. § 19–2516.' *State v. Coutts,* 101 Idaho 110, 113, 609 P.2d 642, 645 (1980) ('[I]n the absence of an explicit request for the formal hearing contemplated by I.C. § 19–2516, the court may reach its sentencing decision by receiving the unsworn formal statements presented by both sides, together with the presentence report and arguments of the respective counsel.' (Emphasis omitted.)). For all these reasons,

the district court rejected Stuart's claim of fundamental error in the use of the preliminary hearing testimony.

We agree with the district court that Stuart is foreclosed from raising the issue of the use of preliminary hearing testimony at sentencing because of our decision in *Stuart I.* In *Stuart I,* the direct appeal, the validity of Stuart's death sentence was considered by this Court, and no issue regarding the use of the preliminary hearing testimony in the sentencing proceeding was raised. Nor did Stuart file a petition for rehearing from our decision in *Stuart I* contesting our finding that '[i]t was stipulated at the sentencing hearing that when sentencing the defendant the court would consider evidence presented at the preliminary hearing and trial along with the presentence investigation report.' *State v. Stuart,* 110 Idaho at 176, 715 P.2d at 846. The reason for not raising the issue on direct appeal was no doubt because this Court, at the time of sentencing, had previously held in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), that the use of a preliminary hearing transcript at the sentencing/aggravation/mitigation hearing was not error, and that no formal sentencing hearing as provided in I.C. § 19–2516 had been requested. Stuart's claim now, that he did not stipulate at the sentencing hearing for the use of preliminary hearing testimony, comes too late. Stuart should have raised the issue by petitioning for rehearing of our decision in *Stuart I,* the direct appeal.[1] The trial court did not err in rejecting Stuart's post conviction claim on the issue of the use of preliminary hearing testimony at sentencing.

---

[1] Our holding in *Stuart I* that the parties had 'stipulated' to the use of the preliminary hearing testimony in the sentencing proceeding was based upon the finding of the trial court in the December 1, 1982, sentencing hearing in which the trial court found, 'Further, it was agreed and understood by both the state and the defendant that the court would rely upon, as part of

the sentencing hearing, the testimony at the preliminary hearing and the trial.' There is nothing in the record to demonstrate that Stuart ever questioned the finding, either before the trial court by way of motion for reconsideration, or on appeal to this Court in *Stuart I.* After the issuance of our opinion in *Stuart I* in which we held, based upon the trial court's finding, that the parties had stipulated to the use of the preliminary hearing testimony in the sentencing proceeding, the defendant Stuart did not petition this Court for rehearing in order to question either the trial court's finding or this Court's holding that Stuart had stipulated the use of the preliminary hearing testimony at the sentencing hearing.

Part II and IIA of the October 1990 opinion read:

## II

Stuart argues that three separate grounds existed for the district court to grant a hearing on his petition for post conviction relief. Those grounds are (A) the use of preliminary hearing testimony for purposes of sentencing; (B) Stuart's claim that his rights were violated by plea bargaining negotiations; and (C) newly discovered evidence which was raised by the four affidavits submitted to the district court. In the rehearing granted by this Court on June 12, 1989, Stuart raises for the first time the issue of whether or not there was a proper weighing of the mitigating circumstances against *each* of the aggravating circumstances as required in our April 4, 1989, opinion in *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989). We will deal with each of these in turn.

### A.

#### *Uses of Preliminary Hearing Testimony*

Stuart argues that the trial court erred by considering preliminary hearing testimony at the sentencing hearing. This issue was not raised by Stuart in his direct appeal, *State v. Stuart,* 110 Idaho 163, 715 P.2d 833 (1985). Nonetheless, Stuart alleges that the error is 'fundamental' and can be raised at any time.

The trial court in this case considered testimony from the transcript of the preliminary hearing, relying upon our decision in *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), which upheld the use of preliminary hearing testimony in sentencing in a death penalty case. The Court in *Osborn* based its decision on our earlier decision in *State v. Coutts*, 101 Idaho 110, 609 P.2d 642, 645 (1980), which held that 'in the absence of an explicit request for the formal hearing contemplated by I.C. § 19–2516, the court may reach its sentencing decision by receiving the unsworn formal statements presented by both sides, together with the presentence report and arguments of the respective counsel.' The district court noted that Stuart did not make any explicit request for a formal hearing contemplated by I.C. § 19–2516, and that Stuart himself 'intend[ed] to rely on trial testimony and argument, and was not demanding strict compliance with the live testimony formality of I.C. § 19–2516.' We conclude that under *State v. Osborn* and *State v. Coutts*, the use of a preliminary hearing transcript at the sentencing/aggravation/mitigation hearing was not error where no formal sentencing hearing as provided in I.C. § 19–2516 had been requested.[1]

---

[1] The trial court in its post conviction decision also denied Stuart's claim, specifically pointing out that in Stuart's original direct appeal to this Court, *State v. Stuart*, 110 Idaho 163, 176, 715 P.2d 833, 846 (1985), this Court had held that "[i]t was stipulated at the sentencing hearing that when sentencing the defendant the court would consider evidence presented at the preliminary hearing and trial along with the presentence investigation report." In *Stuart I*, the direct appeal, the validity of Stuart's death sentence was considered by this

1. Two aberrational exceptions were *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1985), and *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985). As to why I use the word "aberrational," one need only see my dissenting opinions in those cases. But, of more convincing persuasion, if such is needed, one should read the opinion of the Hon. Edward Lodge, District

Court, and no issue regarding the use of the preliminary hearing testimony in the sentencing proceeding was raised. Nor did Stuart file a petition for rehearing from our decision in *Stuart I* contesting our statement that "[i]t was stipulated at the sentencing hearing that when sentencing the defendant the court would consider evidence presented at the preliminry hearing and trial along with the presentence investigation report." *State v. Stuart*, 110 Idaho at 176, 715 P.2d at 846. We need not decide whether it is now too late for Stuart to question the trial court's post conviction finding that it was stipulated at the sentencing hearing that the court could consider evidence presented at the preliminary hearing. Under our prior decisions in *State v. Osborn* and *State v. Coutts*, the trial court did not err in considering the preliminary hearing testimony.

**BISTLINE, Justice, dissenting on Denial of Petition for Rehearing.**

As the Court has done far too often in the past, once again it has buried the opinion which it delivered earlier, six months ago, and replaced it with a new opinion. This Court's opinions are not sent to West Publishing Company for publication until completely final, meaning that either the time for filing petitions has expired, or, that a rehearing has been granted upon which the Court has acted. As a consequence of this practice, the trial bench and bar of Idaho, and the federal courts which will review our decisions in habeas corpus proceedings are kept uninformed as to how this Court's *final* decision evolved and what grossly prejudicial errors have been committed in achieving the inevitable result—routinely affirming death penalty sentences.[1]

The appeal and statutorily required automatic review of the death sentence imposed upon Stuart was commenced some months before May 3, 1985, the day a majority of this Court upheld the ultimate penalty. The number of days that Stuart has been isolated in solitary confinement awaiting

Judge of the Third Judicial District, and now United States District Judge for the District of Idaho, in which he wrote in recusing himself from further participation in either case after this Court reversed the sentences which he imposed in the *Windsor* case and in the *Scroggins* case.

execution as of this date stands at 1970.[2] The Court's initial opinion on the direct appeal is published at 110 Idaho 163, 715 P.2d 833. Therein the Court, in upholding the conviction and the sentence, found no error in the trial court's use at sentencing evidence which had been presented at the preliminary hearing:

> It was stipulated at the sentencing hearing that when sentencing the defendant the court would consider evidence presented at the preliminary hearing and trial along with the presentence investigation report.

*State v. Stuart*, 110 Idaho at 176, 715 P.2d at 847. My dissent in the March 1990 *Stuart* opinion pointed out that there was *not* such a stipulation, which was clearly and directly contrary to the sentencing judge's (and this Court's) assertion. This Court held that there *was* a stipulation, and relied on such stipulation as a main predicate of the Court's opinion.

Today, approximately five years or 1970 days later, the Court no longer indulges in restating the assertion of the stipulation, although six short months ago it did so:

### A.

#### *Use of Preliminary Hearing Testimony*

Stuart argues that the trial court committed fundamental error by considering preliminary hearing testimony in finding, at the sentencing hearing, that statutory aggravating circumstances had been proven beyond a reasonable doubt. *The trial court denied Stuart's claim of error in the use of preliminary hearing testimony at sentencing, specifically pointing out that in Stuart's original direct appeal to this Court, State v. Stuart, 110 Idaho 163, 176, 715 P.2d 833, 846 (1985), that this Court had held that '[i]t was stipulated at the sentencing hearing that when sentencing the defendant the court would consider evidence presented at the preliminary*

*hearing* and trial along with the presentence investigation report.' Furthermore, the trial court relied upon our decision in *State v. Osborn*, 104 Idaho 809, 663 P.2d 1111 (1983), in which this Court upheld the use of preliminary hearing testimony in sentencing in a death penalty case. Furthermore, the district court noted that the petitioner himself 'intend[ed] to rely on trial testimony and argument, and was not demanding strict compliance with the live testimony formality of I.C. § 19–2516.' *State v. Coutts*, 101 Idaho 110, 113, 609 P.2d 642, 645 (1980) ('[I]n the absence of an explicit request for the formal hearing contemplated by I.C. § 19–2516, the court may reach its sentencing decision by receiving the unsworn formal statements presented by both sides, together with the presentence report and arguments of the respective counsel.' (Emphasis omitted.)). For all these reasons, the district court rejected Stuart's claim of fundamental error in the use of the preliminary hearing testimony.

We agree with the district court that Stuart is foreclosed from raising the issue of the use of preliminary hearing testimony at sentencing because of our decision in *Stuart I*. In *Stuart I*, the direct appeal, the validity of Stuart's death sentence was considered by this Court, and no issue regarding the use of the preliminary hearing testimony in the sentencing proceeding was raised. *Nor did Stuart file a petition for rehearing* from our decision in *Stuart I* contesting our finding that '[i]t was stipulated at the sentencing hearing that when sentencing the defendant the court would consider evidence presented at the preliminary hearing and trial along with the presentence investigation report.' *State v. Stuart*, 110 Idaho at 176, 715 P.2d at 846. The reason for not raising the issue on direct appeal was no doubt because this Court, at the time of sentencing, had previously held in *State v. Osborn*, 102

---

**2.** As of September 24, 1990, the number of days   is 1970.

Idaho 405, 631 P.2d 187 (1981), that the use of a preliminary hearing transcript at the sentencing/aggravation/mitigation hearing was not error, and that no formal sentencing hearing as provided in I.C. § 19–2516 had been requested. Stuart's claim now, that he did not stipulate at the sentencing hearing for the use of preliminary hearing testimony, comes too late. Stuart should have raised the issue by petitioning for rehearing of our decision in *Stuart I,* the direct appeal. The trial court did *not err in rejecting* Stuart's post conviction claim on the issue of the use of preliminary hearing testimony at sentencing.[3]

March 1990 *Stuart II* (footnote omitted) (emphasis added).

Today, the pattern changes. Claim is no longer made that Stuart's counsel stipulated to the use of the preliminary hearing testimony at the sentencing. Instead, the use of that testimony is said to be supported by the *Osborn* case and the *Coutts* case. Today the Court says the following:

### A.

### *Use of Preliminary Testimony*

Stuart argues that the trial court erred by considering preliminary hearing testimony at the sentencing hearing. This issue was not raised by Stuart in his direct appeal, *State v. Stuart,* 110 Idaho 163, 715 P.2d 833 (1985). Nonetheless, Stuart alleges that the error is 'fundamental' and can be raised at any time.

The trial court in this case considered testimony from the transcript of the preliminary hearing, relying [in part] upon our decision in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), which upheld the use of preliminary hearing testimony in sentencing in a death penalty case. The Court in *Osborn* based its decision on our earlier decision in *State v. Coutts,* 101 Idaho 110, 113, 609 P.2d 642, 645

(1980), which held that 'in the absence of an explicit request for the formal hearing contemplated by I.C. § 19–2516, the court may reach its sentencing decision by receiving the unsworn formal statements presented by both sides, together with the presentence report and arguments of the respective counsel.' The district court noted that Stuart did not make any explicit request for a formal hearing contemplated by I.C. § 19–2516, and that Stuart himself 'intend[ed] to rely on trial testimony and argument, and was not demanding strict compliance with the live testimony formality of I.C. § 19–2516.' We conclude that under *State v. Osborn* and *State v. Coutts,* the use of a preliminary hearing transcript at the sentencing/aggravation/mitigation hearing was not error where no formal sentencing hearing as provided in I.C. § 19–2516 had been requested.

At 867–868, 801 P.2d at 1218–1219 (withdraws 1990 Opinion No. 35, filed March 12, 1990) (footnote omitted).

*Osborn* and *Coutts* have never properly stood, until now, for the proposition that use of a preliminary hearing transcript at sentencing is appropriate whenever the Supreme Court makes an erroneous finding that the parties stipulated to such use. In fact, if one reads *Osborn* it becomes obvious that *both parties agreed to the use of the preliminary hearing transcript.* And, if one reads *Coutts,* one will realize that *Coutts* never discusses, let alone mentions, preliminary hearings or transcripts of preliminary hearings.

In *Coutts,* the Court held that the sentencing judge may consider "the unsworn formal statements presented by both sides, together with the presentence report and arguments of the respective counsel." 101 Idaho at 113, 609 P.2d at 645. *Coutts* does *not* stand for the proposition that a transcript of the preliminary hearing may be used at sentencing without the consent of

---

**3.** *Stuart* need not have raised that contention in his petition for rehearing in view of the fact that the issue had already been inserted into the case

by my dissent, based upon an irrefutable conclusion which flowed from reading the transcript. Stuart *did* file a petition for rehearing.

the defendant, and the citation to *Coutts* by *Osborn* does in no way change this fact.

Like the finding by the Court that the parties had stipulated to the use of the preliminary hearing "evidence" at sentencing, the Court's finding that the jury must have concluded that Stuart intended to make the victim suffer is less than credible. As the Court stated:

> [A]lthough murder by torture does not require a showing of an intent to kill, making the crime unique, it does require a showing of the intent to torture, or the intent to inflict great pain and suffering upon the victim. *The jury in this case found that such an intent was present,* and that factual finding is supported by substantial competent evidence.

110 Idaho at 176, 715 P.2d at 846 (emphasis added).

The jury was *not* required by their instructions to find such intent before convicting Stuart of first degree torture murder. As one instruction to the jury plainly states:

### INSTRUCTION NO. 18

Murder is the unlawful killing of a human being with malice aforethought or the intentional application of torture to a human being, which results in the death of a human being. Torture is the intentional infliction of extreme and prolonged pain with the intent to cause suffering. *It shall also be torture to inflict on a human being extreme and prolonged acts of brutality* irrespective of proof of intent to cause suffering. The death of a human being caused by such torture is murder irrespective of proof of specific intent to kill; torture causing death shall be deemed the equivalent of intent to kill.

110 Idaho at 187, 715 P.2d at 857 (Bistline, J. dissenting) (emphasis added). This instruction is patterned after I.C. § 18–4001, the statutory definition of murder. The definition includes a definition of torture

which requires no proof *of an intent to cause suffering!* ("It shall also be torture to inflict on a human being extreme and prolonged acts of brutality irrespective of proof of intent to cause suffering.")

For a majority of the Court, in the face of the plain language contained in Jury Instruction 18, to "find" that the jury found that Stuart possessed the requisite intent for torture murder, is preposterous. According to the instructions presented to the jury, there was no need for them to find any intent on the part of Stuart. *All they needed to find was that Stuart inflicted extreme and prolonged acts of brutality.* However, this *was not* the charge of the information upon which he was put to trial where his life was at stake. This was fundamental error of the most glaring kind—for three obvious reasons.

First, no finding was ever required by the jury that Stuart intended the deceased to suffer. This directly contradicted the Court's assertion that "[t]he jury in this case found that such an intent was present...." Second, as was already highlighted:

> [T]he legislative abolition of intent in its alternative definition of murder by torture is clearly in conflict with the first definition, that which was properly adopted from the California Supreme Court. and also in headlong conflict with I.C. § 18–114: 'In every crime or public offense there must exist a union, or joint operation, of act and intent, or criminal negligence.' Under the following section, § 18–115, intent or intention may be established by circumstances, but it has always been required.

110 Idaho at 196, 716 P.2d at 866 (Bistline, J. dissenting). Third, Stuart was charged by the Amended Information with committing torture murder, *i.e.,* intending "to cause suffering or to satisfy some sadistic inclination...." R., 14–15, S.Ct. No. 14865 (*Stuart I,* 110 Idaho 163, 715 P.2d 833). This charge does not coincide with the jury instructions which were at variance from the charge of the information. Similar to

the defendant in *State v. O'Neill,* 118 Idaho 244, 796 P.2d 121 (1990), Stuart was held to answer (by the jury instructions) to something distinctly different than he was charged with in the information.[4] Stuart's conviction resulted from grossly erroneous instructions, clearly necessitating a second trial which hopefully will be free of any such numerous prejudicial errors replete in this record. Such gross fundamental error should not be allowed to stand in any criminal trial, but especially not in a capital case.

---

**4.** Unlike Stuart, O'Neill opted to plead guilty, so that case never got to a jury.